**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| OLD NATIONAL BANK, | ) | |
| | ) | Case No. _____ |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| SARAH ADAMS, KASEY BERNU, | ) | |
| YVETTE CAMPBELL, KIMBERLY | ) | |
| ELLINGSON, RACHAL JOHNSON, | ) | |
| MICHAEL MCCONKEY, SHARON | ) | |
| VOLD, DANIEL YANTES, and | ) | |
| BELL BANK, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Old National Bank ("ONB" or "Old National"), for its Complaint against

Defendants, Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal

Johnson, Michael McConkey, Sharon Vold, Daniel Yantes (together, the "Former

Employees"), and Bell Bank, states as follows:

## THE NATURE OF THIS ACTION

1. This lawsuit arises from a calculated and unlawful scheme by Bell Bank and

eight former Old National employees to orchestrate the *en masse* resignation of senior bank

personnel from two ONB branches (in Brainerd and Baxter, Minnesota) and to immediately

transfer those employees, along with ONB's confidential information and customer

relationships, to Bell Bank.

2. The scheme was designed to cause maximum disruption to Old National's

operations. Every senior business and commercial banking employee at ONB's Brainerd

1

location simultaneously resigned on the morning of Monday, December 8, 2025, forcing ONB to shutter the branch.

3.      That same morning – at the same time – the key personnel at ONB's Baxter branch suddenly and simultaneously resigned, forcing ONB to shut down operations in the bank lobby of that branch.

4.      The coordination among and between the Defendants is obvious and was deliberate, and could only have been accomplished through weeks (if not months) of careful planning between them – all while the Former Employees were still employed as senior bank personnel at, and owed the utmost fiduciary duty of loyalty to, ONB.

5.      The Former Employees jointly drafted their resignation letters (many of which contained identical typographical errors), several of which were addressed to Yvette Campbell ("Campbell"), a co-conspirator who also resigned.  One of the senior bank employees assumed a leadership role in this *coup d'etat*, writing in her resignation email on behalf of the group, "our badges and corp credit cards are in our desks" – proof positive that the group planned in advance to walk out simultaneously.

6.      Video surveillance footage from ONB's Brainerd and Baxter branches shows each of the Former Employees entering their branch office in the early morning hours of December 8, 2025, prior to the start of business hours.  That same surveillance footage shows the Former Employees removing several boxes of documents and materials from their branch (many requiring multiple trips), without any opportunity for inspection by ONB's HR Department or corporate security personnel.

7.    Within hours, Bell Bank had positioned the Former Employees in roles to service the very same customers they had handled at ONB.  On the same day as the mass resignation, ONB's clients, such as Cedarbrook Lumber, were actively solicited to move their business to Bell Bank, based on the rationale that ONB no longer had a branch presence in the Brainerd-Baxter area, and was incapable of servicing their banking needs.

8.    The reputational and financial damage to ONB did not stop there.  From their new posts at Bell Bank, the Former Employees have been actively calling ONB's top bankers and trying to convince them to leave ONB and join them at Bell Bank.  Indeed, before the dust had even settled from the Former Employees' abrupt departure from ONB, an employee at ONB's Baxter branch received a promise that "Bell Bank would have a position for you in the near future," as well as a position for at least one more ONB mortgage banker.

9.    The development of successful branch locations in the Brainerd-Baxter market required decades of hard work and investment by Old National's predecessor-in-interest, Bremer Bank.

10.    Bell Bank does not currently have a footprint in that market; however, upon information and belief, Bell Bank is in the process of opening its first branch in Brainerd, Minnesota.  Rather than investing the time, effort, and money required to develop a successful branch over time, Bell Bank's "strategic shortcut" involved poaching an entire branch of senior bank personnel from Old National.  Using this strategy, Bell Bank would obtain the immediate benefit of hiring a knowledgeable and well-trained staff of professionals; equally important, the coordinated mass exodus of ONB's key personnel

would severely damage (if not destroy) its competitor. This is precisely the type of conduct that constitutes "unfair competition."

11.     Defendants executed their planned raid of ONB's branches on December 8, 2025. The very next day, on December 9, 2025, Old National tried to resolve this matter by sending (via email and overnight delivery) cease-and-desist letters, which asked each Former Employee to affirm in writing – by December 12, 2025 – that he/she:

     a. had returned to ONB, and did not knowingly possess, any of ONB's confidential information;

     b. had not used or disclosed to Bell Bank any of ONB's confidential information; and

     c. would not use, or disclose to Bell Bank, any confidential information for the purpose of soliciting ONB's employees or customers.

12.     Unfortunately – and tellingly – the Former Employees have refused to provide the requested assurances to ONB. Left with no other choice, ONB now brings this lawsuit to redress the serious and ongoing harm it has suffered. Defendants' actions violate federal and state trade secret laws, violate unfair competition laws, breach fiduciary and confidentiality duties, and otherwise amount to tortious interference, civil conspiracy, aiding and abetting, and unjust enrichment. ONB seeks injunctive relief, damages, and all other appropriate remedies to stop this misconduct, protect its rights, and hold Defendants accountable.

## THE PARTIES

13.     ONB is a nationally-chartered bank headquartered in Evansville, Indiana and Chicago, Illinois. It operates bank branches and provides commercial, retail, and

4

investment banking services throughout the Midwest, including in the State of Minnesota. ONB is the successor-by-merger to Bremer Bank, N.A., with the merger effective May 1, 2025.

14.    Bell Bank is a North Dakota state-chartered banking corporation with its corporate headquarters located in Fargo, North Dakota. Bell Bank's principal place of business at which its high-level officers direct, control, and coordinate its activities is also located in Fargo, North Dakota. Bell Bank transacts business in this District and purposefully avails itself of the privileges of conducting business here.

15.    Kimberly Ellingson ("Ellingson") is an individual formerly employed as Credit Systems Director, Executive Vice President at ONB's Brainerd, Minnesota branch. She is currently employed by Bell Bank. Ellingson resides in Pequot Lakes, Minnesota and is a citizen of Minnesota.

16.    Rachal Johnson ("Johnson") is an individual formerly employed as Treasury Management Consultant III, Vice President at ONB's Brainerd branch. She is currently employed by Bell Bank. Johnson resides in Nisswa, Minnesota and is a citizen of Minnesota.

17.    Sharon Vold ("Vold") is an individual formerly employed as a Senior Commercial Banking Specialist at ONB's Brainerd branch. She is currently employed by Bell Bank. Vold resides in Little Falls, Minnesota and is a citizen of Minnesota.

18.    Campbell is an individual formerly employed as Business Banking Relationship Manager IV, Vice President at ONB's Brainerd branch. She is currently

5

employed by Bell Bank. Campbell resides in Baxter, Minnesota and is a citizen of Minnesota.

19. Michael McConkey ("McConkey") is an individual formerly employed as Business Banking Relationship Manager III, Vice President at ONB's Brainerd branch. He is currently employed by Bell Bank. McConkey resides in Brainerd, Minnesota and is a citizen of Minnesota.

20. Daniel Yantes ("Yantes") is an individual formerly employed as Business Banking Relationship Manager III, Vice President at ONB's Brainerd branch. He is currently employed by Bell Bank. Yantes resides in Pequot Lakes, Minnesota and is a citizen of Minnesota.

21. Sarah Adams ("Adams") is an individual formerly employed as Community Banking Market Manager at ONB's Baxter, Minnesota branch. She is currently employed by Bell Bank. Adams resides in Pequot Lakes, Minnesota and is a citizen of Minnesota.

22. Kasey Bernu ("Bernu") is an individual formerly employed as a Relationship Banker II at ONB's Baxter branch. She is currently employed by Bell Bank. Bernu resides in Baxter, Minnesota and is a citizen of Minnesota.

**JURISDICTION AND VENUE**

23. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because ONB asserts claims arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

24. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states. ONB is a citizen of Indiana. Bell Bank is a citizen of North

6

Dakota. Each Former Employee is a citizen of Minnesota. Each Defendant is, therefore, diverse from ONB.

25. This Court has supplemental jurisdiction over ONB's state law claims under 28 U.S.C. § 1367 because those claims are so related to ONB's federal claims that they form part of the same case or controversy.

26. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to ONB's claims occurred in the District of Minnesota, including in Brainerd and Baxter, Minnesota.

27. The Court has personal jurisdiction over each Defendant because each Defendant resides in, does business in, or committed wrongful acts in Minnesota that caused injury to ONB in this District.

## FACTUAL BACKGROUND

### A. Summary of Key Facts

28. In a period of time spanning less than 24 hours, ONB suffered a sudden and catastrophic loss of senior personnel from its Brainerd and Baxter branches. The departures were not isolated or coincidental; they were the result of a coordinated, pre-planned scheme carried out by Bell Bank and the eight Former Employees.

29. On Sunday, December 7, 2025, McConkey submitted his resignation from ONB's Brainerd branch. The following morning, on December 8, 2025, five other senior banking professionals from that branch (Ellingson, Johnson, Vold, Campbell, and Yantes), who collectively managed upwards of $200,000,000 in commercial and business banking relationships, resigned simultaneously.

7

30.     That same day, two additional employees from ONB's Baxter branch (Adams and Bernu) also resigned.

31.     The departures were carefully timed and executed.   In her 7:43 a.m. resignation email, Campbell wrote, "Our badges and corp credit cards are in our desks," thereby confirming that the group planned in advance to walk out early Monday morning before ONB could respond.

32.     The resignation letters also indicated coordination among the departing employees.   Both resignation letters from the Baxter branch contained the same typographical anomalies: both were dated "December 8th,2026" with superscript, no space after the comma, and the wrong year.   One of the Brainerd resignation letters was also incorrectly dated December 8, 2026, suggesting coordination between the branches.

33.     Video surveillance footage from ONB's Brainerd and Baxter branches shows each of the Former Employees: (a) entering their branch offices in the early morning hours of December 8, 2025, prior to the start of business hours; (b) removing several boxes of documents and materials from their branch; and (c) once the Former Employees had finished taking whatever they wanted from the branch – without any opportunity for inspection by ONB's HR Department or corporate security personnel – the Former Employees walked out of ONB together as a single unit.

34.     The coordinated resignations left ONB's Brainerd branch without sufficient staff to operate.  Although some tellers remained, they were stunned by the mass exodus of senior leadership and, without management, they were unable to continue bank operations.  Accordingly, an impromptu "closed" sign was placed on the entrance door,

and the branch was shuttered.  In the Baxter branch, bank operations in the lobby were similarly forced to close due to insufficient staffing.

35.   Within hours of their coordinated resignations, all eight departing employees began working at Bell Bank, which seeks to compete with ONB in the Brainerd-Baxter market.

36.   The Former Employees had access to, and intimate knowledge of, ONB's most sensitive information – including nonpublic customer contact details, account data, credit analyses, pricing information, and employee performance metrics.  Shortly after – and potentially before – their departure, the Former Employees began misusing this confidential, trade secret information for the solicitation of ONB customers and the recruitment of ONB personnel.

37.   ONB has confirmed, for instance, that on the day of her departure, Campbell reached out to Cedarbrook Lumber (a longstanding customer of ONB in Aitkin, Minnesota), informed it that a team of ONB employees was moving to Bell Bank, and solicited Cedarbrook Lumber to move its accounts and business to Bell Bank (as ONB no longer had a presence in Brainerd).

38.   The Former Employees have been similarly soliciting other customers of ONB to move their accounts and business to Bell Bank.

39.   In addition, ONB has learned that Ellingson, from her new position at Bell Bank, has been calling ONB's top bankers and soliciting them to resign and join Bell Bank, thereby continuing the campaign to strip ONB of its workforce.

40.    Before the dust had settled from the Former Employees' departure, one bank employee at ONB's Baxter branch received a communication from one of the Former Employees, promising that Bell Bank would have a position for her – as well as another mortgage banker – in the near future.

41.    On information and belief, the other Former Employees have also been soliciting ONB's workforce on behalf of Bell Bank.

42.    On December 9, 2025, ONB sent cease and desist letters to Bell Bank and the eight Former Employees, demanding a halt to further misconduct and the return of all ONB property and information.  The letters requested sworn affidavits of compliance from each Former Employee, confirming, among other things, that they have not stolen ONB's trade secrets and they do not intend to improperly solicit ONB's customers or employees. The Former Employees have simply ignored those letters.

43.    Defendants have caused significant operational disruption, reputational harm, and economic loss to ONB – harm which is ongoing.  This lawsuit seeks to stop that conduct, protect ONB's confidential information and workforce, and recover damages caused by Defendants' coordinated and unlawful scheme.

**B.    <u>ONB Invests in Confidential Customer Relationships</u>**

44.    ONB, like its predecessor, Bremer Bank, has made substantial investments in building, maintaining, and protecting its customer relationships across Minnesota, including in the Brainerd and Baxter markets.  These investments include hiring and training skilled banking professionals, developing customized financial solutions, and delivering services tailored to the needs of commercial, small business, and retail clients.

10

45. Because of these investments, ONB maintains longstanding, valuable relationships with its commercial and consumer banking clients, including customers serviced by its Brainerd and Baxter branches. These relationships are essential to ONB's ongoing business operations, profitability, and goodwill in the communities it serves.

46. ONB's value proposition is not based solely on competitive rates or products. It rests heavily on the depth and continuity of its customer relationships, the institutional knowledge developed over time, and the nonpublic customer information gathered and used by ONB to serve its clients effectively. The resulting customer goodwill is among ONB's most important and valuable business assets.

47. ONB relies on its relationship managers, commercial bankers, and other frontline personnel to serve as stewards of this goodwill. These employees often develop deep working relationships with customers and serve as ONB's primary interface with those clients. But the customer relationships belong to ONB (not the employee), and are backed by ONB's brand, systems, credit approvals, and institutional knowledge. These relationships are carefully managed to ensure consistency and retention over time.

48. The success of ONB's Brainerd and Baxter branches was built on years of work to develop these relationships and gather sensitive customer data to serve those customers effectively.

49. In the ordinary course of business, ONB compiles and maintains detailed, nonpublic information about its customers – individually and in the aggregate – that is highly confidential and proprietary to ONB. This confidential information includes, but is not limited to:

11

a. The names and identifying information of ONB customers, including each customer's status as:

    i. a financial services customer generally (i.e., a person or entity who needs, wants to receive, or has previously received banking, loans, treasury management services, or similar financial services), and

    ii. a current or former customer of ONB specifically;

b. The contact information of ONB customers, including their mailing addresses, email addresses, and telephone numbers;

c. Personal identification information about customers, such as their birthdays, social security numbers, and names of family members;

d. Customer business and financial information, including:

    i. information about their accounts, such as: account numbers, account structures, balances, lending histories, signatories, and beneficiaries;

    ii. information about their lending needs, financial plans, and income;

    iii. credit profiles, pricing and profitability data, internal relationship notes, and strategic banking recommendations.

e. Customer lists and other compilations, in whole or in part, of the information set forth in (a)-(d), above.

50. This information is not shared outside ONB, is not available to the public, and cannot be readily compiled from public sources.

51. ONB's confidential information was developed over a substantial period of time, and at great expense. Indeed, the vast majority of ONB's customer information took several years and hundreds of thousands of dollars to obtain and compile.

52. ONB derives substantial economic value from its confidential information. The information is invaluable in its own right; it is the "lifeblood" of ONB without which it could not operate.

12

53.     Equally important, the confidential information also derives substantial economic value from its confidentiality; the information is valuable *precisely because* it is available only to ONB, and is not generally known by other banks in this highly competitive industry.

54.     ONB's confidential information would be of tremendous value to its competitors, who could use it to unfairly poach ONB's customers.  For example:

   a.     The information would allow a competitor to *immediately* identify entities with banking, treasury management, or particular lending needs. The competitor would be spared the significant costs, both temporal and monetary, that ONB incurred to develop this information.

   b.     With knowledge of the customer's contact information, the competitor could send targeted solicitations directly to those entities.

   c.     Armed with foreknowledge of the customer's credit profile and financial needs, the competitor could (i) perfectly tailor their marketing efforts for each individual customer; and (ii) undercut ONB's rates.

55.     The Former Employees – now at Bell Bank – are actively leveraging their knowledge of ONB's customer base, including relationship status and account profiles, to target key accounts and solicit a migration of business to Bell Bank.  This conduct not only jeopardizes ONB's customer relationships, it undermines the confidentiality and trust that ONB's clients place in the bank.  Indeed, the use of confidential ONB information to solicit ONB's customers threatens to convert ONB's hard-earned goodwill and data into a competitive weapon against it.

**C.     ONB's Proprietary Employee Information Is Confidential**

56.     ONB also maintains and protects proprietary internal employee information that is not publicly known and derives independent value from its confidentiality.

13

57.    This confidential employee information includes, but is not limited to: internal performance rankings, compensation structures and bonus formulas, incentive program metrics, employee role assignments, individual and team-level productivity reports, succession planning documents, and designations of "key," "high potential," or otherwise strategically-important employees.

58.    This information is compiled and maintained by ONB at substantial expense and is accessible only to select ONB personnel with a legitimate need to know, such as senior management, human resources officers, and executive leadership.

59.    The secrecy of ONB's employee information is critical to its competitive position.  If a competitor were to obtain ONB's compensation and incentive data, internal rankings, or high-potential employee lists, it could selectively target ONB's top performers and undercut ONB's talent retention strategy.  Any unauthorized acquisition, use, or disclosure of such information by competitors or departing employees would cause substantial competitive harm.

**D.    <u>ONB Protects the Secrecy of Its Confidential Information</u>**

60.    ONB takes the protection of its confidential, proprietary, and trade secret information seriously and implements multiple layers of safeguards to ensure that such information remains secure and inaccessible to unauthorized individuals, including competitors.

61.    ONB limits access to sensitive customer and employee information to personnel with a legitimate business need to know, and access is protected through multiple layers of technological, physical, and procedural safeguards.  Confidential customer data

14

(such as contact lists, relationship histories, internal notes, pricing strategies, and account analytics) and internal personnel and business data (including performance reports, compensation structures, team rankings, strategic plans, and succession analyses) is stored on secure, password-protected platforms that are encrypted.  Access rights to internal systems and databases are role-based and are restricted through secure login credentials, multi-factor authentication, and regular monitoring of access logs.

62.  ONB maintains internal policies and procedures governing the handling of confidential information.  These include written policies on data privacy, acceptable use, information security, and internal confidentiality obligations.  All employees are expected to comply with these policies as a condition of employment and are trained on the importance of confidentiality and data protection.  Employees are prohibited from copying or transferring this data to external devices, sending it to personal email accounts, or otherwise removing it from ONB's secure environment.

63.  In addition to its written compliance policies and procedures, ONB has also developed, implemented, and maintains security measures to safeguard its confidential information.  More specifically:

    a.  All of ONB's computers, networks, and information accounts are password protected.  Users are required to regularly change their passwords, and remote access is restricted (and, where permitted, requires dual-factor authentication).

    b.  Computer, network, and email activity is closely monitored.  ONB utilizes electronic safeguards that automatically flag any employee who attempts to forward an email message to their personal account, or who tries to download information or files to an electronic storage device (e.g., a USB "flash drive") or cloud-based storage account (e.g., "Dropbox," "Google Drive," etc.).

c.     ONB branch locations are equipped with automatic locks requiring "keycard" access, and are monitored via 24-hour video surveillance.

d.     Upon separation of employment (for any reason) employees are required to immediately return all ONB property (including laptops, keycards, and any paper copies of files), and their ability to access any computers, networks, or information accounts is terminated.

64.     As a matter of practice and procedure, when a team member's employment with ONB is terminated (either voluntarily or involuntarily), the departing employee is required to promptly return any and all documents and electronic files that constitute or contain confidential information. ONB also makes a point of reminding the departing employee of his or her ongoing obligations to maintain the confidentiality of, and never use or disclose, any confidential information that they may have obtained or developed, or to which they may have otherwise been privy, during the course of their employment with ONB.

65.     ONB's confidentiality safeguards are not merely formalities; they are integral to protecting its competitive position, maintaining customer trust, and complying with legal obligations under state and federal law. ONB has invested considerable resources in developing and maintaining these protocols and enforcing compliance throughout the organization.

**E.     The Former Employees Access ONB's Confidential Information**

66.     Each of the eight Former Employees held key positions of trust and responsibility within ONB's Brainerd and Baxter, Minnesota branches. In those roles, they had direct access to highly sensitive and confidential customer, employee, and operational information integral to ONB's business.

16

67. Ellingson served as Credit Systems Director and Executive Vice President at ONB. She had enterprise-level visibility into ONB's credit practices, risk frameworks, customer portfolios, and strategic credit decisions. Ellingson had regular access to sensitive internal data, including, for instance, customer profitability reports, credit exposure summaries, loan performance analytics, and proprietary scoring models.

68. Johnson held the position of Treasury Management Consultant III and Vice President at ONB. Johnson worked closely with business clients to structure deposit, liquidity, and cash management solutions. She had access to detailed customer account structures, balances, cash flow histories, and internal relationship notes. Johnson also participated in pricing discussions and retention strategies for ONB's most significant treasury clients.

69. Vold was a Senior Commercial Banking Specialist at ONB. She played a central role in servicing and administering ONB's commercial loan and deposit accounts. Vold had access to and knowledge of ONB's internal documentation regarding credit facilities, collateral, customer relationship histories, and operational procedures.

70. Campbell held the title of Business Banking Relationship Manager IV, Vice President at ONB. She was a senior business banker responsible for originating, growing, and managing complex business relationships. She had direct access to ONB's customer relationship management (CRM) systems, lending files, internal customer notes, and pricing and profitability data.

71. McConkey served as a Business Banking Relationship Manager III and Vice President at ONB. McConkey held responsibilities similar to Campbell's, managing a

17

portfolio of business customers and contributing to ONB's commercial banking efforts. His role required knowledge of customers' financial structures, lending terms, and business plans.

72.     Yantes was also a Business Banking Relationship Manager III and Vice President at ONB, working closely with ONB's business clients in the Brainerd area.  He had visibility into ONB's customer base, account strategies, and market positioning. Yantes used ONB's proprietary data systems to manage his portfolio and coordinate with internal teams.

73.     Adams held the position of Community Banking Market Manager at ONB's Baxter branch.  Adams was a senior officer responsible for customer acquisition, community engagement, and team leadership.  Her role gave her access to internal sales reports and customer metrics.

74.     Bernu was a Relationship Banker II at ONB's Baxter branch.  While more junior, Bernu was still entrusted with confidential customer and account-level information. Bernu was privy to customer financial data, onboarding procedures, and internal system workflows necessary to support relationship managers and banking operations.

75.     Through their respective positions, all Former Employees were entrusted with access to ONB's secure internal systems, including its CRM platforms, loan origination and servicing systems, internal reports, customer profiles, account histories, and internal employee assessments.  They used these tools not only to manage client relationships, but also to collaborate across departments and deliver ONB's financial services under strict confidentiality obligations.

18

76.     Because of their seniority and their job functions, many of the Former Employees had knowledge of ONB's strategic business plans, marketing initiatives, and potential expansion opportunities within the Brainerd and Baxter markets.  They were regularly exposed to confidential team performance data, incentive structures, and internal forecasts, none of which are available to ONB's competitors or the public.

77.     This deep familiarity with ONB's customer and personnel infrastructure made the Former Employees uniquely positioned to damage ONB's business if they misused or disclosed what they learned while employed.

**F.     The Former Employees Coordinate a Simultaneous Defection to Bell Bank**

78.     On December 8, 2025, six senior employees of ONB's Brainerd, Minnesota branch simultaneously submitted resignation letters and immediately departed their roles.  These individuals included Ellingson, Johnson, Vold, Campbell, McConkey (who submitted his resignation the day before, on Sunday, December 7, 2025), and Yantes.  On the same day, two additional employees – Adams and Bernu – from ONB's Baxter, Minnesota branch also submitted their resignations.

79.     These departures were not isolated or coincidental.  The uniform timing, and similar language and formatting of resignation letters – several of which were addressed to another resigning employee, Campbell – could only have been accomplished through careful planning and coordinated efforts.  Multiple letters contained identical dating errors and identical typos (e.g., "December 8th,2026"), reinforcing that they were drafted in consultation with one another, even across the two branches.

19

80.     The coordination extended beyond resignation letters.  Campbell's 7:43 a.m. resignation email stated: "Our badges and corp credit cards are in our desks," revealing a plan to simultaneously resign at the start of business hours in order to maximize operational disruption and minimize ONB's opportunity to prepare a response.

81.     Although a few non-officer employees (e.g., branch tellers) remained at the Brainerd location, the simultaneous resignation of senior branch leadership – including commercial bankers, treasury consultants, and leadership – forced ONB to close the Brainerd branch.  A "Closed" sign was posted on the door, necessitated by the abrupt and calculated resignations of the key personnel.

82.     The Baxter branch was similarly impacted.  Though the drive-through remained operational, the resignation of both the Market Manager and Relationship Banker required the immediate closure of the lobby to customers.

83.     All the Former Employees began working immediately for Bell Bank, which seeks to directly compete with ONB in the Brainerd-Baxter region.  This same-day employment transition could not have occurred without weeks (or even months) of planning, pre-resignation communications, and coordination amongst the Former Employees and Bell Bank, including offers of employment and onboarding arrangements made while the Former Employees were still employed by – and owed the utmost fiduciary duty of loyalty to – ONB.

84.     The Former Employees' collective action was designed to destabilize ONB's operations in the Brainerd and Baxter markets and create the appearance of a sudden and total collapse of ONB's presence in the region.  The purpose and effect of the coordinated

resignations were not only to damage ONB's business operations but also to facilitate an immediate transfer of customer relationships, employee goodwill, and institutional knowledge from ONB to Bell Bank. Subsequent events confirm this strategy: customers, including Cedarbrook Lumber in Aitkin, were promptly contacted and asked to move their accounts to Bell Bank; key employees who remained at ONB were solicited; and confidential internal knowledge – such as top-performer rankings and client portfolios – is being used to further Bell Bank's competitive position.

85.     The orchestration of the resignations, the overnight shift to a competitor, the disruption of branch operations, and the swift post-resignation solicitations were not independent acts. Rather, they are part of a calculated campaign – planned jointly by the departing employees and Bell Bank – to harm ONB's business and divert its customers, talent, and goodwill.

## G.     Defendants Target ONB's Customers

86.     At least two of the Former Employees retained, transferred, or otherwise misappropriated ONB's confidential and trade secret information – either before or immediately after their resignations – and are using it on Bell Bank's behalf. The nature and speed of Bell Bank's outreach to ONB customers and recruitment of ONB employees cannot be otherwise explained.

87.     Cedarbrook Lumber, located in Aitkin, Minnesota, is a long-standing and valued commercial customer of ONB. Cedarbrook's business relationship with ONB is based on years of personalized service and confidential financial insight maintained by ONB's relationship managers. Almost immediately after departing ONB and joining Bell

21

Bank on December 8th, Campbell contacted Cedarbrook Lumber, informed it that a team of ONB employees was moving to Bell Bank, and solicited Cedarbrook Lumber to move its accounts and business to Bell Bank – in part, because ONB ostensibly no longer has a presence in Brainerd, and is therefore unable to serve their needs.

88.     The decision to target this particular business, so soon after the mass resignations, illustrates the disclosure and use of ONB's internal and confidential customer information (and appears timed to exploit the disruption caused by the resignations). Cedarbrook Lumber was not publicly identified as an ONB customer.  In addition, ONB's customer-specific data concerning Cedarbrook – including credit exposure, fee structures, contact history, and relationship strategy – was confidential and was developed and maintained by ONB at considerable expense.  Neither Bell Bank nor the Former Employees could have obtained such information through lawful, public means.

89.     The solicitation of Cedarbrook is not an isolated occurrence, but a demonstrable example of the kind of targeting Bell Bank has undertaken in the wake of the coordinated resignations – relying on improperly-retained information and relationships that belong to ONB.  The other Former Employees are also soliciting, or coordinating the solicitation of, other ONB customers on behalf of Bell Bank.

90.     ONB did not authorize the use or disclosure of its trade secrets or confidential information by the Former Employees or by Bell Bank.  Their acquisition and use of this information for competitive purposes was neither consented to nor legally permissible.

91.     The misappropriation of ONB's trade secrets and confidential data has caused and continues to cause immediate, irreparable harm to ONB, including the loss of

22

customer goodwill, disruption of ongoing business relationships, exposure of internal business strategies, and dilution of the competitive advantage ONB spent years developing.

92.    The misappropriation also undermines the trust that ONB's customers and employees place in the Bank to safeguard sensitive information – a trust that ONB carefully cultivates through substantial investments in confidentiality and information security.

93.    Absent injunctive relief, ONB faces continued erosion of customer trust, diversion of key accounts, loss of longstanding banking relationships, and irreparable harm to its competitive standing in the communities it serves.

**H.    Defendants Target and Solicit ONB's Key Employees**

94.    In addition to soliciting ONB customers, Bell Bank and the Former Employees have initiated an aggressive campaign to solicit current ONB employees – particularly top-performing bankers and relationship managers – to leave ONB and join Bell Bank.

95.    ONB has learned that Ellingson has been actively calling ONB's most valuable bankers from her new position and soliciting their employment at Bell Bank. On information and belief, the other Former Employees are also soliciting, or coordinating the solicitation of, other ONB employees on behalf of Bell Bank.

96.    These recruiting efforts are not occurring in a vacuum. They are part of a deliberate strategy by Bell Bank to continue the scheme initiated by the mass resignations at ONB's Brainerd and Baxter branches. Rather than a series of coincidental, post-employment networking contacts, the outreach to ONB employees is better understood as

the next coordinated step in a broader campaign to dismantle ONB's Brainerd-area workforce and siphon away its talent.

97.     The Former Employees possess detailed, nonpublic knowledge about ONB's current employees, including performance levels, compensation structures, career goals, and management evaluations.  That information – compiled and maintained by ONB for internal use – gives Bell Bank a substantial and unfair advantage in targeting employees for defection.

98.     These solicitation efforts were discussed, planned, and coordinated between and amongst the Defendants for weeks (or months) before the Former Employees had resigned, when they were still employees at – and owed the utmost fiduciary duty of loyalty to – ONB.  Bell Bank's participation in these discussions are an extension of the Former Employees' breaches of duty and further evidence of Bell Bank's knowing participation in a broader plan to poach ONB's workforce.

99.     This conduct constitutes tortious interference with ONB's employment relationships, misuse of confidential information, and an ongoing threat to ONB's workforce stability.  Absent injunctive relief, ONB faces continued loss of key personnel, diminished morale among remaining employees, and permanent damage to its ability to serve customers and compete in the market.

**I.     Bell Bank's Scheme to Cripple ONB from Within**

100.     The coordinated mass resignation of ONB's Brainerd and Baxter branch employees was not a spontaneous or employee-driven event – it was orchestrated with, encouraged by, and designed to benefit Bell Bank.  Bell Bank knowingly induced,

facilitated, and capitalized on this effort to cripple ONB's operations and capture its customer base, personnel, and goodwill in the region.

101. Bell Bank hired all eight Former Employees effective immediately upon their resignations. Such rapid onboarding, particularly for senior banking roles, requires advance planning, internal approvals, and coordination – steps that necessarily occurred while the Former Employees were still employed by ONB and in breach of their fiduciary obligations.

102. Bell Bank is now actively encouraging the Former Employees to solicit ONB customers and staff.

103. Bell Bank's actions go far beyond normal, lawful competition. This is not a case of independent job-switching or arms-length recruitment. Bell Bank has leveraged its resources, recruiters, and infrastructure to stage a calculated raid on ONB's personnel and client relationships, using ONB insiders as instruments of the scheme.

104. The pattern and timing of the solicitations – following immediately on the heels of a coordinated branch raid – demonstrates that Bell Bank is directing or endorsing the effort as part of a deliberate strategy to weaken ONB's competitive position.

105. By knowingly encouraging ONB employees to breach their fiduciary and confidentiality duties, coordinating their resignations, onboarding them *en masse*, and using them to solicit ONB's employees and customers, Bell Bank has positioned itself not as a passive employer, but as a central architect and beneficiary of an unlawful scheme.

25

**J.    Defendants' Scheme Harms ONB**

106.    As a direct and proximate result of Defendants' coordinated and unlawful conduct, ONB has suffered, and continues to suffer, substantial harm, both financial and reputational.

107.    The abrupt, coordinated resignation of nearly the entire leadership and business banking staff from ONB's Brainerd and Baxter branches – engineered and executed by Bell Bank and the Former Employees for weeks – has caused immediate, material harm to ONB's operations, goodwill, and customer relationships in the region.

108.    These closures caused the immediate loss of branch revenue, including lost fee income, missed commercial and consumer lending opportunities, and lost deposits. These losses will continue to mount every day that ONB's Brainerd and Baxter branches remain understaffed.

109.    ONB has also incurred and will continue to incur substantial recruitment and training expenses to replace the departed employees – many of whom were seasoned professionals with deep institutional knowledge and long-standing client relationships. Recruiting, hiring, and training new employees to replace the Former Employees will cost ONB several hundred thousand dollars. ONB expects that onboarding and ramping up new personnel to equivalent levels of productivity and trust will take months, if not longer, further compounding ONB's losses.

110.    In addition, ONB has incurred significant costs associated with emergency operational planning, customer communication, and crisis management efforts necessary to mitigate reputational damage in the affected communities.

26

111.   ONB has also suffered harm to its goodwill and standing in the Brainerd and Baxter markets.  The sudden closure of ONB's local branches caused customer confusion, concern, and distrust.  These closures created a public perception that ONB is not committed to the Brainerd and Baxter markets.  This perception was worsened by the fact that departing employees, acting in coordination, left without advance notice.  Customers arriving for in-person banking found their branches shuttered with a "Closed" sign, and their long-standing bankers suddenly unreachable.  The fact that those same employees then reappeared at a competing bank created the appearance of instability at ONB (and continuity at Bell Bank), compounding the competitive disadvantage.

112.   Further, the loss of institutional knowledge, confidential business intelligence, and key customer and employee relationships cannot be easily replaced.  The departed employees were entrusted with proprietary information about ONB's clients, internal strategies, pricing structures, performance rankings, incentive plans, and other sensitive material that, once misused, confers a permanent unfair advantage to competitors.

113.   ONB is also incurring substantial attorneys' fees and internal costs to investigate Defendants' misconduct, preserve evidence, assess potential legal claims, and seek judicial relief to prevent further harm.

114.   The harm to ONB is irreparable and ongoing.  The disclosure or misuse of ONB's confidential information – such as customer data, internal employee evaluations, and strategic business planning – once revealed or exploited, cannot be "undone."  Competitive harm flowing from that disclosure will continue to ripple through the market,

undermining ONB's ability to retain customers and employees even if damages are later awarded.

115.    Similarly, the ongoing solicitation of ONB employees and customers risks permanent loss of key talent, disruption of team continuity, customer confusion, and irreversible damage to ONB's goodwill.  Courts recognize that such harms – especially when perpetrated through the misuse of insider knowledge – are not compensable through monetary damages alone.  These are intangible assets that, once lost, cannot be fully restored.  Indeed, these coordinated acts – resignations, customer solicitations, employee targeting, and misuse of ONB's confidential information – threaten to permanently erode ONB's customer base, institutional knowledge, and competitive standing.  ONB has no adequate remedy at law to redress this type of ongoing and threatened misconduct of Bell Bank and the Former Employees.

116.    Without immediate injunctive relief, ONB faces the prospect of continued poaching of its workforce, misappropriation of its confidential and trade secret information, and a cascading loss of customer relationships – all of which would cause long-term and unquantifiable damage that cannot be rectified through a damages award alone.

117.    Defendants' conduct was willful, malicious, and exhibited a deliberate disregard for the rights of ONB, its employees, and its customers.  Defendants' acts were not the result of mistake, accident, or mere negligence, but instead reflect intentional wrongdoing and a conscious disregard of ONB's legal rights.

## COUNT I
## Misappropriation of Trade Secrets – The Defend Trade Secrets Act
### (*Against All Defendants*)

118.   ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 of this Complaint as if fully set forth herein.

119.   Defendants' actions, as described above, constitute violations of one or more provisions of the Defend Trade Secrets Act ("DTSA").  The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).  The DTSA further provides that "a court may grant an injunction – to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable…." 18 U.S.C. § 1836(b)(3)(A).

120.   By engaging in the conduct described above, Defendants have misappropriated, threaten to misappropriate, or inevitably will misappropriate ONB's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

121.   The trade secret information to which the Former Employees had access and which came into their possession includes, but is not limited to, confidential customer banking information (customers' deposit and loan account numbers; account balances and transaction histories; information concerning customers' deposit, loan, line-of-credit, and overdraft products; customers' fee, overdraft, and rate-concession histories), confidential relationship information (customers' contact information; their status as customers of

29

ONB; the particular mix of products and services each customer uses; customers' service preferences, cash-flow patterns, and borrowing needs), and compilations of such information (branch- and banker-specific customer lists, call sheets, and pipeline or sales reports identifying existing and prospective customers and cross-sell opportunities).

122.   ONB is the owner of that trade secret information because it is the legal entity in which rightful legal or equitable title to the trade secrets is reposed.

123.   ONB expended substantial time, energy, money, and ingenuity in compiling this information based on its own efforts and communications with clients, prospective clients, employees, prospective employees, and others.

124.   The trade secrets derive independent economic value and benefit from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic benefit from the disclosure or use of the information by using such information to poach ONB's valuable customers and employees.

125.   ONB has taken reasonable measures to keep this information secret.  As described more fully above, it has promulgated privacy and confidentiality policies; it has implemented both electronic and physical protections to keep the information secret; and it requires employees with access to the information to sign confidentiality agreements.

126.   ONB communicated these trade secrets to the Former Employees in confidence.

127.   As set forth above, the Former Employees (and Bell Bank by virtue of its employment of the Former Employees and its actions of obtaining client information from them) misappropriated, threaten to misappropriate, or inevitably will misappropriate

ONB's trade secrets by, among other thing, disclosing the identities of ONB's customers and employees, along with their contact information, to Bell Bank, and then using that information to unfairly compete with ONB. The Former Employees did so without the express or implied consent of ONB.

128. At the time of disclosure and use, the Former Employees: (a) knew that their knowledge of the trade secret information was acquired under circumstances giving rise to duties to maintain the secrecy of the trade secret information and limit its use, and (b) their disclosure to Bell Bank, or their use on their own accord or on behalf of Bell Bank, constituted a breach of their duties to maintain the secrecy of that confidential information, not disclose it to anyone other than ONB, and not use it for their own benefit or for the benefit of any other person or entity (other than ONB).

129. The Former Employees intended to convert, or inevitably will convert, the trade secrets to the economic benefit of themselves and Bell Bank, without ONB's consent, for use while at Bell Bank. The Former Employees and Bell Bank can obtain economic value for the disclosure and use of ONB's trade secrets, for example, by utilizing the information therein to solicit, attempt to induce, and induce ONB's clients and employees to switch their business from ONB to Bell Bank.

130. Bell Bank acquired, received and possesses, or inevitably will acquire, receive and possess, the trade secrets, knowing same to have been misappropriated without ONB's authorization and in violation of the Former Employees' duties to ONB.

131. At the time Bell Bank acquired the trade secret information from the Former Employees, Bell Bank knew and/or had reason to know that their use and disclosure of that

31

information to (and for the benefit of) Bell Bank constitutes: (a) intellectual property theft by the Former Employees, (b) a breach by the Former Employees of their duties to ONB and their customers to maintain the secrecy of the information, and (c) an inducement by Bell Bank of the Former Employees' breach of duties to ONB and its customers to maintain the secrecy of the information.

132.   Bell Bank used the trade secret information provided by the Former Employees and, at the time Bell Bank used the trade secret information that the Former Employees had provided, Bell Bank knew and/or had reason to know that they had acquired the trade secret information during the course of their employment with the ONB, under circumstances giving rise to duties to maintain the secrecy of the information and limit its use.

133.   The misappropriation of these trade secrets has caused substantial harm to ONB, including the erosion of customer relationships, the poaching of key employees, and the loss of competitive business intelligence, customer relationships, and business expectancies.

134.   As a consequence of the foregoing, ONB has suffered and will continue to suffer irreparable harm, injury and loss. Under the DTSA, actual or threatened misappropriation can be enjoined.  If not enjoined, ONB will continue to suffer irreparable harm.

**COUNT II**
**Misappropriation of Trade Secrets – The Minnesota Uniform Trade Secrets Act**
(*Against All Defendants*)

135.   ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 of this Complaint as if fully set forth herein.

136.   Defendants' misappropriation of the proprietary business and personnel information described above also violates the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01, subd. 5.

137.   The trade secret information to which the Former Employees had access and which came into their possession includes, but is not limited to, confidential customer banking information (customers' deposit and loan account numbers; account balances and transaction histories; information concerning customers' deposit, loan, line-of-credit, and overdraft products; customers' fee, overdraft, and rate-concession histories), confidential relationship information (customers' contact information; their status as customers of ONB; the particular mix of products and services each customer uses; customers' service preferences, cash-flow patterns, and borrowing needs), and compilations of such information (branch- and banker-specific customer lists, call sheets, and pipeline or sales reports identifying existing and prospective customers and cross-sell opportunities).

138.   ONB is the owner of that trade secret information because it is the legal entity in which rightful legal or equitable title to the trade secrets is reposed.

33

139.   ONB expended substantial time, energy, money and ingenuity in compiling this information based on its own efforts and communications with clients, prospective clients, employees, prospective employees, and others.

140.   The trade secrets derive independent economic value and benefit from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic benefit from the disclosure or use of the information by using such information to poach ONB's valuable customers and employees.

141.   ONB has taken reasonable measures to keep this information secret. As described more fully above, it has promulgated privacy and confidentiality policies, it has implemented both electronic and physical protections to keep the information secret, and it requires employees with access to the information to sign confidentiality agreements.

142.   ONB communicated these trade secrets to the Former Employees in confidence.

143.   As set forth above, the Former Employees (and Bell Bank by virtue of its employment of the Former Employees and its actions of obtaining client information from them) misappropriated, threaten to misappropriate, or inevitably will misappropriate ONB's trade secrets by, among other thing, disclosing the identities of ONB's customers and employees, along with their contact information, to Bell Bank, and then using that information to unfairly compete with ONB. The Former Employees did so without the express or implied consent of ONB.

144.   At the time of disclosure and use, the Former Employees: (a) knew that their knowledge of the trade secret information was acquired under circumstances giving rise to

duties to maintain the secrecy of the trade secret information and limit its use, and (b) their disclosure to Bell Bank, or their use on their own accord or on behalf of Bell Bank, constituted a breach of their duties to maintain the secrecy of that confidential information, not disclose it to anyone other than ONB, and not use it for their own benefit or for the benefit of any other person or entity (other than ONB).

145. The Former Employees intended to convert, or inevitably will convert, the trade secrets to the economic benefit of themselves and Bell Bank, without ONB's consent, for use while at Bell Bank. The Former Employees and Bell Bank can obtain economic value for the disclosure and use of ONB's trade secrets, for example, by utilizing the information therein to solicit, attempt to induce, and induce ONB's clients and employees to switch their business from ONB to Bell Bank.

146. Bell Bank acquired, received and possesses, or inevitably will acquire, receive and possess, the trade secrets, knowing same to have been misappropriated without ONB's authorization and in violation of the Former Employees' duties to ONB.

147. At the time Bell Bank acquired the trade secret information from the Former Employees, Bell Bank knew and/or had reason to know that their use and disclosure of that information to (and for the benefit of) Bell Bank constitutes: (a) intellectual property theft by the Former Employees, (b) a breach by the Former employees of their duties to ONB and their customers to maintain the secrecy of the information, and (c) an inducement by Bell Bank of the Former Employees' breach of their duties to ONB and its customers to maintain the secrecy of the information.

148.   Bell Bank used the trade secret information provided by the Former Employees and, at the time Bell Bank used the trade secret information that the Former Employees had provided, Bell Bank knew and/or had reason to know that they had acquired the trade secret information during the course of their employment with the ONB, under circumstances giving rise to duties to maintain the secrecy of the information and limit its use.

149.   As a consequence of the foregoing, ONB has suffered and will continue to suffer irreparable harm, injury and loss of customer relationships and business expectancies.

150.   Defendants' conduct constitutes "misappropriation" under Minn. Stat. § 325C.01, subd. 3, and has caused substantial harm to ONB, including the erosion of customer relationships, the poaching of key employees, and the loss of competitive business intelligence.

151.   ONB is entitled to injunctive relief under Minn. Stat. § 325C.02, as well as damages for actual loss, unjust enrichment, and recovery of attorneys' fees due to the willful and malicious nature of Defendants' conduct.

### COUNT III
### Breach of Common Law Duty of Confidentiality
(*Against the Former Employees*)

152.   ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 of this Complaint as if fully set forth herein.

153.   During the course of their employment with ONB, each of the Former Employees was entrusted with nonpublic, confidential, and proprietary information

36

relating to ONB's business operations, customers, employees, pricing structures, internal performance data, and strategic plans.

154.    This information was not publicly known, was compiled and maintained by ONB at significant expense and effort, and was safeguarded from disclosure to competitors.  It included, without limitation, customer contact information, account history, relationship notes, pricing terms, internal employee performance assessments, compensation data, organizational structure, and prospective growth strategies.

155.    Minnesota law imposes a common law duty on employees not to use or disclose confidential information acquired during the course of their employment, even after their employment ends.  This duty exists independently of any statutory trade secret protection or contractual confidentiality agreement.

156.    The Former Employees owed ONB a duty to maintain the confidentiality of this information and to refrain from disclosing or using it to the detriment of ONB, including for the benefit of a competitor.

157.    Upon information and belief, the Former Employees disclosed, used, or otherwise transmitted confidential ONB information to Bell Bank, including in connection with efforts to solicit ONB's customers and employees, transition business relationships, and assist Bell Bank in strategically targeting ONB's market position and workforce.

158.    Such disclosures and uses of confidential information were unauthorized, wrongful, and undertaken in bad faith.  They directly violated the Former Employees' common law duty to preserve the confidentiality of information learned through their employment with ONB.

159.   As a direct and proximate result of these breaches, ONB has suffered irreparable harm and substantial monetary loss, including the erosion of customer relationships, the poaching of key employees, and the loss of competitive business intelligence, customer relationships and business expectancies.

160.   ONB is entitled to damages for the economic losses caused by these breaches, as well as equitable relief, including an injunction preventing any further use or disclosure of ONB's confidential information and requiring the return or destruction of any such materials in the possession or control of the Former Employees or Bell Bank.

### COUNT IV
### Breach of Fiduciary Duty
(*Against the Former Employees*)

161.   ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 of this Complaint as if fully set forth herein.

162.   Each of the Former Employees was an employee of ONB during the relevant period and held positions of trust, responsibility, and discretion within the company.

163.   Under Minnesota law, employees owe their employer a common law fiduciary duty of loyalty while employed.  This duty includes the obligation to act in the employer's best interests, refrain from competing with the employer, avoid self-dealing, and not misuse confidential information.

164.   The Former Employees were not entry-level personnel; rather, they held senior business banking, market leadership, and treasury roles with access to confidential customer and employee data, business strategies, and client relationships.   They

38

represented ONB to its customers and internal teams, and were entrusted with safeguarding ONB's business interests.

165. While still employed by ONB, the Former Employees solicited one another and coordinated with one another (and with Bell Bank) to orchestrate a mass resignation of ONB's Brainerd and Baxter leadership. They concealed their coordinated plans, timed their resignations to inflict maximum operational harm, and provided no advance notice, despite their positions of trust, and directly contrary to the best interest of their employer, ONB.

166. The Defendants intentionally disrupted ONB's Brainerd and Baxter branch operations, resulting in the closure of the Brainerd lobby and drive-through and partial closure of the Baxter branch, which harmed ONB's customer relationships and reputation in the market.

167. Collectively, the Former Employees' actions – coordinating their resignations, withholding disclosure of their intentions, arranging a simultaneous exit, and accepting employment with a competitor under these circumstances – constitute multiple breaches of their fiduciary duty of loyalty.

168. As a direct and proximate result of these breaches, ONB has suffered substantial harm, including reputational damage, the loss of key personnel, customer relationships, and business expectancies, and the wrongful use of its confidential business information.

169.    ONB is entitled to recover damages resulting from these breaches, as well as equitable relief, including injunctive relief, disgorgement of any benefits improperly received, and other remedies available under law and equity.

**COUNT V**
**Aiding and Abetting Breach of Fiduciary Duty**
(*Against All Defendants*)

170.    ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 and 161-169 of this Complaint as if fully set forth herein.

171.    Under Minnesota law, a party is liable for aiding and abetting a breach of fiduciary duty where: (a) a fiduciary duty existed; (b) the fiduciary breached that duty; (c) the defendant knew of the fiduciary duty and the breach; and (d) the defendant substantially assisted or encouraged the breach.

172.    Each of the Former Employees owed ONB a fiduciary duty of loyalty during the term of his or her employment.

173.    As set forth above, the Former Employees breached their fiduciary duties by, among other things:

- Secretly planning a coordinated mass resignation during their employment at ONB, and contrary to the best interests of their employer;

- Timing their resignations to maximize disruption to ONB's Brainerd and Baxter branches;

- Using ONB resources to prepare for their departure to Bell Bank;

- Taking or using confidential ONB information; and

- Attempting to transfer ONB's goodwill, customer base, and operations to Bell Bank.

174.    In so doing, each individual Former Employee knew that the other Former Employees owed and were breaching fiduciary duties to ONB.  They actively coordinated and assisted one another's breaches by, among other things:

- Sharing resignation plans and coordinating timing;

- Addressing resignation letters to fellow co-defendants (as occurred with Campbell);

- Collaborating in outreach to ONB employees and customers;

- Encouraging participation in the coordinated walkout; and

- Coordinating timing of the mass resignation to be as damaging to ONB as possible.

175.    These actions constitute substantial assistance and encouragement of each other's breaches of fiduciary duty and render each of the Former Employees liable for aiding and abetting such breaches under Minnesota law.

176.    Bell Bank also knew that the Former Employees owed duties of loyalty to ONB and were in the process of breaching them.  Bell Bank substantially assisted and encouraged the breaches by, among other things:

- Soliciting the Former Employees for coordinated hire while they were still employed by ONB;

- Encouraging a group resignation designed to shut down ONB's operations;

- Arranging for the employees to start at Bell Bank immediately after their resignations;

- Facilitating or approving the use of ONB's customer information and goodwill; and

- Encouraging or condoning outreach to ONB's current employees and customers.

177. Bell Bank's actions enabled and supported the Former Employees' disloyal conduct and rendered Bell Bank a knowing participant in those breaches.

178. As a direct and proximate result of Defendants' actions, ONB has suffered and will continue to suffer irreparable harm and damages, including but not limited to reputational injury, disruption to its operations, and loss of confidential and proprietary information, customer relationships, and business expectancies.

179. ONB is entitled to recover damages resulting from this conduct, as well as equitable relief, including injunctive relief, disgorgement of any benefits improperly received, and other remedies available under law and equity.

## COUNT VI
### Civil Conspiracy
(*Against All Defendants*)

180. ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 of this Complaint as if fully set forth herein.

181. Under Minnesota law, civil conspiracy is established where two or more persons or entities, by agreement, combine to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, and one or more overt acts are taken in furtherance of that agreement.

182. Bell Bank and the Former Employees knowingly conspired and acted in concert to accomplish an unlawful purpose – namely, the mass resignation of key employees from ONB's Brainerd and Baxter branches for the purpose of crippling ONB's

operations, misappropriating its trade secrets and confidential business information, interfering with its customer and employee relationships, and transferring those assets and relationships to Bell Bank.

183.  In the alternative, Defendants conspired to accomplish a purportedly lawful purpose – competition – but did so by unlawful means, including breach of fiduciary duty, breach of the duty of confidentiality, tortious interference, and trade secret misappropriation.

184.  Overt acts in furtherance of the conspiracy include, among other things:

- Coordinated resignations of senior employees from ONB's Brainerd and Baxter branches, planned in advance;

- Timing of resignations to occur simultaneously and without notice, leaving ONB's branches closed or functionally inoperable;

- Immediate onboarding of the departing employees at Bell Bank;

- Use of ONB's confidential customer and personnel information to solicit ONB's customers and top employees;

- Direct outreach to ONB's customers, including Cedarbrook Lumber, to transfer their relationships to Bell Bank; and

- Ongoing solicitation of ONB's remaining bankers using insider knowledge acquired during employment.

185.  Each Defendant knowingly participated in this scheme, either by initiating it, assisting it, or knowingly accepting and exploiting its benefits.

186.  As a direct and proximate result of this civil conspiracy, ONB has suffered substantial damages, including the loss of key personnel, confidential information, goodwill, customer relationships and business expectancies.

43

187.   All Defendants are jointly and severally liable for the damages caused by the conspiracy and the unlawful acts committed in furtherance thereof.

188.   ONB is entitled to compensatory damages, punitive damages, and all other available remedies under law and equity as a result of Defendants' concerted misconduct.

## COUNT VII
### Tortious Interference with Existing Business Relationships
(*Against All Defendants*)

189.   ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 of this Complaint as if fully set forth herein.

190.   ONB maintains longstanding, valuable relationships with its commercial and consumer banking clients, including customers serviced by its Brainerd and Baxter branches.   These relationships are essential to ONB's ongoing business operations, profitability, and goodwill in the communities it serves.

191.   All of these relationships involve contracts between the customer and ONB.

192.   At all relevant times, Defendants were aware of these customer relationships. The Former Employees managed or serviced many such customers while employed by ONB, and Bell Bank hired those employees specifically for the purpose of transferring those relationships.

193.   Defendants intentionally and wrongfully interfered with these existing business relationships by soliciting ONB's customers, attempting to transition their banking relationships to Bell Bank, and using ONB's confidential customer information for that purpose.

194.    For example, ONB customer Cedarbrook Lumber was approached and encouraged to move its accounts and business to Bell Bank the day of the coordinated resignations.  This occurred before ONB had a meaningful opportunity to respond or reassign account responsibilities.

195.    These efforts to divert ONB's customer relationships were not the result of ordinary market competition.  They were coordinated, timed, and facilitated by the misuse of ONB's internal knowledge and confidential information.

196.    ONB is entitled to compensatory damages, punitive damages for willful and malicious interference, and injunctive relief preventing further solicitation of ONB customers through improper means.

## COUNT VIII
### Tortious Interference with Prospective Business Expectancy
(*Against All Defendants*)

197.    ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 of this Complaint as if fully set forth herein.

198.    In addition to existing customer relationships, ONB had valid business expectancies regarding future transactions and continued dealings with prospective and long-standing clients.

199.    These expectancies arose from ONB's established market position, its investments in client service, and the strong performance of its Brainerd and Baxter banking teams prior to the resignations.

200. Defendants knew of ONB's prospective business opportunities and intentionally interfered with those expectancies by orchestrating a coordinated departure designed to cripple ONB's local operations and by immediately redirecting customer outreach to Bell Bank.

201. This interference was accomplished through improper means, including coordinated disloyal conduct while the Former Employees were still employed by ONB, use of ONB's confidential and proprietary information, and the forcing the abrupt closure of customer-facing services at the Brainerd and Baxter branches.

202. ONB is entitled to compensatory damages, punitive damages for willful and malicious interference, and injunctive relief preventing further solicitation of ONB customers through improper means.

## COUNT IX
### Tortious Interference with Employment Relationships
(*Against All Defendants*)

203. ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 of this Complaint as if fully set forth herein.

204. ONB maintained valid, ongoing at-will employment relationships with numerous employees across its Minnesota branches, including each of the individual Former Employees prior to their resignations.

205. Under Minnesota law, at-will employment relationships are protected against intentional and improper interference by third parties.

206. Each of the Former Employees was aware of ONB's employment relationships with their fellow ONB colleagues, including those who remained employed at ONB after December 8, 2025.

207. Bell Bank was also aware that the Former Employees, prior to December 7, 2025, were employed by ONB.

208. Beginning before their resignations, Defendants engaged in a concerted scheme to interfere with ONB's employment relationships by recruiting one another, planning an *en masse* resignation, and seeking to cause maximum operational disruption to ONB.

209. After joining Bell Bank, Ellingson, and potentially others, began contacting top ONB bankers and encouraging them to resign and accept employment at Bell Bank.

210. These post-resignation solicitations – especially when made by recently departed colleagues – are uniquely damaging and influential, and are part of the same scheme to deplete ONB's workforce.

211. Bell Bank knowingly supported, encouraged, and benefitted from this scheme by hiring the group simultaneously, placing them in competing positions, and incentivizing further poaching from ONB.

212. Defendants' conduct – both individually and collectively – constitutes intentional and improper interference with ONB's employment relationships.

213. This conduct was not incidental to fair competition; it was calculated to destabilize ONB's branches, demoralize its workforce, and strip it of talent in service of Bell Bank's competitive interests.

214. As a direct and proximate result of Defendants' tortious interference, ONB has suffered actual damages, including the loss of key employees, the cost of hiring and training replacements, operational disruption, reputational harm, and diminished workforce morale.

215. Defendants' conduct has also caused and continues to cause irreparable harm to ONB, including the ongoing threat of additional resignations and harm to customer relationships tied to specific employees.

**COUNT X**
**Unfair Competition (Minnesota Common Law**
**and Minnesota Deceptive Trade Practices Act)**
(*Against Bell Bank*)

216. ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 of this Complaint as if fully set forth herein.

217. Minnesota law recognizes a cause of action for unfair competition under both common law and the Minnesota Deceptive Trade Practices Act ("DTPA"), Minn. Stat. §325D.44.

218. Under Minnesota common law, unfair competition encompasses unethical, unlawful, or bad-faith commercial conduct designed to misappropriate the business, goodwill, or market position of a competitor.

219. Under Minn. Stat. § 325D.44, subd. 1(13), a deceptive trade practice includes engaging in "any other conduct which similarly creates a likelihood of confusion or of misunderstanding" and includes "unfair methods of competition" and "unfair or unconscionable acts or practices" as defined by Minn. Stat. § 325F.69, subd. 1 and 8.

48

220.   Bell Bank has engaged in unfair and deceptive conduct by, among other things, orchestrating a coordinated branch raid of ONB's Brainerd and Baxter locations; encouraging a group resignation by key personnel; immediately employing those individuals in equivalent roles at Bell Bank; utilizing those individuals and ONB's confidential business information to solicit ONB customers; and using at least one of those individuals to actively recruit ONB's top-performing employees.

221.   Bell Bank's conduct offends public policy as established by Minnesota's protections for fiduciary duties, trade secrets, and fair commercial practices.  Its conduct is also unethical, unscrupulous, and substantially injurious to both ONB and to ONB's customers who were misled or left confused by the sudden closure and reassignment of staff.

222.   Bell Bank has also contributed to the public perception that ONB's Brainerd and Baxter branches are understaffed, thereby creating confusion in the marketplace and damaging ONB's customer relationships and brand goodwill.

223.   ONB has been and continues to be irreparably harmed by Bell Bank's deceptive and unfair conduct through the loss of employee talent, confidential business strategies, goodwill, customer relationships, and diminished revenue.

224.   ONB is entitled to all available remedies under the DTPA and common law, including but not limited to injunctive relief, attorneys' fees under Minn. Stat. § 325D.45, subd. 2, and compensatory and equitable relief.

49

**COUNT XI**
**Unjust Enrichment**
(*Against All Defendants*)

225.   ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-117 of this Complaint as if fully set forth herein.

226.   Under Minnesota law, a claim for unjust enrichment arises when a party knowingly receives something of value to which it is not entitled, and retention of that benefit would be unjust and inequitable.

227.   Defendants have knowingly obtained and retained substantial benefits derived from ONB through wrongful conduct, including:

- ONB's confidential and trade secret business information, such as customer identities, contact information, internal account data, pricing models, employee performance data, and talent pipeline intelligence;

- The goodwill and customer relationships that ONB cultivated and supported over time through its investments in people, systems, and service;

- The benefit of ONB's internal training, market development, and operational infrastructure, which Bell Bank and the Former Employees leveraged to transition customers and employees away from ONB with minimal cost or effort;

- Business opportunities and banking relationships wrongfully diverted from ONB to Bell Bank as a result of the coordinated mass resignation and follow-on solicitations.

228.   Defendants did not pay for, create, or earn these assets and benefits, and were not entitled to acquire them through surreptitious, coordinated conduct that undermined ONB's operations.

229. Allowing Defendants to retain the benefits of this conduct – obtained through breaches of fiduciary duty, misuse of information, and coordinated disruption – would be unjust and inequitable.

230. ONB has no adequate remedy at law that would fully compensate for the unjust enrichment derived from the misappropriation of its confidential information, workforce, and customer relationships.

231. ONB is entitled to equitable relief requiring Defendants to disgorge all benefits wrongfully obtained and retained, including the value of any misappropriated customer accounts, any improperly solicited employee relationships, and the use of ONB's proprietary data.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Old National Bank, respectfully requests that the Court enter judgment in its favor and against Defendants, Bell Bank, Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, and Daniel Yantes, jointly and severally, and grant the following relief:

A. A temporary, preliminary, and permanent injunction:

    i. Enjoining Defendants from using, disclosing, or retaining any of ONB's trade secrets or confidential and proprietary information, including but not limited to customer lists, customer data, personnel information, compensation structures, internal reports, or business strategies;

    ii. Prohibiting Bell Bank, directly or indirectly, from employing, contracting with, or retaining the services of any of the former ONB employees named in this Complaint – Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, and Daniel Yantes – during the pendency of this action and thereafter as warranted;

      iii.    Enjoining Defendants from soliciting, inducing, or encouraging any ONB employee to resign or sever their relationship with ONB, or otherwise interfering with ONB's employment relationships;

      iv.    Enjoining Defendants from soliciting or diverting ONB customers, business, or accounts using any ONB trade secrets, confidential information, or insights derived from their former roles at ONB, including, but not limited to knowledge of the existence of ONB's customer relationships learned through their former employment with ONB; and

      v.    Enjoining Bell Bank and the Former Employees from destroying, altering, concealing, or failing to preserve any evidence related to ONB's claims, including communications, documents, emails, text messages, call logs, and other records related to the coordinated departures, ONB's employees, or ONB's customers.

B.    Compensatory damages in an amount to be proven at trial for the loss of customer relationships, revenue, goodwill, and employee resources.

C.    Disgorgement of all compensation, benefits, or profits wrongfully obtained by Defendants as a result of their misconduct.

D.    Exemplary and punitive damages as permitted by law.

E.    Prejudgment and post-judgment interest as allowed by law.

F.    Restitution and imposition of a constructive trust over any funds, benefits, or business obtained through the use or misuse of ONB's trade secrets or confidential information.

G.    An order requiring Defendants to return and/or destroy all ONB property, information, documents, or data in their possession, custody, or control, including any copies or derivatives.

H.    An award of attorneys' fees, expert witness fees, and costs incurred in prosecuting this action, including, but not limited to, those available under the Defend Trade Secrets Act, the Minnesota Uniform Trade Secrets Act, and the Minnesota Deceptive Trade Practices Act.

I.    Such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, ONB hereby demands

a trial by jury on all issues so triable.

Dated: December 15, 2025                    Respectfully submitted,

                                            **OLD NATIONAL BANK, Plaintiff**


                                            By:  /s/ *Mack H. Reed*
                                                    One of Its Attorneys


Mack H.  Reed (MN No. 398703)
LEWIS BRISBOIS BISGAARD & SMITH, LLP
90 South 7th Street, Suite 2800
Minneapolis, Minnesota 55402
Phone: (612) 428-5000
Fax: (612) 428-5001
mack.reed@lewisbrisbois.com

        and

Christopher S.  Griesmeyer (IL No.  6269851, *pro hac vice* pending)
Zachary Mulcrone (IL No. 6300387, *pro hac vice* pending)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Phone: (312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com