**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Old National Bank,<br><br>      Plaintiff,<br><br>v.<br><br>Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, Daniel Yantes, and Bell Bank,<br><br>      Defendants. | Court File No. 0:25-CV-04636 (PJS/LIB)<br><br><br>**DECLARATION OF YVETTE CAMPBELL IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

Yvette Campbell declares as follows:

1. I am a Senior Vice President of Commercial Banking for Defendant Bell Bank, and I am named as a Defendant in this case. I make this declaration based on personal knowledge, and if called and sworn as a witness, I could and would testify competently to the facts stated herein. I submit this declaration in opposition to Plaintiff Old National Bank's ("ONB's") Motion for Temporary Restraining Order.

**Relevant Employment History**

2. I started working for ONB's predecessor, Bremer Bank ("Bremer") in September 1992, and in total, worked for Bremer for more than 30 years, until ONB acquired Bremer in approximately May 2025.[1] I started at Bremer as a part-time teller and

*Signed by:*

*Yvette Campbell*

E86B823E1EC84A5...

[1] Between September 1992 and May 2025, I left my employment at Bremer twice. The first was for approximately 11 months following the birth of my twins in 1996-1997. The second was when my family moved to South Dakota in 2020-2022. Following each absence, I resumed my employment at Bremer.

worked my way up to a full-time position, then to a personal banker, branch manager, and finally to Market President, which was my final job title at Bremer.

3.      Once ONB took over, my outward title remained the same, but internally I was acknowledged as a Business Banking Relationship Manager IV, Vice President at ONB's Brainerd location.

4.      I did not have an employment agreement, or any other agreement, with either Bremer or ONB.

5.      As Market President for Business Banking at Bremer/ONB, I was a producing manager and sales leader for the Brainerd and Duluth business banking team. I had four direct reports, including two at the Brainerd location (Dan Yantes and Michael McConkey) and two at the Duluth location (Todd Fedora and Jason Reid).

6.      ONB expected me to be available to ONB leadership, ONB employees, as well as ONB customers through my personal cell phone. ONB published my personal cell phone number on my business card and in my email signature. I was also expected to use my personal cell phone to take photos during property site visits and construction inspections, and then to use my personal email to email the photos to my work email account.

7.      ONB did not pay for my cell phone or contribute to my cell phone service costs.

8.      ONB did not prohibit me from storing contact information on my cell phone for anyone I interacted with during my employment—customers, prospects, or otherwise.

9.      I am not aware of any ONB policies requiring me to delete business-related contacts from my cellphone when my ONB employment ended.

10.     During my career at Bremer, I was treated with nothing but respect and was rewarded both personally and professionally. Bremer provided me with competitive compensation to allow me to take care of my family. Additionally, Bremer repeatedly invested in my success by offering additional training opportunities and leadership courses so that I could grow professionally and be promoted within the company. Simply, while working for Bremer I felt cared for, respected, and part of a family.

### ONB's Lack of Support for Bremer Customers and Employees

11.     In approximately May 2025, when ONB closed on its acquisition of Bremer, everything changed.

12.     First, ONB's messaging greatly differed from that of Bremer, and I learned that ONB had "discouraged industries." This meant ONB discourages its business banking team from soliciting customers in industries such as resorts, golf courses, land developers, and non-profits, as well as customers that were smaller in size. This was exceptionally hard to hear, as many of the customers at the Brainerd location were in these industries, and were smaller, so it was unclear how or whether ONB wanted to move forward with these current customers. In some instances, ONB did not want to move forward with the customers in any capacity. This happened to a longtime customer of Bremer's who was a non-profit, S.A.S., that required a small line of credit to be used primarily for gaps in cashflow. ONB denied the line of credit. The Executive Director was devastated, and I had to suggest that S.A.S. try other banks in the area for credit approval.

13.     Having to turn away current customers affected how I felt I could proceed in my role at ONB, and I no longer thought marketing to new or prospective customers at ONB would be productive when the majority of the businesses in the Brainerd Lakes area were unwanted.

14.     Second, I was alerted by ONB that only operations employees would be eligible for a retention bonus, and that the revenue or sales team would not receive any retention bonuses as "they could be replaced." While I understood that with the acquisition some changes would occur, ONB's decision to view sales and revenue-based employees as expendable had an immediate negative impact on the morale of my team.

15.     As an example, shortly after the ONB acquisition in May 2025, a high performing loan support staff member left, and ONB would not allow me to fill the position. This frustrated my team of lenders, who were concerned about workflow. I pleaded with ONB's loan support senior manager because I was concerned that my lenders were becoming increasingly discontented with working at ONB.  She responded that "lenders could be replaced."

16.     For the first time in decades, I felt unsupported by my employer to competently perform my job duties and support my staff. I also felt ignored and disregarded at ONB, even though I had been a top performer at Bremer for many years.

17.     Third, and related to my developing concerns about customers and employees, I was repeatedly told, sometimes in a chastising manner, that I "will lose some customers/employees" and that "it is okay," implying that I need to be okay with it and to

let the issue go. Hearing this phrase over and over made me feel at odds with the relationship manager I had become, both for my employees and my customers.

18. I had always centered myself on becoming a customer's most trusted advisor, no matter how large or small the account, and ONB was telling me it was okay if customers had a negative experience, as they were free to leave. I could not fathom facing my friends and customers in church and at community events knowing that they no longer had any trust in their banking relationship.

19. Fourth, once our banking software, programs, and applications transitioned from Bremer over to ONB in October 2025, it was clear that the technology used by ONB was antiquated, many functions had not mapped over from Bremer's systems to ONB's like we were told they would, and that our customers found ONB's platform difficult and frustrating to use.

20. During the first week after the conversion to ONB's systems, we were overwhelmed by the volume of customers requesting help to log into online banking. Our training around ONB's digital banking systems was woefully inadequate. It was difficult to research which online banking platform the client had been mapped over to as there are several; followed by researching which of the many phone numbers would be applicable for a specific client to call for help. And once we called, we had to remain on hold for 30+ minutes before someone answered. Despite asking several times, the business banking team was not allowed to have access to the programs to trouble shoot for small business online banking.

21.    I would try to help by calling ONB's internal help line, help desk, or customer service, but I sat on hold for extended periods of time.

22.    We had three ONB ambassadors in the Brainerd location during the first week after conversion, one for business banking and two for retail banking. We asked the business banking ambassador to help our loan support person enter some loan applications that had been held due to a blackout period. I tried to troubleshoot as much as I could without interrupting our ambassador. On day two, I received a terse email from a senior leader within ONB stating, "use your ambassador." If this leader had called me, I would have explained that our ambassador was busy helping our loan support staff enter loan applications into the new system.

23.    I learned that the retail ambassadors had access to the programs to help small business customers. I tried on numerous occasions to ask them a simple question but was met with rudeness. On one specific occasion, a retail ambassador informed me that she was "trying to order lunch," so could not be interrupted to help our customers. We were told the week prior by Joyce Anderson that lunch would be brought in each day for the entire branch. Mid-week we learned that it was only being ordered in for the retail team. Again, I was left feeling like the business banking team was disposable.

24.    I continued to show up for work every morning, despite working 12+ hour days, being treated rudely by ONB ambassadors, fielding complaints from customers who were waiting 2-3 days or longer for a return call from ONB's help desk, and being told lunch would no longer be provided for my team. Senior ONB leadership never even said

"thank you" to our local team for putting in such long hours and working tirelessly to solve avoidable customer problems.

25.    Our customers were also routinely being poached by other local banks during this time, as customers were unable to do simple things like log into online banking and check their balances. Some of our customers closed accounts that very first week after conversion.

26.    Despite my concerns, over the next several months, I gave ONB a chance to do better. Towards the end of October 2025 after conversion, however, I realized that ONB had no intention of changing its practices and culture; ONB would never be the same as working for Bremer.

27.    Between the first day of conversion and my last week of employment at ONB, we had several customers that, due to issues with ONB's digital solutions, did not have their payroll direct deposit batch properly sent out. These customers and/or their accounting firms reached out to us several times, several days in a row, but still were not contacted by ONB's helpdesk team to solve their issue. This resulted in many individuals in the Brainerd-Baxter area not getting paid. This severely impacted our reputation.

28.    I had several conversations with ONB leadership where I expressed my frustration and exhaustion, including one conversation on or around November 13, 2025. I explained to ONB leadership during that conversation that the continual threat by customers and employees of leaving ONB was not sustainable, as it was never-ending and caused a substantial negative impact on my physical and mental health. Despite my concerns, ONB could not provide me with any assurances of change or even attempted

change. I felt as though I could either get on board with ONB's practices, or leave, and I chose the latter.

### Exploration of Other Opportunities

29. In late October, I opted to explore my options and reached out to an individual I knew from my time serving on a non-profit board (unaffiliated with ONB) that also worked in the banking industry. My contact introduced me to Bell Bank.

30. Morale in the Brainerd and Baxter branches of ONB was at an all-time low, and my close work friends and I openly discussed our frustrations and desires to leave. As part of those discussions, I learned that Kim Ellingson was also in discussions with Bell Bank, so we began jointly exploring an opportunity with Bell.

31. As part of those joint discussions, I shared my ONB compensation information with Ms. Ellingson so that she could provide it to Bell Bank.

32. I accepted a position as Commercial Banker SVP at Bell Bank on November 20, 2025.

### Summary of Relevant Events Related to My Resignation

33. I notified ONB of my departure on December 8, 2025, and left the same day.

34. Before leaving, I packed a plastic storage tote with my personal items that accumulated throughout my years of service at Bremer/ONB, including family photographs, my college diploma, awards from Bremer, a plaque memorializing my participation in the Blandin Leadership and Kiwanis Club, as well as other mementos and personal effects. I did not take any ONB documents. **A true and correct image of the personal belongings I took with me is attached as Exhibit A.**

8

35.    I am not aware of any ONB policy requiring security to walk an employee out of the building when they resign.

36.    I am not aware of any ONB policies requiring me to delete business-related contacts from my cellphone when my ONB employment ended.

37.    Other than contact information, some of which was gathered because of friendships that eventually turned into business relationships, and some collected during my time away from Bremer, I do not have any ONB-related material on my phone that I can recall.

38.    Following my departure from ONB on December 8, 2025, I received a telephone call from ONB employee Tony Loosbrock, and a text message from ONB employee Joyce Anderson asking, "What's going on??" that I did not answer.

39.    I also called ONB employee Jason Reid to let him know that I thought he had a bright career ahead of him, did a fantastic job, and that I would gladly be a personal reference for him if he ever needed one in the future. I also hoped that he would send me a picture of his expected second child, and he later sent me a text sharing a holiday photograph of his family.

40.    On December 10, 2025, I received a text message from ONB employee Kerri Metz, to which I sent two replies. A true and correct copy of the screenshots of these text messages are below:



41.     Other than these interactions, I do not recall communicating with any other ONB employees following my departure.

42.     I never took any employee-related data or information from ONB, including performance levels, compensation structures, career goals, and management evaluations, and I have not shared any employee-related data and information with Bell Bank.

43.     As for customers, before I left ONB, I expended a great deal of effort to ensure that their service from ONB would not be interrupted by my resignation. I left ONB a detailed spreadsheet identifying all my outstanding and pending items. I also printed emails and highlighted the most important information to ensure that it would be easy for anyone who stepped into my role to quickly find what they need. I compiled this information into folders for each customer, including personal notes and details relating to the customer and pending transactions. I then listed my manager, Tony Loosbrock, on my

out-of-office email reply. All of this information remains in the possession of ONB. I did not take any of this information when I left.

44.    After I departed, I contacted a handful of former customers that I remembered had urgent or time-sensitive pending transactions with ONB to ensure that they had the proper contact information for ONB representatives who could help them. I assured these former customers that I left detailed notes for my manager regarding their pending transactions, and that my departure would not cause any delay.

45.    I called other former customers to inform them of my move and asked whether they wanted my updated contact information.  If they did, I asked for their email addresses, as I no longer had that information.

46.    I called Customer C.L. by using the main line number for C.L., which is publicly available. I am very familiar with the family that owns C.L. because we attend the same church and have raised our children together. We are close enough friends that I purchased a gift made by their son for my daughter, and we speak a few times each month. I wanted to make sure that C.L.'s owners heard the news from me, and I also provided C.L. with the names of ONB employees for the branch in Aitkin, Minnesota.

47.    Most recently, on December 19, 2025, C.L. called me and asked for help with a business equipment loan. I am aware that C.L. intends to keep his deposit account with ONB. Because I know my customer, I advised him that it would be easier for him to originate his new loan with ONB, as that would provide him with one online login to see all his bank accounts, which I know is very important to him. I then provided C.L. with

11

Tony Loosbrock's cell phone number and email address. C.L. is not a customer of Bell Bank.

48.     I also contacted a representative for Customer C.R.  I did not solicit any business from C.R., as the transaction involving C.R. and ONB cannot be unwound without substantial penalties to C.R., so I would never even suggest such option. My intention was to let him know that I had left ONB and provide him with updated contact information. C.R. is not a customer of Bell Bank.

49.     PP8S.L. is a customer that I brought to Bremer after I moved back to Minnesota in 2022 and rejoined Bremer Bank. Similar to C.R., I did not solicit any business from PP8S.L. Instead, I provided PP8S.L. with contact information for the appropriate point of contact at ONB and answered a few questions that the customer had regarding their loan.

50.     I have not reached out to A.S.J. since I moved to Bell Bank. A representative of A.S.J. informed me that the company would be closing its ONB accounts and moving to Bell Bank. I did not solicit their transfer of business.

51.     For other customers that I contacted, several only had one loan with ONB that cannot be refinanced. This means that the customer is unable to move the loan, and I am not in any position to solicit business from these customers. Nevertheless, I wanted them to hear the news of my transition to Bell Bank directly from me.

52.     I have never had a non-solicitation agreement, or even an employment agreement, with Bremer or ONB.

12

53. Because of my connections within the community, many of the former customers that I contacted, or who contacted me, are close personal friends.

**The 12/8 Resignations Did Not Necessitate the Brainerd Branch's Closure**

54. While working for ONB, I had a key fob and alarm code to access the Brainerd branch. My alarm code only worked for the premises. I had no access to any of the vaults or teller systems.

55. No one from business banking needed to be on site for the Brainerd branch lobby to remain open. In fact, business banking operated wholly separate from the teller and retail aspects of the branch location. The systems used were not the same, approvals were not the same, and there was no coordination of schedules between the two sides of the business.

56. There are several examples of this in practice, but most recently in the summer of 2025, when ONB required all business banking teams to work in Alexandria, Minnesota for a day. That day, ONB locations did not shutter simply because their business banking teams worked in a different city.

57. Practically speaking, this made sense. Often customer meetings occur at customers' offices. This meant that it was not uncommon for the entire business banking team to be out of the branch location at the same time.

58. Of the eight Employee-Defendants, six worked from ONB's Brainerd location, and all six worked on the business banking side.

59. I have not used or disclosed any confidential information that I may have obtained during my course of employment with ONB.

13

60. I am the primary income earner in my family by a significant margin, and my spouse and I continue to provide financial support to our children. If I am forced not to work while this lawsuit is pending, we will likely be forced to sell our home.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on December 21, 2025.

Signed by:

s/ Yvette Campbell

Yvette Campbell

14

# EXHIBIT A

Attached to the Declaration of **Yvette Campbell** in opposition to Old National Bank's

Motion for Temporary Restraining Order

*Old National Bank v. Adams et al.*

Case No. 0:25-CV-04636 (PJS/LIB)





Exhibit A to Campbell Decl. in Opp. to ONB's Motion for TRO                    3





Exhibit A to Campbell Decl. in Opp. to ONB's Motion for TRO                    5



You are a Bremer CEO Roundtable Winner.

You embody our cultural strengths.

You understand the need to try new things.

You advocate for transparency.

You believe in the importance of relationships.

You connect and collaborate.

You respect diversity and commitment to community.

You reflect our readiness for tomorrow.

You exemplify our long term success.

And it's <u>your</u> spirit that ignites a passion for excellence at Bremer.