## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Old National Bank, | Court File No. 0:25-CV-04636 (PJS/LIB) |
| Plaintiff, | |
| v. | **DECLARATION OF KIM ELLINGSON IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, Daniel Yantes, and Bell Bank, | |
| Defendants. | |

Kim Ellingson declares as follows:

1.     I am the Brainerd/Baxter Market President for Defendant Bell Bank, and I am named as a Defendant in this case. I make this declaration based on personal knowledge, and if called and sworn as a witness, I could and would testify competently to the facts stated herein. I submit this declaration in opposition to Plaintiff Old National Bank's ("ONB's") Motion for Temporary Restraining Order.

### Relevant Employment History

2.     I started working at Bremer Bank ("Bremer") in March 1999 as a Vice President of Business Banking, which was later acquired by ONB in May 2025. Prior to starting at Bremer, I worked for 10 years at Community First National Bank in Fargo, North Dakota, and then Norwest Bank in Brainerd. Towards the end of my time at Norwest Bank, it was acquired by Wells Fargo, and I decided that I wanted to move back to a community bank.

3.      Over my nearly 26-year career at Bremer, I had numerous opportunities to grow in my professional development.  Bremer recognized my hard work and invested in my success. After working at a national bank, Bremer was a breath of fresh air in the banking industry because it gave me more autonomy and empowered local decision-making to better serve my clients.  Bremer's size and strategic priorities matched my values.

4.      As a Vice President of Business Banking at Bremer in Brainerd, I had lending authority up to $1M.  Brent Iserman and I were peers, both working as business bankers. Mr. Iserman is now employed by ONB.

5.      After six years, the business banking manager (who oversaw Mr. Iserman and me) left for another financial institution.  We both applied for the vacated position, but I was promoted over Mr. Iserman.  He would have been my direct report, but he quickly left Bremer.[1]  I was eventually promoted to Senior Vice President, and in that role, I was responsible for a leading team of eight business banking managers across five branches, and I held lending authority up to $3M.

6.      Following eleven years as Senior Vice President of the business banking department, I was selected as Region President of the Brainerd Charter.  In this role, I had regional oversight over five branches' executive decision making. I was recognized for my contributions with offers of more opportunity, such as leading the successful expansion of Bremer in the Duluth market.  I became the Director of Commercial and Agricultural Loan

---

[1] Mr. Iserman came back to Bremer, and at times, was my immediate supervisor.

Delivery with 12 direct reports and 156 indirect reports, and I led the deployment of a new digital platform. This was the position I held until ONB acquired Bremer.

### ONB's Lack of Support for Bremer Customers and Employees

7. When ONB's acquisition closed in May 2025, I was given a choice between taking a severance package or accepting a more limited role with ONB, working in "Credit Strategy" to try to upgrade ONB's loan operating system, which was known as the "Commercial Loan Transformation" ("CLT") project.

8. I could not fully retire on the severance package, as I am the primary provider of medical benefits for myself and my husband. So, I accepted ONB's offer to become a Credit Systems Director, Executive Vice Present at ONB's Brainerd location.

9. I did not have an employment agreement, or any other agreement, with Bremer or ONB.

10. ONB expected me to be available to ONB leadership, and ONB employees, on my personal cell phone. ONB published my personal cell phone number on my business card, and it was included in my email signature block.

11. ONB did not pay for my cell phone or contribute to my cell phone service costs.

12. ONB did not prohibit me from storing contact information on my cell phone for anyone I interacted with during my employment—customers, prospects, or otherwise.

13. As the months rolled on at ONB, I discovered I had been sold on a project that was full of challenges. I learned that CLT was already in play for almost eighteen months with limited progress. It was paused during the Bremer acquisition, it had limited

3

resource allotment (just two full-time employees with others who floated in and out), and little support from the credit teams or ONB leadership. I realized that the project objectives would not be achievable without additional resources and collaboration across the organization.

14. I shared my concerns with my colleagues, Shane Johnson, Sherri Matuke, and Theresa Biss. I told them I was unhappy, felt unsupported, and was dissatisfied in my role at ONB.

15. I also discussed these challenges with my manager, Tim Kocher, during our 1-on-1 meetings. Mr. Kocher agreed and admitted he was also experiencing some of the issues I raised. He explained that as a whole, ONB worked in silos, so projects like CLT were difficult because they required collaboration across all aspects of commercial lending, including operations, technology, and credit. Without this collaboration and support, I know it would be difficult, if not impossible, to meet ONB's timeline expectations.

16. Eventually, I reached out to Human Resources and spoke with Kelsey Dompke. Instead of appreciating the uphill battle I faced trying to accomplish the project goals, Ms. Dompke just encouraged me to "keep trying" and said I was a "valued member of the team."

17. During the integration process at ONB, former Bremer employees offered suggestions to assist with the system conversion scheduled for October 2025. But ONB was clear that it did not need any ideas from Bremer.

18. From the start of the CLT project in May or June to October, the stress of facing substantial hurdles at work caused my health to decline. I was not sleeping well and

I suffered from chronic headaches. I am usually known to be a driven, competent, happy person, but I became very unhappy, and my mood permeated every aspect of my life, including my family relationships.

19. Beginning in August of 2025, I started keeping a list of challenges that were impeding the CLT project. When my list grew to 10 challenges, I realized it was time to consider other opportunities. This was a huge struggle, because in my thirty-plus years of working, I never backed down from a challenge. But I owed it to myself and my family to make a change, even if it meant giving up my role and not completing the CLT project.

20. In late October, I submitted an online request to ONB's Human Resources department to learn whether retirement was an option at this point in my career.

21. I did not receive a response to my online request, so I called the HR department. I confirmed that I was eligible for retirement; I only needed to notify my manager, and I could retire the same day.

22. Around the same time, I learned from Rachal Johnson, Michael McConkey, Daniel Yantes, Yvette Campbell, and Sharon Vold that a number of customers were struggling with the system conversion. They shared how embarrassed and frustrated they were with the negative impression ONB gave customers.

## Exploration of Other Opportunities

23. Shortly afterward, a group of Brainerd ONB employees was talking about the system conversion issues. Mr. Yantes shared that he had received an employment offer at another bank and was considering accepting the offer. I do not recall who mentioned the idea, but someone said, "so where are we all going?".

24.     I then reached out to Rock Messerschmidt, a former colleague from Community First National Bank who retired from Bell Bank, to ask his advice. The call centered on personal career advice. I also asked Mr. Messerschmidt whether he thought Bell Bank would ever consider coming to the Brainerd Lakes area. Mr. Messerschmidt said he would reach out to one of his contacts. He then gave me Patrick Chaffee's name.

25.     During the week of November 4th, I reached out to Mr. Chaffee. Bell Bank expressed interest in having a meeting in Fargo, North Dakota. Bell Bank advised that the meeting invitation was open to any employee who may be interested in transitioning from ONB to Bell Bank.

26.     That same week, on November 7, 2025, I reached my limit on the number of challenges I faced associated with the CLT project.

27.     Ms. Campbell told me that Ms. Adams from the Baxter ONB location was interested in joining any potential meeting with Bell Bank, as she was actively exploring her employment options outside of ONB.

28.     On November 14, 2025, I, along with Ms. Johnson, Mr. McConkey, Ms. Campbell, Mr. Yantes, and Ms. Adams met with Bell Bank in Fargo. Ms. Vold was interested in a meeting with Bell Bank, but was unable to attend the meeting.

29.     Following that meeting, I learned that Kasey Bernu was interested in joining any future discussion with Bell Bank, as she was unhappy with her employment at ONB.

30.     I asked each of the seven individuals if they would be willing to share their current compensation. I did not obtain any compensation information about the others from ONB's system.

6

31.    During the week of November 17th, we discussed salary and bonus expectations with Bell Bank.  We each had to decide, individually, whether it made financial sense to leave ONB.

32.    On or around November 19, 2025, the eight of us received individual employment offers from Bell Bank. None of the offers were contingent upon others accepting.

33.    Once I received my offer, I learned I would have to take a pay cut at Bell Bank. Despite the decreased pay, I was so miserable at ONB, I was okay with taking the offer.

34.    During this time, I had considered other opportunities at banks in the Brainerd Lakes area. The Bell Bank offer was the best offer for my personal and professional needs.

35.    I accepted a position as Market President of Brainerd/Baxter on November 21, 2025.

36.    During my negotiations with Bell Bank, Bell leaders instructed me on more than one occasion NOT to take any customer or confidential information from ONB's systems. Bell Bank representatives made it clear that they did not want any data that was derived from ONB or Bremer.

37.    My employment with Bell Bank is also conditioned on my promise that I will not knowingly or intentionally use or disclose any information that could be claimed by a prior employer as confidential or proprietary.

7

**Summary of Relevant Events Related to My Resignation**

38.     On December 8, 2025, I notified ONB of my retirement and advised that my retirement was effective as of December 5, 2025.

39.     As I was leaving ONB's Brainerd location, I packed a box with all of my personal items that accumulated throughout my years of service at Bremer/ONB, including family photographs, a 25-year service award, Bremer mugs/cups, and personal items (dental floss, sewing kit, etc.). I did not take any ONB documents.

40.     **A true and correct image of the contents of my box is attached as Exhibit A**.

41.     I am not aware of any ONB policy requiring security to walk me out of the building after I retire.

42.     I am not aware of any ONB policies requiring me to delete business-related contacts from my cellphone when my ONB employment ended.

43.     Other than contact information, I do not have any ONB-related material on my phone.

44.     Following my retirement from ONB, I received a text message from my manager, Tim Kocher, asking to talk.  We spoke on the phone, and Mr. Kocher expressed concern over my retirement. I told him that I did not believe my working conditions were going to change, and I did not want to end my career working on a project that had no chance of success.

8

45.     I also received text messages from Andrea Hintzman, Stephanie Stone, and Mike Job. True and correct copies of the screen shots of the December 8, 2025 text message conversations with Andrea Hintzman and Stephanie Stone are below:

  

46.     Mike Job texted me on December 12, 2025. A true and correct copy of the screen shot of the December 12, 2025 text message with Mike Job is below:



47.     As for my contact with ONB employee Thad Olsen, Brent Iserman's Declaration is incorrect that I "asked him to call [me]." Doc. 10 ¶ 78. Mr. Olsen reached out to me first and asked for my side of the story. A true and correct copy of the screen shot of the December 8, 2025 text message from Thad Olsen is below:



48.     We spoke over the phone that same day. Mr. Olsen wanted to know my "side of the story," and asked about my work at Bell Bank. I told him my new job was great, but I specifically said I would not ask him to join Bell Bank. If he was interested in working for Bell Bank, I would put him in touch with someone else.  I never asked anyone at Bell Bank to reach out to Mr. Olsen.

49.     I did contact certain ONB employees to let them know of my retirement by sending them a text message, which read:

> I wanted you to hear from me – that I tendered my immediate retirement notice to Tim this am.  I am not going to belabor my "why" right now other than to say I have chosen what is best for me.  Today is going to be crazy but I will try to catch up when I can

10

50.     After this, I talked on the phone with Shane Johnson, Sherri Matuke, and Jean Chase.  I also received text messages, including, but not limited to the following messages from Teresa Biss and Rian Copeland:

 

51.     I also reached out to ONB employees Gary Johnson and Joyce Anderson to share the news that I retired from ONB, and I received calls from Marit Haman and Katie Bellos.  I also received a call from Shaun Coard, whose last day with ONB was on December 5.

52.     Other than these interactions, I do not recall communicating with any other ONB employees following my retirement.

53.     I did not take any employee related information, such as performance levels, compensation structures, career goals, or management evaluations from ONB. The only information I shared with Bell Bank was the compensation information that my colleagues gave me to share on their behalf.

54. As for customers, I was not directly overseeing any customers in my role with ONB.

55. After I retired, I contacted two former customers to let them know that I no longer worked at ONB. As to J.F.K., I have a long-standing personal relationship with the customer and his wife. His wife and I are friends, and we often attended the same personal and professional events.

56. One of my former customers, T.M., contacted me after my retirement and said he wanted to move all of his personal and business loans and deposits to Bell Bank. He said he had just been released from the hospital, so he asked me to follow up with the Chief Financial Officer of his company directly.

57. I never had a non-solicitation agreement, or even an employment agreement, with Bremer or ONB.

58. I previously served on the Brainerd Lakes Chamber Board, and I have served on the Board of the Initiative Foundation for ten years. Because of my connections within the community and years of service at Bremer/ONB, many former customers and employees are close personal friends.

59. When business bankers look for opportunities to earn new customers, we use publicly available data to research prospects. This includes Google searches and the data published online by the Federal Reserve (https://banks.data.fdic.gov).

60. Most of our customer base in the Brainerd/Baxter market is local, so we connect with new customers by canvassing businesses, cold-calling, and relying on our personal networks.

12

61.     While working for ONB, I had a key fob and alarm code to access the branch. My alarm code only worked for the premises. I had no access to any of the vaults or teller systems.

62.     I have not used or disclosed any confidential information that I may have obtained during my employment with ONB.

63.     If I was unable to work, it would cause real hardship for my family. Our health insurance runs through my employment, and our household relies on my income.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on December 21, 2025.

Signed by:

s/ Kim Ellingson
34E98295E0DD4D0...

Kim Ellingson

# EXHIBIT A

Attached to the Declaration of **Kim Ellingson**
in opposition to Old National Bank's

Motion for Temporary Restraining Order


*Old National Bank v. Adams et al.*

Case No. 0:25-CV-04636 (PJS/LIB)



Exhibit A to Ellingson Decl. in Opp. to ONB's Motion for TRO                    2



Exhibit A to Ellingson Decl. in Opp. to ONB's Motion for TRO                    3



Exhibit A to Ellingson Decl. in Opp. to ONB's Motion for TRO                4