# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Old National Bank,<br><br>        Plaintiff,<br><br>v.<br><br>Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, Daniel Yantes, and Bell Bank,<br><br>        Defendants. | Court File No. 0:25-CV-04636 (PJS/LIB)<br><br>**DECLARATION OF MICHAEL MCCONKEY IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

Michael McConkey declares as follows:

1. I am a Senior Vice President of Commercial Banking for Defendant Bell Bank, and I am named as a Defendant in this case. I make this declaration based on personal knowledge, and if called and sworn as a witness, I could and would testify competently to the facts stated herein. I submit this declaration in opposition to Plaintiff Old National Bank's ("ONB's") Motion for Temporary Restraining Order.

## Relevant Career History

2. I started at Bremer Bank ("Bremer") in November 2020 as a Business Banker 3/Vice President.

3. Prior to Bremer, I worked for 29 years at Norwest Bank, which was later acquired by Wells Fargo. I started at Norwest Bank in March 1992 as a personal banker, working in the Willmar and St. Cloud branches. In February 1997, I moved to Brainerd to help open a new Norwest bank and managed five retail branches in the Brainerd Lakes area.

4. I continued as a Wells Fargo employee when Norwest merged with Wells Fargo in 1998. In March 2003, I became a business banker. When I started, we had a local Brainerd area president, three business bankers, two business assistants and a credit analyst. Within ten years, I was the only team member left in the Brainerd business banking department at Wells Fargo.

5. During that time, Wells Fargo was involved in many scandals, lawsuits, and government investigations, which severely limited my productivity. Then, in September 2020, I was notified that I was being laid off.

6. I explored opportunities with several area banks, but Bremer Bank ("Bremer") was my first choice.

7. When I informed my customers from Wells Fargo that I was now working at Bremer, several told me that they were eager to move their banking to Bremer because they had only stayed at Wells Fargo because of me.

8. I valued that Bremer was a community bank, with all the related benefits. For example, Bremer's practice provided for on-site credit decisions. I wanted to provide my current customers that I was bringing with to Bremer with the premier customer service that Bremer was known for in the community. Overall, I really enjoyed coming to work every day during my time at Bremer.

9. Even though I found Bremer later in my career, I planned to work for Bremer for approximately ten years prior to retirement. Bremer offered me competitive compensation when I joined, including a pension plan and stock. During my nearly five

years at Bremer, I was rewarded financially, appreciated for my work, and I immensely valued the team atmosphere.

10. My final job title at Bremer was Vice President/Business Banker 4.

## ONB Fails Bremer's Customers and Employees

11. Once ONB took over in May 2025, my outward title remained the same, but internally I was acknowledged as a commercial banker at ONB's Brainerd location.

12. As a business banker for Bremer/ONB, I was responsible for developing and retaining business relationships, performing credit analyses, loan structure design, risk management, and ensuring loan portfolio compliance. I was to identify and initiate opportunities to build and develop new and existing client relationships. I actively cross-sold appropriate banking products to new and existing clients and refer client to other banking areas for additional needs

13. ONB expected and encouraged me to be available to ONB leadership, ONB employees, as well as ONB customers through my personal cell phone. ONB published my personal cell phone number on my business card.

14. ONB did not pay for my cell phone or contribute to my cell phone service costs.

15. ONB did not prohibit me from storing contact information on my cell phone for anyone I interacted with during my employment—customers, prospects, or otherwise.

16. I started questioning whether my 10-year retirement plan at Bremer was going to come to fruition following the purchase of Bremer by ONB. Specifically, having gone through an acquisition of a community bank by a national bank (Norwest to Wells

3

Fargo) already once in my career, I was not excited about yet another similar transition. In addition, since I had only left Wells Fargo five years prior, I was not eager to jump back into to being a part of a national bank.

17. My hesitation grew in the months following close of the acquisition in May 2025 and leading up to the conversion of systems in October 2025. Prior to the start of the acquisition, I was assured by ONB that 100% of employees and customers would be retained. Then, once the conversion process started, ONB advised that employees and customers would likely leave during this process, and ONB was fine with the attrition.

18. I believe that the high rate of attrition following the conversion was caused by several factors, including due to the lack of training by ONB, and its poorly designed, outdated software and systems.

19. I was provided minimal training prior to the conversion, and it felt as though OBN was fabricating policies and procedures as the process was unfolding in real-time. Ultimately, the transition for employees and customers was nothing short of a nightmare.

20. For instance, ONB advised employees that certain information was being relayed to customers related to online banking. The information, however, was not being relayed, and my customers were understandably upset. I was then required to spend hours of my day trying to help my customers access their online banking accounts, which involved spending significant time on hold waiting for ONB customer support to answer the phone.

21. My job was made increasingly more difficult as ONB's entire credit process ground to a halt. I had customers with loans and lines maturing, including Customer M.M.

4

(as discussed in further detail below), and I was unable to receive any information from underwriting or obtain timely credit decisions. Given that was one of the main reasons that I was attracted to Bremer initially—on-site credit decisions—I was incredibly frustrated that all control over credit decisions had disappeared.

22. On a personal note, I experienced ONB's inability to timely process Bremer customers' paychecks for their employees firsthand. My wife is a teacher in an area school district. Her first paycheck after the conversion, as with all the other hundreds of school district employees paychecks, were delayed due to ONB errors.

23. Disappointing my customers during the conversion was the hardest part of the unsuccessful transition of Bremer customers to ONB. I had assured them that their accounts and banking needs would transition smoothly to ONB's systems, but that did not happen. My customers trusted me, and I hated breaking that trust.

24. I was never contacted at any point by anyone from ONB leadership, including Mr. Iserman, to see how I was doing as an employee or how my customers were doing given the substantial impacts. I dreaded coming to work.

25. Based on all of these frustrations, I contemplated early retirement. No amount of money could have kept me at ONB.

### Retirement and Transition to Bell Bank

26. I contacted ONB's Human Resources department regarding my plans to retire. One of ONB's HR representatives confirmed that I could accept full-time employment at another business upon retirement from ONB.

27. I explored several post-retirement employment opportunities, including at Bell Bank and another area bank. I knew there was no way I would stay at ONB.

28. After meeting with leaders from Bell Bank, I felt like I was home. Unlike at ONB, the people I met at Bell Bank appeared to care about its employees as human beings and to care about its customers.

29. On November 21, I accepted a position as Senior Vice President/Commercial Banker at Bell Bank.

30. During my negotiations with Bell about potential employment, Bell leadership instructed me on more than one occasion not to take any customer or confidential information from ONB's systems.

31. Bell Bank conditioned my employment offer on my promise not to knowingly or intentionally disclose any information that could be claimed by a previous employer as confidential or proprietary.

32. I notified ONB of my retirement from ONB on December 7, 2025.

33. My adult daughter, Peyton McConkey, who remains a current employee at ONB's Baxter branch, lives with my wife and me. It was very difficult not to share my decision with her, but I did not tell her that I was retiring from Bell and joining Bell Bank until December 7, 2025.

34. On the morning of December 8, 2025, I went into ONB's Brainerd branch to collect my personal belongings. Specifically, I collected all of my personal belongings that had accumulated throughout my years of service at Bremer/ONB including Bremer awards,

6

family photographs, and artwork. **True and correct images of my belongings are attached hereto as Exhibit A**.

35. I did not take any ONB documents.

36. The surveillance footage from December 8 attached to the Iserman Declaration misidentifies me. The individual in the photographs wearing a black jacket is Daniel Yantes, not me.

37. I am not aware of any ONB policy requiring security to walk an employee out of the building upon retirement.

### Summary of Relevant Post-Resignation Communications

38. I am not aware of any ONB policies requiring me to delete business-related contacts from my cell phone when I retired.

39. I can confirm that other than some contact information for other ONB employees and certain customers, some of which I had store existed before I arrived at Bremer, and some that was gathered because of friendships that eventually turned into business relationships, I do not have any ONB-related material on my phone as far as I am aware.

40. Following my retirement from ONB on December 7, 2025, some current ONB employees reached out to me, including Paul Keprios, by contacting me on my cell phone. I discussed my retirement and my new job.

41. I also have ongoing interactions and conversations with my daughter, Peyton.

42. In addition, I called Ms. Sjelin on the afternoon of December 8, 2025, to apologize for not giving her advance notice that I was retiring, and to ask whether she had any questions about any pending ONB customer issues.

43. Other than these interactions, I do not recall communicating with any other ONB employees following my departure.

44. I never took any employee-related data or information from ONB, such as performance levels, compensation structures, career goals, and management evaluations, and I have not shared any employee-related data and information with Bell Bank other than my own compensation.

45. As for customers, before I left ONB, I took significant steps to ensure that ONB would be prepared upon my retirement. This included setting my out-of-office and directing those who reached out to me to Olivia Sjelin, who is a Commercial Banking Specialist, Sr. ("CBS") at ONB. I also provided Ms. Sjelin with a detailed update on all pending customer issues, and I copied her on email correspondence with customers to provide introductions in the weeks before I retired.

46. After I retired, I made calls to former customers that I had worked with for many years and developed personal relationships with because I wanted them to hear my retirement news directly from me, and to provide them with the names and contact information for ONB representatives who could help them with their immediate needs. This includes a representative of Customer M.M.

47. Prior to my retirement, Customer M.M. required time-sensitive decisions from ONB related to lines of credit. However, due ONB's halt of credit decisions as

discussed above, M.M. was placed in a terrible situation where I was trying obtain, at a minimum, an extension of M.M.'s lines of credit, to prevent maturity. Despite my putting in long hours, including working on days off during the Thanksgiving holiday, ONB would not make a credit decision for M.M., and on December 1, 2025, the line matured.

48. In the week before I retired, I continued to work hard to resolve Customer M.M.'s issues created by ONB's failure to timely approve the extension of M.M.'s line of credit. I e-mailed my primary point of contact at Customer M.M. asking him to call me as soon as he could, but he was traveling internationally that week. When he returned my call on Monday, December 8, I advised him that I was no longer at ONB, but everything was in place to temporarily extend the line of credit. I also provided him with Olivia Sjelin's contact information and stated she was a good person to reach out to. I have not spoken with him since that call.

49. Second, I contacted some of my customers that I worked with at Wells Fargo who had followed me to Bremer/ONB, as well as individuals with whom I have personal relationships with outside of ONB.

50. This includes my contacts with Customer S.P., a customer I brought to Bremer when I joined in November 2020.

51. My relationships with my customers have been established throughout my 34-year career are long-lasting. More often than not, these relationships either started as friendships that turned into business relationships, or vise-versa.

9

52. My post-retirement contacts with former customers served to ensure that customers did not feel abandoned by ONB, or myself, and to provide assurances that ultimately their banking needs would be met.

53. I also provided some former customers with my updated contact information.

54. I did not take any compilations of information while at Bremer/ONB that contained branch and banker specific customer lists, call sheets, and pipeline or sales reports identifying existing and prospective customers and cross-sell opportunities, as alleged by ONB, and I have not shared any branch and banker specific customer lists, call sheets, and pipeline or sales reports, identifying existing and prospective customers and cross-sell opportunities with Defendant Bell Bank.

55. I have never had any non-solicitation agreement, or even a written employment agreement with Bremer or ONB.

56. Because of my connections within the community, many of the former customers that I contacted, or who contacted me, are close personal friends.

57. I had access to ONB's Brainerd location via a badge. The badge and my corporate credit card were left at my desk. I had log-on information and passwords to access various OBN systems, which I also left behind.

58. I have not used or disclosed any confidential information that I may have obtained during my employment with ONB.

59. I am the primary income earner for my family, so it would be difficult if I am not permitted to continue working for Bell Bank while the legal action continues.

10

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on December 21, 2025.

s/ *Michael McConkey*
Michael McConkey

# EXHIBIT A

Attached to the Declaration of **Michael McConkey** in opposition to Old National Bank's

Motion for Temporary Restraining Order

*Old National Bank v. Adams et al.*

Case No. 0:25-CV-04636 (PJS/LIB)



Exhibit A to McConkey Decl. in Opp. to ONB's Motion for TRO 2



Exhibit A to McConkey Decl. in Opp. to ONB's Motion for TRO                              3