**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Old National Bank, | Court File No. 0:25-CV-04636 (PJS/LIB) |
| Plaintiff, | |
| v. | **DECLARATION OF DANIEL YANTES IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, Daniel Yantes, and Bell Bank, | |
| Defendants. | |

Daniel Yantes declares as follows:

1.      I am a Senior Vice President of Commercial Banking for Defendant Bell Bank, and I am named as a Defendant in this case.  I make this declaration based on personal knowledge, and if called and sworn as a witness, I could and would testify competently to the facts stated herein. I submit this declaration in opposition to Plaintiff Old National Bank's ("ONB's") Motion for Temporary Restraining Order.

**Relevant Employment History**

2.      I started at Bremer Bank ("Bremer") in October 2013 as a Business Banker, Assistant Vice President. Prior to Bremer, I worked as a Business Relationship Manager at Wells Fargo. I made the move to Bremer for several reasons, including due to Bremer's well-regarded reputation in the community, its clear ability to handle my already established customer base with ease, and its use of high-end technology to elevate overall customer experience.

3.      As a local community bank, Bremer engaged with the surrounding community by investing time, energy, and resources, which paid dividends, as the community in turn invested in Bremer for its banking needs. I witnessed the community's support of Bremer firsthand while at Wells Fargo. I lost several prospective customers while I still worked at Wells Fargo due to the unparalleled offerings by Bremer in the community.

4.      In total, I worked full-time for Bremer for over 12 years, and my final job title was Vice President, Business Banker.

### ONB's Failure to Support Bremer Customers Led Me to Leave

5.      Once ONB took over, my outward title remained the same, but internally I was acknowledged as a Business Banking Relationship Manager III, Vice President at ONB's Brainard location.

6.      At ONB, I was responsible for generating new loan and deposit opportunities by developing and maintaining strong business relationships throughout the communities we served. I was responsible for yearly calling efforts with current customers, prospects, and center of influences. I was also responsible for monitoring credit quality and appropriate loan structuring.

7.      ONB expected and encouraged me to be available to ONB leadership, ONB employees, as well as ONB customers through my personal cell phone. ONB published my personal cell phone number on my business card.

8.      ONB did not pay for my cell phone or contribute to my cell phone service costs.

9.     ONB did not prohibit me from storing contact information on my cell phone for anyone I interacted with during my employment—customers, prospects, or otherwise.

10.    I was incredibly happy working at Bremer, and I loved the community atmosphere that Bremer cultivated; I never anticipated leaving. However, with the acquisition by ONB in May 2025, the culture dramatically shifted to that of a national, publicly traded bank versus a community bank. Having known how it felt to work at a national bank, given my time at Wells Fargo, I was apprehensive about working again for a national bank.

11.    My apprehension grew following a site visit from an ONB ambassador to the Brainard location. The ONB ambassador advised that with the transition, customers and employees will leave ONB, and that is okay.

12.    After hearing the ONB ambassador's words, I had an immediate reaction that it was not okay to lose customers or employees following the transition, and I questioned why it would be okay.

13.    At this point, I had worked 19 years in this industry, established many customers throughout my years of service, and met the needs of those customers time and again (including several before I had even arrived at Bremer/ONB). I was never going to be okay with losing customers when the loss appeared preventable, but ONB signaled that it did not want to work to help keep those customers during the transition process.

14.    I was also concerned that ONB had designated certain types of customers as being with "Discouraged Industries." Resorts are one of those categories of customers that ONB "discouraged." Our branch is located in the Brainerd Lakes area, and I have many

3

resort customers that I was worried might eventually be asked to leave the bank by ONB credit policy. This worried me as many of these clients I have worked with for years would be asked to find other banking arrangements simply because of their industry.

15.     With conversion to ONB systems, I received multiple complaints from customers regarding their dissatisfaction with ONB and ONB's customer service team. My customers reported instances of rude and unhelpful customer service representatives at ONB; that ONB failed to make their staff or customers aware of the conversion of foreign wires to foreign currency; that ONB deposited money into the wrong accounts; and that ONB was slow to approve credit. Several of my long-time customers were, understandably, furious and unhappy.

16.     ONB's cavalier approach to these concerns fostered distrust amongst my customers. Particularly, one of my customers, C.W.R., which I brought to Bremer when I transitioned from Wells Fargo in 2013, had a line of credit with Bremer/ONB that was approaching its maturity date in December 2025. I attempted to renew the line of credit on multiple occasions in October and November 2025, but these efforts were routinely met with pushback and delays  from ONB leadership.

17.     For a multitude of financial reasons, C.W.R. needed the credit line renewed before it expired. I expeditiously responded to all ONB's questions and requests for information, and I submitted the final request for approval on or about November 25, 2025. Nevertheless, ONB refused to provide any answer on whether it would approve the line of credit.

18.     At the time of my departure, I had not heard back from ONB's senior credit department on whether the renewals for C.W.R. would be approved.

19.     Likely due to ONB's slow response times, C.W.R. recently chose a different bank (not Bell Bank) to be its financing bank for a separate new venture.

20.     For my customer B.P.R., it too was in an industry that ONB did not want to continue to do business with, *i.e.*, resorts. It also did not make financial sense for B.P.R. to continue doing business with a national bank like ONB, as it required substantially higher costs for note maturity and renewal. At Bremer, it was possible to obtain a property evaluation for approximately $500 to renew a note, whereas ONB's policy required a formal appraisal at a cost of approximately $15,000.

21.     After enduring the many challenges my customers were experiencing and I was personally facing, I started pursuing other employment options, including with Bell Bank, as well as other banks in the area.

22.     In fact, I had accepted a job offer with another bank, and I was planning to start with that bank on November 18, 2025.

23.     However, prior to my start date at that new job, I met with Bell Bank and felt that it was a better fit for me personally and professionally for this point of my career.

24.     I wanted to continue to work with my core team, and I chose to move with them to Bell rather than accept the pending job offer I had with another bank.

25.     I was going to leave ONB no matter what. If there had not been an opportunity to leave with the group of Employee Defendants, I would have left separately.

26.     None of the other named Employee Defendants pressured me into leaving ONB, as I had already decided to leave. None of them pressured me into joining Bell Bank, either. The opportunity to join Bell as a group developed organically while we were openly acknowledging our individual reasons for wanting to leave ONB to one another.

27.     I gave the compensation terms in the offer letter I received from another bank to Kim Ellingson to share with Bell Bank for purposes of negotiating my compensation package. I did not provide Kim or Bell with my ONB compensation information, nor do I have any reason to believe Bell Bank obtained that information from any other source.

28.     On November 20th, 2025, I accepted a position with Bell Bank as Senior Vice President of Commercial Banking.

### Summary of Relevant Events Related to My Resignation

29.     I notified ONB of my departure on December 8, 2025, and left the same day.

30.     On the morning of December 8, 2025, I gathered my personal belongings as I was leaving ONB's Brainerd branch. Based on my review of the Iserman Declaration filed in this lawsuit, I have been misidentified as Michael McConkey. I did not have a box when I left, and I was wearing a black jacket. *Id.*

31.     I collected all my personal belongings that had accumulated throughout my years of service at Bremer/ONB, including family photographs, plaques, a Minnesota hockey stick state cut-out, art, a duck figurine, and an award. I did not take any ONB documents. **True and correct images of my belongings are attached as Exhibit A**.

32.     I am not aware of any ONB policy requiring security to walk me out of the building when I resigned.

6

33. Other than contact information, some of which existed before I arrived at Bremer, and some that was gathered because of friendships that eventually turned into business relationships, I do not have any ONB-related material on my phone that I can recall.

34. Following my departure from ONB on December 8, 2025, some current ONB employees reached out to me, including Gary Johnson and Ryan Thompson through text message and phone, and Jessica Wegworth via LinkedIn.

35. Other than these interactions, I cannot recall any other interactions with ONB employees since my departure.

36. I also am not aware of any, so I never took any, employee-related data or information from ONB, such as performance levels, compensation structures, career goals, and management evaluations, and I have not shared any employee-related information with Bell Bank.

37. As for customers, before I left ONB, I took steps to ensure that ONB would be prepared upon my departure. This included setting my out-of-office and directing those who reached out to me to Olivia Sjelin, who is a Commercial Banking Specialist, Sr at ONB. Olivia has worked for Bremer/ONB for over five years and is a great resource for customers. I knew she would be able to help customers after I resigned.

38. In addition, Sharn Vold and I left a detailed list with pending action items for customer matters, and we included contact information for who was to handle each matter on the ONB side, as well as how to get a hold of each customer.

7

39.     After I resigned, I made calls to former customers that I had worked with for many years and developed personal relationships with because I wanted them to hear my news firsthand, and to provide them with the names and contact information for ONB representatives who could help them with their immediate needs.

40.     Second, I contacted some of my customers that I worked with at Wells Fargo who had followed me to Bremer/ONB from Wells Fargo, and individuals with whom I have relationships outside of ONB. This includes my contact with C.W.R., which has been my customer since 2007. My customer contact at C.W.R. is a great friend, and an individual with whom I have coached hockey. I originally started providing banking services to C.W.R. while I was at Wells Fargo. I did not need any information from ONB in order to contact C.W.R. since I have that relationship independently from my employment with ONB.

41.     Similarly, I have known my primary contact at customer B.P.R. personally for over ten years since before working with B.P.R. at Bremer. The children of my client contact at B.P.R. go to the same school and our oldest kids are in the same grade. Further, that client contact owns the local hockey rink that is used by a hockey association whose board I serve on. I have served on that hockey board for nine years, including as president in the previous two years. B.P.R build the rink and has owned it since in or around 2000.

42.     My conversations with C.W.R. and B.P.R. did not center on, or require, any ONB customer-specific data.

43.     Third, some former customers contacted me, including one of the owners of T.H.&R, who called me on December 8, 2025 after he heard I had left ONB. This customer

8

experienced major issues at conversion with deposits going into the wrong account, as well as some payroll issues where employees were not paid on time. I did not solicit T.H.&R's business.

44.    Suffice it to say, many of these relationships are long-lasting, taken years to build, and are complex. My contact with former customers served to ensure that customers did not feel abandoned by OBN, or myself, and that ultimately their banking needs would be met.

45.    I also provided some former customers with my updated contact information.

46.    I am not aware of any, so never took any, compilation of information while at Bremer/ONB that contained branch and banker specific customer lists, call sheets, and pipeline or sales reports identifying existing and prospective customers and cross-sell opportunities, as alleged by ONB, and I have not shared any branch and banker specific customer lists, call sheets, and pipeline or sales reports, identifying existing and prospective customers and cross-sell opportunities with Defendant Bell Bank.

47.    I have never had any non-solicitation agreement, or even any written employment agreement with Bremer or ONB.

48.    I am not aware of any ONB policies requiring me to delete business-related contacts from my cell phone when my ONB employment ended.

49.    Because of my connections within the community, many of the former customers that I contacted, or who contacted me, are close personal friends. I am also not aware that T.H.&R., C.W.R, or B.P.R. are current customers of Bell Bank.

9

50.    I had access to ONB's Brainard location via a badge. I left the badge on my desk.

51.    I have not used or disclosed any confidential information that I may have obtained or developed during my course of employment with ONB.

52.    Plus, my employment at Bell Bank is conditioned on my agreement not to use or disclose any information a previous employer may fairly consider to be confidential and proprietary.

53.    Bell Bank representatives told me several times as I was considering employment with Bell that I should not take any customer or confidential information from ONB's systems, and I honored that direction.

54.    I am the primary income earner for my family, and any lost income would be catastrophic for our financial situation. In addition, I carry our family's benefits through Bell Bank. Medical insurance is very important because I have a medical condition that requires very expensive treatment every eight weeks.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on December 22, 2025.

Daniel Yantes
_____
Daniel Yantes



# SIGNATURE CERTIFICATE

**REFERENCE NUMBER**
60A51538-66DD-40DE-8854-2E17754D66E2

## TRANSACTION DETAILS

**Reference Number**
60A51538-66DD-40DE-8854-2E17754D66E2

**Transaction Type**
Signature Request

**Sent At**
12/22/2025 07:23:23 AM EST

**Executed At**
12/22/2025 07:25:00 AM EST

**Identity Method**
email

**Distribution Method**
email

**Signed Checksum**
91a229a4ed77d06ab8a6f436a046cca5a9c0a1dd20124c3e23389297293c57a3

**Signer Sequencing**
Disabled

**Document Passcode**
Disabled

## DOCUMENT DETAILS

**Document Name**
Declaration of Daniel Yantes in Opposition to Motion for TRO - Revised 12-22

**Filename**
Declaration_of_Daniel_Yantes_in_Opposition_to_Motion_for_TRO_-_Revised_12-22.pdf

**Pages**
10 pages

**Content Type**
application/pdf

**File Size**
50.8 KB

**Original Checksum**
548704d4161ae1bd7ffff1945c05e9f7bc7afad459874332fa24f382caf4a861

# SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name** <br> Dan Yantes <br><br> **Email** <br> dryantes@gmail.com <br><br> **Components** <br> 1 | **Status** <br> signed <br><br> **Multi-factor Digital Fingerprint Checksum** <br> 4f53cda18c2baa0c0354bb5f9a3ecbe5ed12ab4d8e11ba873c2f11161202b945 <br><br> **IP Address** <br> 75.100.219.200 <br><br> **Device** <br> Mobile Safari via iOS <br><br> **Typed Signature** <br> *Daniel Yantes* <br><br> **Signature Reference ID** <br> B5261948 | **Viewed At** <br> 12/22/2025 07:24:14 AM EST <br><br> **Identity Authenticated At** <br> 12/22/2025 07:24:59 AM EST <br><br> **Signed At** <br> 12/22/2025 07:25:00 AM EST |

# AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 12/22/2025 07:23:23 AM EST | Melissa Solberg (msolberg@spencerfane.com) created document 'Declaration_of_Daniel_Yantes_in_Opposition_to_Motion_for_TRO_-_Revised_12-22.pdf' on Chrome via Windows from 66.41.47.163. |
| 12/22/2025 07:23:23 AM EST | Dan Yantes (dryantes@gmail.com) was emailed a link to sign. |
| 12/22/2025 07:24:14 AM EST | Dan Yantes (dryantes@gmail.com) viewed the document on Mobile Safari via iOS from 75.100.219.200. |
| 12/22/2025 07:25:00 AM EST | Dan Yantes (dryantes@gmail.com) authenticated via email on Mobile Safari via iOS from 75.100.219.200. |
| 12/22/2025 07:25:00 AM EST | Dan Yantes (dryantes@gmail.com) signed the document on Mobile Safari via iOS from 75.100.219.200. |

# EXHIBIT A

Attached to the Declaration of **Daniel Yantes**
in opposition to Old National Bank's

Motion for Temporary Restraining Order


*Old National Bank v. Adams et al.*

Case No. 0:25-CV-04636 (PJS/LIB)









Exhibit A to Yantes Decl. in Opp. to ONB's Motion for TRO                    5



Exhibit A to Yantes Decl. in Opp. to ONB's Motion for TRO                    6



Exhibit A to Yantes Decl. in Opp. to ONB's Motion for TRO                                                   7



Exhibit A to Yantes Decl. in Opp. to ONB's Motion for TRO                    8



Exhibit A to Yantes Decl. in Opp. to ONB's Motion for TRO                    9



Exhibit A to Yantes Decl. in Opp. to ONB's Motion for TRO                    10







Exhibit A to Yantes Decl. in Opp. to ONB's Motion for TRO                    13





Exhibit A to Yantes Decl. in Opp. to ONB's Motion for TRO                15







Exhibit A to Yantes Decl. in Opp. to ONB's Motion for TRO                18