UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

|  |  |  |
|---|---|---|
| Old National Bank, | ) | File No. 25-CV-4636 |
|  | ) | (PJS/LIB) |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | Minneapolis, Minnesota |
|  | ) | December 23, 2025 |
| Sarah Adams, Kasey Bernu, | ) | 1:03 p.m. |
| Yvette Campbell, Kimberly | ) |  |
| Ellingson, Rachal Johnson, | ) |  |
| Michael McConkey, Sharon Vold, | ) |  |
| Daniel Yantes, and Bell Bank, | ) |  |
|  | ) |  |
|  | ) |  |
| Defendants. | ) |  |

------------------------------------------------------------

BEFORE THE HONORABLE PATRICK J. SCHILTZ
UNITED STATES DISTRICT COURT JUDGE

**(MOTION HEARING)**

Proceedings reported by certified stenographer;
transcript produced with computer.

JANELL M. GRUBER, RMR, CRR, CRC
(612) 664-5105

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Grieman Rome & Griesmeyer LLC<br>CHRISTOPHER S. GRIESMEYER, ESQ.<br>205 West Randolph St<br>Suite 2300<br>Chicago, IL 60606 |
| | Lewis Brisbois Bisgaard & Smith LLP<br>BETHANY JEWISON, ESQ.<br>MACK H. REED, ESQ.<br>90 South 7th Street<br>Suite 2800<br>Minneapolis, MN 55402 |
| For Defendants Adams, Bernu, Campbell, Ellingson, Johnson, McConkey, Vold, and Yantes: | Spencer Fane LLP<br>RANDI J. WINTER, ESQ.<br>ARIEL K. LIERZ, ESQ.<br>HEIDI J. BASSETT, ESQ.<br>100 South Fifth Street<br>Suite 2500<br>Minneapolis, MN 55402 |
| For Defendant Bell Bank: | Bradford Andresen Norrie & Camarotto<br>JONATHAN P. NORRIE, ESQ.<br>3600 American Boulevard West<br>Suite 670<br>Bloomington, MN 55431 |
| Court Reporter: | JANELL M. GRUBER, RMR, CRR, CRC<br>300 South Fourth Street<br>1005 U.S. Courthouse<br>Minneapolis, MN 55415 |

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  We are here today on the case of Old National Bank versus Sarah Adams, et al.  The case is Civil Number 25-4636.

If I could have the attorneys make their appearances, please.  Begin over here.

MR. GRIESMEYER:  Good morning, your Honor.  Christopher Griesmeyer on behalf of plaintiff.

MR. REED:  Afternoon, your Honor.  Mack Reed on behalf of plaintiff.

MS. JEWISON:  Your Honor, Bethany Jewison on behalf of plaintiff.

THE COURT:  Good afternoon to all of you.

MS. WINTER:  Good afternoon, your Honor.  Randi Winter, along with my colleagues Heidi Bassett and Ariel Lierz, on behalf of the individual employee defendants, who are Sarah Adams, Yvette Campbell, Kasey Bernu, Rachal Johnson, Michael McConkey, Sharon Vold, and Dan Yantes.  I think I've caught them all.

THE COURT:  Okay, very impressive.

MR. NORRIE:  Good afternoon, your Honor.  Jonathan Norrie for Bell Bank.

THE COURT:  All right.  Good afternoon to you as

well.

Let's see, Mr. -- how do you say it again?  I'm sorry.

MR. GRIESMEYER:  It's Griesmeyer, your Honor.

THE COURT:  Griesmeyer.

Mr. Griesmeyer, it's your motion.  If I could have you at the podium, please.

MR. GRIESMEYER:  Certainly.

THE COURT:  You just let me know when you're ready to go there.  And you're kind of tall.  There is -- right in front of your belt buckle, there is a button that will allow you to move that podium up if you want.

MR. GRIESMEYER:  This is fine, thank you.

THE COURT:  Up to you.

MR. GRIESMEYER:  Thank you, Judge.

But Judge, thank you again very much for squeezing us in.  I know your schedule is particularly busy, especially this time of year.  This motion is quite important, as you can imagine, to Old National Bank.  And also, I thank defense counsel for the ability to read 200 pages of their briefing, and I say that only partially tongue in cheek, because I am grateful, because I do now know quite a bit more about the facts and circumstances surrounding the departure of these individual employees than I did, you know, when we filed our complaint last Monday.

Right?

THE COURT: Right. So let's -- and you're welcome, and I'm sorry you folks had to work over the weekend. Takes me back to when I was in practice. It seemed like every Christmas, every Christmas I was in the office for emergency motions. Let's -- I'd like to just work our way through these, and I recognize you haven't had a chance to file a reply brief. I'm sure there's things you learned you didn't know. There's things that you think they told me that might not be correct that you want to correct.

I want to start, though, just to be real clear. These employees were at-will employees, not subject to any kind of nonsolicitation agreement, nondisclosure agreement, noncompetition agreement, any other kind of agreement. The baseline here is they have every right to change employers if they want, every right to leave Old National Bank, every right to go to work for Bell Bank, every right to call their old clients, every right to call their old colleagues and encourage them -- this is after they leave, of course. I mean, that's the bottom line.

I recognize that in the course of doing this, they could do things like misappropriate trade secrets, which you obviously are entitled to protection against, but I don't -- there's a tone throughout your complaint and your briefs about the outrage that these people would leave and stuff.

I'm not at all outraged.  They're just exercising the same rights you and I have.  There is no profession that has people leave en masse more than the legal profession where whole practices go from one law firm to another all the time, and so I don't start with -- I start wanting to very much protect any rights you have that are being violated, but at the same time, what's happened here hasn't upset me at all.  It's just business.  These are two billion-dollar banks.  This is mostly about money.  It's just business, and sometimes business gets sharp edged, and so we start with that.

Now, with the trade secrets, there's basically three major things you've argued in your briefs as to why you are accusing the employees of stealing trade secrets.  One are these boxes.  It sounds like from their declarations, they're saying there wasn't -- wasn't any -- hardly any documents in these boxes, much less trade secrets.  Do you have -- and I -- I want to make it clear, we're just starting.  I realize in discovery, you may discover things that give you the entitlement to relief, but we're here on a PI motion.  I know I don't have to repeat all the law governing PI motions to you.

Do you have any evidence that there is any documents in these -- or any trade secrets in these boxes that were carried out?

MR. GRIESMEYER:  Well, Judge, first of all, I believe it's our intention that this would be a TRO hearing, not a preliminary injunction hearing.

THE COURT:  It's a PI hearing, because they've had notice so there's a chance to respond, so that makes it a PI hearing.

MR. GRIESMEYER:  Well, Judge, certainly they have produced pictures of some of the contents of the boxes, and of course, you know, the pictures seem to be innocuous; and defense counsel for the defendants characterizes this as a lawsuit about knickknacks and, you know, family pictures.

THE COURT:  Yeah, I understand, but bottom line is:  Do you have any evidence there was any documents in those boxes that contain any trade secrets?

MR. GRIESMEYER:  So evidence inside the boxes themselves?  Not yet.  You know, we are in the process of -- now that we know that this was going on for three weeks, they accepted their offer of employment in November, November 20, 21 -- 20 and 21 of earlier this year and then continued to work at Old National for three weeks without giving anybody any notice whatsoever.  So now that we know that it was a three-week period of time, yes, we're going through, and our IT department is going through and running off the print logs to see what sort of documents they printed, what sort of CRM, customer resource management

materials they analyzed, but the trade secrets in and of themselves might not just be documents.

THE COURT:  I get that.  I'm taking them in categories.  I take it the answer is no, that you don't have any evidence that they physically took documents that contain trade secrets out of -- out of the bank?

MR. GRIESMEYER:  They have not provided that evidence yet.

THE COURT:  Well --

MR. GRIESMEYER:  Yes.

THE COURT:  They're not required to provide the evidence.  You're required, when you move for a PI, to cite the evidence.  You don't have any.  Okay.

Next, oftentimes in these trade secret cases, we have accusations of employees loading things onto thumb drives and, you know, portable hard drives, whatever.  I take it from what you've told me that ONB -- I didn't hear you raise any concern about that.  I take it that's because you have this -- this system that notifies ONB if somebody does try to download documents to the cloud or a personal -- or a -- you know, a thumb drive or something; is that right?

MR. GRIESMEYER:  We do, except we now -- looking at their affidavits, we now do have evidence.  We have evidence that they have on their phones our confidential customer information.

THE COURT:  Yeah, we'll get to that in a second. They have it on their phones, because you encourage, according to them -- you know, I'm just taking what they said.  You encourage them to use their phones to call customers, to be available for customers; so naturally, the phone's going to capture contact information, because that's what happens when you use your phones.

So in terms of them down -- there's no accusation here at this time, recognizing that you're looking, that they downloaded trade secrets onto any clouds or thumb drives or anything like that, other than customer information on their personal phones?

MR. GRIESMEYER:  We don't have that yet.

THE COURT:  Okay.  Now, in terms of the customers, you list a bunch of stuff here that you say is trade secrets, and I -- I want to put aside the issue of -- just momentarily the issue of names and contact information.

Is there -- I'm wondering if there's any other evidence that they've used anything other than customer names and contact information?  You say in your brief -- you mainly make an argument that they seem to have selectively targeted big customers to go after, and that means they're using -- and knowing, you know, how much money the customer has and what their needs are, I agree that would generally be trade secrets under the law.  The question is:  What's

the evidence that they've used that, that they've used anything other than names and phone numbers?

You say they targeted, and that's kind of implicit evidence of use of trade secrets.  They give me a bunch of explanations for why some of the employees contacted some of the customers, and it has to do with things like long-time personal friendships, coaching teams together, going to the same church and seeing them all the time, bringing the customer to Bremer Bank when they came to Bremer Bank.  I mean, they've given me explanations that don't have any hint of any targeting based on trade secrets but mostly based on personal friendships and personal relationships.  So where are we at on reasoning they must have used trade secrets?  Again, other than -- let's put aside customer names and phone numbers.  Other than that, what evidence do we have of them using trade secrets?

MR. GRIESMEYER:  Certainly.  So -- and again, we're at the pleadings phase.

THE COURT:  Yep.

MR. GRIESMEYER:  We don't -- you know, we don't -- we haven't had the opportunity to conduct discovery.  We've asked for expedited discovery.

THE COURT:  I'm not suggesting there's any rule of evidence problem or anything like that.  You want me to enter a pretty serious injunction, including putting these

employees out of work, and I need some evidence.

MR. GRIESMEYER:  Sure.  And just -- I will -- I'll address that in a moment; but to be clear, so the injunction now that we are seeking is much more narrowly construed than the injunction that, you know, we initially asked for in our proposed order last Tuesday.

THE COURT:  But any injunction, you have to have evidence.

MR. GRIESMEYER:  Sure.  The only injunction we're asking for today is a temporary restraining order to enjoin these people from using our confidential information to solicit customers, not to -- not to stop them from soliciting customers, not stop them from, you know, soliciting employees, not, you know, don't work at Bell Bank, none of that.  You know, we're not asking for that. We just are saying, if you're going to compete against us, please don't use our confidential trade secret information. That's it.

THE COURT:  Before I can enter such an injunction, I need evidence they've used your confidential trade secrets.

MR. GRIESMEYER:  So the evidence is, you know, when they -- day one after they leave, they target the ten largest customers systematically that represent 40 percent of Old National's business in the Brainerd-Baxter area.

These are the most important customers, and those are the ones they are contacting.  Not any other customers.  They're starting with them.

THE COURT:  So my question's going to be:  How do you know this?  I'm not arguing with you, I just -- sincere question.  So how do you know they contacted -- the first ten people they contacted were A, B, C, D, and E, and they didn't contact anybody else other than those folks?

MR. GRIESMEYER:  Well, we know they contacted those customers, because those customers have reported to us, you know, that they were contacted.

THE COURT:  And if you were to line up your commercial-lending customers by whatever size of the business --

MR. GRIESMEYER:  Mm-hmm.

THE COURT:  -- these would be the top ten on that list?

MR. GRIESMEYER:  I believe so, yes.  And so, you know, these -- they're targeting these people not just because, you know, they're large, but they also know, you know, what their loan structures are.  They know when the lines of credit are due.  They know what their financing needs are.  They know, you know, loan maturity dates.  They know all of that, and they know, you know, some of these customers, you know, have lending needs.  So there's a

reason why, you know, they're contacting these people as opposed to cold calling, you know, thousands of businesses in, you know, the Brainerd-Baxter area, see if they need lending services.

You know, they get to skip all of that, and using our confidential information, specifically target people that they know are our customers.  Now, the fact that they -- it's a business.  The fact that it's a business that may or may not have lending needs, that might not be trade secret information, but certainly the fact that they are a customer of Old National and have a lending relationship with Old National, that is a trade secret, and that is confidential information.

THE COURT:  Well, I'm not -- I'm not sure about that.  The -- I've had a bunch of cases over the years where essentially the alleged trade secret was customer lists; and the law in the Eighth Circuit on it is not really clear, but basically customer lists may or may not be trade secrets. It kind of depends on the surrounding circumstances, and it's -- it's -- generally speaking, just the fact that somebody -- you know, when an employee -- to accept that knowledge that somebody is ONB's customer is a trade secret and you can't contact them because you know that they're a customer, you essentially -- if that was correct, that would essentially mean that there would be a perpetual

nonsolicitation clause or restriction on these employees.

Now, when you -- even when you try to write nonsolicitation clauses, they have to be strictly limited, and usually you can't even -- you can't even write a nonsolicitation clause that says you can't solicit anybody who was a customer of your former employer.  It usually has to be restricted to those you actually work with and built goodwill and stuff like that.  If I agree with your interpretation of the law, isn't that basically the equivalent of an eternal nonsolicitation clause when you didn't even ask them to sign a -- I mean, when the law explicit -- limits explicit nonsolicitation clauses, how could the statutory law basically create an eternal nonsolicitation clause?

MR. GRIESMEYER:  You know, it's not an issue of nonsolicitation.  It's an issue of nonuse of confidential trade secret information.

THE COURT:  How do they -- generally speaking, when employee A leaves firm and goes to competitor, she can call former customers.  In your view, would customers just -- are they always trade secrets?

MR. GRIESMEYER:  Not necessarily.  I mean, certainly if it's like a published relationship, you know, there's been press releases about, you know, the relationship, things like that, certainly if it's public

knowledge --

THE COURT:  Are there internal policies at ONB that say that your employees can't -- can never disclose outside of ONB that somebody does or doesn't do business with ONB?

MR. GRIESMEYER:  Indeed, there are, yes.  And so these are policies that, you know, they've conveniently neglected to talk about in their affidavits, and you know, when they say in their affidavits that, you know, we're not aware of any sort of policy that, you know, would require us to delete customer information from our phones, it sounds like they may have not been paying attention back in May of 2025 when they sat through the training and acknowledged receipt of the employee handbook, the Old National code of conduct, the Old National code of ethics, the Old National information security policy.

THE COURT:  So suppose that -- I'll just take Ms. Adams, because she's the first name on the list; okay?  Suppose Ms. Adams has worked with some particular client for many years.  She leaves to go to Bell Bank.  Can she ever call that client and solicit on behalf of Bell Bank?

MR. GRIESMEYER:  Well, does -- how does she know the client?

THE COURT:  Because she worked with them for years.

MR. GRIESMEYER:  And that's the only way that she knows the client is the fact that, you know, she worked with them and that their contact is strictly through, you know, knowledge that she gained through the course of her employment?

THE COURT:  Yeah, she worked with them.

MR. GRIESMEYER:  Then I would argue that, yeah, that would be, you know, probably a trade secret.  If instead it's something where, you know, that customer also happens to be her next-door neighbor, the customer also happens to be her, you know, aunt, then no.  You know, then she is not using Old National's confidential trade secret information.

THE COURT:  Okay.  So let me just --

MR. GRIESMEYER:  She's using her personal knowledge of that customer.

THE COURT:  -- break that down.  So she's been working with this client for years.  She knows that it's -- it's an ONB customer, because she's been working with the customer for years.  That's the only way she knows it, because she's been working with them.  She can never solicit them as far as you're concerned?

MR. GRIESMEYER:  I don't think she can.  Again, you know, the only -- we're talking, you know, hypothetically here, the only knowledge she has is knowledge

that she has gleaned, you know, from and during the course of her employment.

THE COURT:  So she essentially has an eternal nonsolicitation restriction with respect to any customers that she knew were customers just because she worked at the bank?

MR. GRIESMEYER:  Again, you know, the subset of customers here that we're talking about would be pretty small, because chances are, they probably have other relationships with them; right?

THE COURT:  Well, could be, but, you know, I'm wondering about the next case where somebody knows of 100 customers because he's worked with 100 people, and he only knows because he's worked with them, and he moves to a competitor, and on the logic of your position is he can literally never solicit any of those 100 customers.

MR. GRIESMEYER:  Is he prohibited from contacting them?  No, I suppose not.  You know, would he be prohibited from, you know, accepting business from them if they reached out to him?  No.  But is he prohibited from trading off of confidential information that he learned during the course of his employment at ONB?  Yes.  Yes, he is.

THE COURT:  And even though there is --

MR. GRIESMEYER:  That's what they're doing.

THE COURT:  The practical impact of that is an

eternal nonsolicitation clause as to those -- in my hypothetical as to those 100 clients?

MR. GRIESMEYER:  For so long as they have a lending relationship with Old National, yes.

THE COURT:  Yeah, see, that's the -- that's -- and again, I'm being sincere.  I'm not trying to be difficult, but this is the problem I have with the notion of customer names being trade secrets.  It really -- if you start thinking through the implications of that, they're pretty serious.

MR. GRIESMEYER:  I agree.

THE COURT:  Now, you say -- you say it might be different now if they're friends or neighbors.  Some of these clients are friends and neighbors, so as to those, is there any problem?

MR. GRIESMEYER:  Well, that's -- we're not asking to enjoin that activity.  The activity that we're asking to enjoin is simply do not use Old National's confidential trade secret information to solicit.

THE COURT:  The "simply" is --

MR. GRIESMEYER:  If you're not using that information, then go ahead, solicit.  If you have other relationships with the people, go ahead.

THE COURT:  The problem -- you use the word "simply."  That's the problem.  You two have a very strong

disagreement about what is confidential information, so before I can say to them don't use confidential information, they have to know what I mean by confidential information.

MR. GRIESMEYER: Well, they should know, because it's set forth in Old National's policies, which they acknowledge receipt of and they promised to follow, so they know exactly what is confidential.

THE COURT: They say, for example, as to customer information, you told them to use their personal phones to talk to their customers, which means that that information would be on their personal phones. I think if I remember the declarations right, they said nobody ever told them that they couldn't reveal this.

MR. GRIESMEYER: And again, they're ignoring the fact -- well, that's not true, because they are ignoring the fact that there are policies that expressly state, hey, when you leave, you can't take any confidential information with you. If you have confidential information, you have to return it.

THE COURT: Okay. So if one of these employees calls their -- someone they've worked with for years. They know it's a customer only because they've worked with them, and the reason they're calling them is to let them know who at ONB they should now reach out to to continue their business with ONB. Is that a problem?

MR. GRIESMEYER:  It's not a solicitation.

THE COURT:  Okay.  If the -- one of their customers is somebody they see regularly, because it's a neighbor or a fellow church member or their kids are on the same sports team, and they call them because they don't want -- they're afraid that this person will get mad if they have to find out on the street rather than from them.  So they call them just to tell them that they've left ONB to go to Bell, but they don't solicit.  Any problem with that?

MR. GRIESMEYER:  Two things.  Number one, we've already mentioned, not a solicitation.  Number two, not use of Old National's confidential information.  They're using other information.

THE COURT:  Okay.  So a lot of these declarations -- I haven't, like, tried to -- I don't have any way to line up every specific phone call with every -- but they say, I didn't solicit.  I called just to let them know I had left, or I called because this was a friend, or I called to let them know who at ONB could take care of their business.  Do you have -- what is the evidence of one of these employees calling somebody who is a customer, who she knows is a customer only because she worked at ONB, and actually solicited, not called for some other reason but to solicit?  Do you have like -- can you cite me -- is there in the record affidavits from two or three of these top ten

clients where they say, Joe Blow, who my only relationship was is at the bank, called me to ask me to move my business?

MR. GRIESMEYER:  We don't have an affidavit from clients.  We do have an affidavit from Mr. Iserman, who identifies a client that was expressly solicited the day these people left and was asked to move their business.

THE COURT:  So his -- and I apologize, I had to read a lot in a short period of time, so I can't keep up with names and stuff here.  He identifies -- does he identify the employee, the client, and we can tell that the only relationship between that employee and that client is business essentially, there's no personal information on the outside?

MR. GRIESMEYER:  To the best of his knowledge, that's correct.

THE COURT:  And that the call was a solicitation call, not some other kind of FYI call or something like that?

MR. GRIESMEYER:  That is what the client reported, yes.

THE COURT:  Okay.  And how many calls do we have evidence for?

MR. GRIESMEYER:  Right now?

THE COURT:  Yeah.

MR. GRIESMEYER:  That's the only one that I can

cite right now.  I don't know how many more there are.  I don't know which one of these ten potentially would fall within that category.  I don't know which other ones they've contacted, you know, which is kind of why we're hoping to conduct some expedited discovery here so we can get that information.

THE COURT:  Yeah, and you may be --

MR. GRIESMEYER:  Sure.

THE COURT:  -- entitled to expedited discovery.  That's something I'll let the magistrate decide.  In our district, that's how we do it.

MR. GRIESMEYER:  But Judge, you'll forgive me if I modestly suggest, you know, their affidavits from these individual defendants were very carefully worded and perhaps maybe less than genuine.  I don't want to come around and say, listen, they're lying, but keep in mind, look at what these people and how they behaved themselves during the last three weeks of employment.

Some of these people, Ms. Ellingson, for example, the day before she left, she contacts human resources to ask about retirement packages, telling them, I'm thinking about retiring.  Then when she resigns, her resignation letter says, I've retired.  Not, I'm still working and I'm resigning and going to work for a competitor, but I've retired.  So, you know, there's a number of employees that

use that phraseology and looked into, quote, unquote, retirement after -- three weeks after they had already accepted their offer of employment and knew they were going to be going to work for Bell Bank.

So, you know, when these employees are going to behave like that, you'll forgive me when I suggest that perhaps their affidavits might not be genuine, and we may need to take some discovery here.

THE COURT:  You're entitled to all the discovery you want, I mean, you know, consistent with the rules.  The flip side of the story, that -- I get that.  I don't mean to diminish that, but the flip side of the story is if what they say is true, they also spent a ton of time on spreadsheets and instructions and things like that to help minimize the impact of their departure on the ONB clients they had, which is something they had no obligation to do. I mean, was that true?  ONB's your client.  Did they leave these various instructions and spreadsheets and, you know, this is where things are at with this client?

MR. GRIESMEYER:  For the purposes of our motion, I think the more important question is:  Did they take a copy of them?

THE COURT:  Take a copy of?

MR. GRIESMEYER:  The spreadsheets.  Did they print off a copy of it?  Did they take it with them?

THE COURT: Yeah, I don't know, but what's my answer to my first question? Did they leave that kind of stuff to help ONB when they left?

MR. GRIESMEYER: As I sit here, I don't know. I don't know if they did, in fact, leave that.

THE COURT: Okay. The other kind of evidence you put forward of taking trade secrets is their recruitment of employees left at ONB after they leave. And again, it's a targeting argument, that they targeted the best people and that there's evidence, therefore, they're using things like internal performance rankings and stuff like that. Now, again, my concern here -- again, it's possible. I don't mean to say that it couldn't have happened, but they -- the evidence of target -- it's just such a small sample size. How many people do we know that -- not that your employee reached out to them, but they reached out to that employee in some sort of a targeting way? How many people are we talking about?

MR. GRIESMEYER: I believe there's three as of today.

THE COURT: And one of them is this Mr. Olsen?

MR. GRIESMEYER: I believe.

THE COURT: Who they say at least -- I don't know what the truth is, but they say at least, he first reached out to them, to Ms. Ellingson, I believe. So it could be

two.

MR. GRIESMEYER:  It could be ten.  You know, I don't know.

THE COURT:  I don't know, right, but you're here seeking the TRO/PI.  You've got the burden of putting evidence in the record that justifies it, and I just -- I just don't see any evidence of this right now.  Could it be happening?  I don't know.  I'm not saying it's not, but I got three employees out of I don't know how many dozens or hundreds in Minnesota of which one it appears may have reached out to them, which brings us down to two, and I don't know why -- I mean, there could be very plausible explanations for why they -- they targeted those two, like somebody was a particularly good friend with one of them or something.  I just don't know, but it just seems to me that evidence is kind of thin.  Do you disagree with me about that?

MR. GRIESMEYER:  I do not disagree that evidence at the pleadings stage and the temporary restraining order, even the preliminary injunction phase, when we have not had the opportunity to conduct discovery is by definition thin, yes.  It's thin.  Of course it is, but, you know, we don't have to present, you know, concrete evidence and prove our case.  We have to prove that we're likely to succeed on the merits, and we have presented some evidence, and that's all

that we need to do at this point.  And again, the injunction that we're asking for is simply do not use our confidential information; and candidly, all of the defendants in their affidavits, they -- the individual defendants said they don't have any confidential information.  Bell Bank in their affidavits said they expressly instructed those people do not use Old National Bank's confidential information.  And so if we're asking for an injunction that says, Please don't use Old National Bank's confidential information to solicit -- to solicit customers and employees, we're essentially asking them for the sleeves off their vest.  What is the problem here?  Why is this not an agreed TRO?

THE COURT:  Because you don't agree on what confidential information is.  They don't think the customer contact information and names is confidential information.  You think it is.  So that's the problem.  You disagree about what it is.  I assume if you agreed exactly on what was and wasn't confidential, you could just stipulate to it, but -- but I think that's the problem.

Anything more you want to say about trade secrets before I move on to some of the other things?

MR. GRIESMEYER:  No, your Honor.

THE COURT:  Okay.  So in terms of the breach of the duty of loyalty, you've got this claim about them, while they were still there, persuading each other to leave and

stuff like that. I don't -- again, I don't know what happened and what didn't happen, but I don't think it has anything to do with a request for a PI. I mean, whatever happened in the past, I can't undo it with a PI, and I don't -- I just don't know how this would give rise -- it's -- it's backward-looking torts or whatever it would be, and any remedy would have to be restorative as opposed to preventive going forward. I mean, if they were there and they did breach their loyalty by encouraging each other to leave, how does that give rise to a PI? They've already left. I can't make them go back to work for you.

MR. GRIESMEYER: I would agree the injunction that we're seeking, you know, isn't to have them no longer work, you know, at Bell Bank. It's to protect our confidential trade secret information.

THE COURT: Yeah. And I mean, you have every right to take discovery on this, and if you find breaches, to seek compensation for the breaches, but I don't think today it's particularly relevant.

MR. GRIESMEYER: They've admitted to the breaches in their affidavits. They've admitted that Kim Ellingson, you know, during the three-week period when she was still employed, you know, negotiated the severance -- or negotiated the compensation packages at Bell Bank, and, you know, basically assisted a competitor to poach employees

while she still was a very highly-placed executive at Old National.

THE COURT:  That could be.  What you're going to have to focus on in discovery, and I know you will, is the law creates some really fine lines with that.  I mean, you -- you can't -- I mean, the most obvious case of a breach is if employee A has agreed to go to -- we'll say Bell Bank, and she goes in as sort of an agent of Bell Bank to try to recruit others to come with her.  Okay, that would be a pretty blatant violation of the duty of loyalty.  But, you know, a handful of friends at a particular firm, all of whom are really unhappy for the same reasons, who all leave at the same time to go to the same employer, that might not be a breach.  It kind of depends on what they were saying to each other, so on, so on.  You're going to have to be -- I know you know this, but you're just going to have to really nail down who said what to whom.

MR. GRIESMEYER:  Absolutely.  We're going to need discovery.  We're going to need their phones.  We're going to need their phones to be, you know, forensically imaged and preserved so we can search, search their call log history, search their text messages.  So it's -- you know, one of the things we asked for in our motion for expedited discovery is please, you know, order them to image their phone so no data is deleted.

THE COURT:  Well, take that -- and I understand that.  Who's your magistrate in this case?  Judge Brisbois?  Yeah, so take it up with Judge Brisbois.  The magistrates take the first crack at any kind of discovery request here.

Okay.  In terms of irreparable harm, which is the other major issue, I -- your brief, when talking about irreparable harm, largely talks about the harm that you've already suffered.  You know, when they left, it was embarrassing, and it hurt our goodwill, and people thought we couldn't, like, service them, and blah, blah, blah; but the irreparable harm that matters when you're here on a PI is what harm will be suffered in the future, tomorrow, the next day, the day after that, if you don't get a PI.

MR. GRIESMEYER:  Mm-hmm.

THE COURT:  And as you well know, money is not irreparable, and I -- I'm not -- what -- just crystalize for me, what is the harm that -- the irreparable harm that a PI will save you from suffering in the future?

MR. GRIESMEYER:  Certainly.  It's the disclosure of our confidential trade secret information, because once that information is disclosed, they can't send it back.  You can't put it back in, and that's what we're seeking to enjoin.  And that type of activity, you know, certainly can be enjoined.  I mean, otherwise you would never have any type of an injunction for, you know, a nonsolicitation or a

noncompete agreement.  Understanding we don't have those covenants here, but, you know, if you did, you could always say, Well, no, you know, the fact that customers are leaving, you know, that can be addressed with money damages.

But courts still enter injunctions, because they know that when they are soliciting in violation of nonsolicit or competing in violation of noncompete, it's a continuing breach, and to enjoin continued breaches, and similarly to enjoin continued misuse of our confidential trade secret information.  That's the irreparable harm that we're seeking injunction for.

THE COURT:  Okay.  All right.  I don't have any more questions for you at this time.  Is there anything more about anything you wanted to say?

MR. GRIESMEYER:  You know, at this point, no.  We would just again ask for, as I mentioned, a temporary restraining order or preliminary injunction.

THE COURT:  Okay.  Just a couple of things, because one way or the other, we're going forward with the lawsuit.  Just a couple things.  One is your complaint is a kitchen sink complaint.  It's just got -- if we were here on a 12(b)(6) motion, I would dismiss most of your complaint as duplicative, as being based only on conclusory allegations. I would really encourage you to go through and think about trying to pare that complaint down.

The -- ask yourself -- I mean, you basically have a trade secret claim.  You have a duty of loyalty claim.  I mean, ask yourself, for example, If I can't recover on my federal trade secrets claim, is there any real chance I'm going to recover on the state one?  Is there any real chance I'm going to recover on the common-law duty to maintain confidential information?  If there's not, just plead your best claim.  If there is, if there's some difference in the elements or something where you can see a plausible way that I might lose on the federal trade secrets claim but I might still win on the state trade secrets claim, then that's fine, but -- and the same with, you know, the duty of loyalty.  It just piles on, in my view, duplicative claim after duplicative claim after duplicative claim.  And I've really in my time as a judge been sort of a crusader against kitchen sink complaints.  They just waste a ton of my time, a ton of lawyer time, a ton of client money, and so I just encourage you to take a hard eye at it.  And I realize after discovery, you'll have a better sense of how to focus.

MR. GRIESMEYER:  And Judge, you know, it's the old saying, you know, if I had more time, I would give you a shorter brief.

THE COURT:  I totally get it.  I'm just --

MR. GRIESMEYER:  We had two days to get the complaint.

THE COURT:  -- encourage you going forward.  It's not meant to be threatening going backwards.

The other thing is is that when you do at some point craft an amended complaint, which seems likely after you start learning things in discovery, you need to be specific of -- when you accuse employees of breaching duties and things like that, I need to know which employee breached in what way.

MR. GRIESMEYER:  Certainly the affidavits that we've received so far are going to go a long way to helping with that.

THE COURT:  Yeah.  And again, I know this was hasty, and I was once you in private practice with a client saying, Come on, come on, come on, what's taking so long, so I get that.  But a complaint that just en masse -- like, for example, if there was people encouraging people to leave, some were being encouraged and some were doing the encouraging.  The encouraged didn't breach any duties.  The encouragers did, and, you know, that's something you'll need to sort out in discovery.

That's all I have.  Thank you, and I'll invite you back up after I talk with Ms. Winter.

MR. GRIESMEYER:  Thank you, your Honor.

THE COURT:  I'm not as good as you at memorizing names, but also that's practice.

MS. WINTER:  Well, your Honor, I think I may have missed one, and that's Ms. Ellingson, in my appearances.

THE COURT:  Okay.  So when talking with Mr. Griesmeyer, he says now all they're looking for today is asking you not to use their confidential information.  That doesn't seem like an unreasonable request.  Why won't you just agree to not use the confidential information?

MS. WINTER:  Your Honor, we don't know what it is, and you are correct that we disagree that customer identities and contact information constitute trade secrets or confidential information.

THE COURT:  Is there anything other than -- do you have, as far as you know -- I know you're the lawyer and you have multiple clients.  Do you have any basis for believing that your clients have any kind of confidential information or trade secrets other than customer information, customer names, and customer contact information, and whatever fragments they have in their minds?  I mean, they can't get rid of their memories.

MS. WINTER:  No, your Honor, and all of those declarations were not just artfully drafted by lawyers.  These are the words of the clients themselves, and so, for example, when Sharon Vold offers to us, Well, I did e-mail myself the employee handbook.  Should I disclose that?

We say yes, and we disclosed it to the Court.  And

each and every one of them put in their sworn statements saying they did not take documents of ONB.  They are not relying or using ONB's confidential information, at least what they can understand and appreciate to be ONB's confidential information.

And I recognize, your Honor, that the Eighth Circuit law on this issue of customer identity and contact information and whether that can rise to the level of confidential information is not entirely clear and the cases can go both ways.  We're here under Minnesota law for the most part, other than the federal trade secret claim, and Minnesota law is clear that that kind of information in a circumstance like this is not trade secret, and it is not protectable confidential information, particularly when there are no restrictive covenants to limit the employee from soliciting the customers.

Now, it's actually Mr. Griesmeyer who cited the case that can guide the Court on this, and it's the Sanitary Dairy case from the Minnesota Supreme Court in 1961, and in that case, the Supreme Court wrestled with this exact issue. And ultimately what the Court said was, no, client identity, client location, that's not confidential when the relationship is created by joint efforts of both the employee and the employer, and that's what happened here.

THE COURT:  Well, that might be right, but it's

just really hard for me to know that right now; right?  It's just --

MS. WINTER:  Yeah.

THE COURT:  It's really hard.  There are customer lists that are protectable trade secrets, and there are customer lists that are not protectable trade secrets, and there are customer lists where some of the names on the list are trade secrets and some of them aren't, and you need facts to figure that out.  And the rules that apply are really not -- you know, are sometimes difficult to apply and understand.

I mean, we can understand the extremes.  Nobody would say that McDonald's customers are a trade secret, I don't think; but at the same time, if there was a company that sold some specialized product that only a handful of people in the world needed and they worked really hard to figure out who those people were, that would be a -- you know, a trade secret.  So I just -- at this point, I don't think I can say that they have a -- you know, that they're likely to succeed on their claim.  I can't say they're likely to lose on their claim, but I just don't have enough information to make that decision.

MS. WINTER:  You're right, your Honor, and what you heard today was, "Not yet.  We don't have the evidence yet," and so it's not appropriate, although 'tis the season

to be here on a TRO motion before you in your chambers and the work you have to put into it, we shouldn't be here today on this. If any other claims survive a motion to dismiss, which hopefully we won't have to bring if the complaint is cleaned up, there is discovery, an opportunity to flesh out this issue of whether there's anything actually protectable there.

But consider the context we're in, too. This is Brainerd-Baxter area of Minnesota.

THE COURT: Yeah. I mean, I totally get that, and trying to distinguish a client that's just a client from a client that's a friend, I understand. I know that area well, and I get it. People are -- everybody knows everybody, and people who are clients become friends, and friends become clients, and it gets really hard to untangle that.

MS. WINTER: Yes, and certainly there are other cases. I think there's one case, I don't remember the name, but it's a case where it was very nuanced technology of sanitizing sewer systems, and the customer list in that instance was protectable. It was unique to that narrow industry. We don't have that here.

Now, ONB asserts, Oh, there are these client contact lists. They are super secret. They're trade secret. Well, one, where's the evidence we have that, as

opposed to the names in memory? Because what my clients are telling me is they know their customers because they've serviced them for many years very well, and that's where the information comes from.

It's also news to us that the TRO that is being sought today is so much narrower than what was actually put before the Court, which was to stop all these individuals from being employed at Bell Bank.

THE COURT: Yeah, so we're not going to do that, but don't -- I mean, don't -- I admire an attorney who will read the opponent's briefs and come in and narrow their request. I mean, that's what should happen rather than stubbornly seek. So I'm not going to criticize Mr. Griesmeyer for that. I think, you know, that speaks well of him that he read the briefs and he narrowed his request to something that's more plausible than stopping all of them from work.

MS. WINTER: Yes. But that's not to say that our clients should be obligated to simply stipulate to a TRO in any fashion.

THE COURT: No, I didn't suggest you were obligated. It would have saved us all this, but I understand you can't do that when there's a dispute over what confidential information means.

As we go forward -- so a couple of things as we go

forward.  One is talk to your clients about not destroying evidence.  So Judge Brisbois will enter any kind of formal orders, but obviously there shouldn't be any spoliation of evidence, so talk to them about what that is and why they shouldn't do that; and also, they shouldn't use anything that could arguably be a trade secret or confidential information other than the client names and -- and numbers, and I assume most of those phone calls have now been made, so there isn't going to be a lot of that going forward.

If there's something that there's some dispute about, I would be happy to have an informal conversation among the lawyers where if you have a client who wants to, like, use X and you're just not sure what the judge would think of that, I can quickly -- you know, I can in a day get you on the phone and talk it through with you.  So let's not -- but obviously, I'm sure a lot of that stuff that -- that was listed in your opponent's brief, things like, you know, client's income, or client's needs, or dates that loans become -- they shouldn't be using any of that, mentioning any of that, anything like that.  So make sure they understand that.

MS. WINTER:  Yes.  Had those conversations, and we will continue to, your Honor.

THE COURT:  Okay.  Let me just look at my notes here and see if I had any question, anything I wanted you to

clarify.

Do you -- Mr. Griesmeyer told me of this one case he's aware of where -- well, it's hearsay.  It's passed through, but one of your clients called a big -- a big client of ONB's who she only knew through business, and it was a pure solicitation, send your business there.  Are you aware of the names of these people that are involved in this?

MS. WINTER:  No, and candidly, your Honor, without more detail, I don't know how I try to discern that; and I appreciate, though, that it was on fast track, but when you look at Mr. Iserman's declaration, it's all, This client by initial was solicited by so-and-so, but there's no detail.  We don't even know if Mr. Iserman heard directly from that client the circumstances of those communications, but I would direct the Court to page 20 -- it's 21 on the ECF filing number, 14 on the bottom of our brief, which outlines the specific details of each and every one of the ten customers.

THE COURT:  Yeah, I didn't try to match them, but you've addressed all of the ten that were mentioned.

MS. WINTER:  Yeah.

THE COURT:  And -- I don't think I have any other questions for you at this time.  Anything else that you wanted to say today?

MS. WINTER:  There were many things I would like to say, your Honor, but I don't think the Court needs to hear them.

THE COURT:  Okay.

MS. WINTER:  Thank you.

THE COURT:  Thank you, Ms. Winter.

Mr. Griesmeyer, anything more that you wanted to say this morning?

MR. GRIESMEYER:  Judge, yes.  Briefly.

You know, just now you admonished Ms. Winters here to make sure her clients know that they shouldn't be using loan information, income levels, account balances, loan terms, rates.  They shouldn't use that when they're communicating with customers.

THE COURT:  Mm-hmm.

MR. GRIESMEYER:  Why then won't you enjoin them?

THE COURT:  Because we don't enjoin people from doing something that they haven't done or threaten to do. We just never do that in federal court.

MR. GRIESMEYER:  But they are threatening to do that.

THE COURT:  Not the stuff that I listed.  I haven't seen any evidence that they've done or really threatened to do it.  The only thing that they've admitted doing that there's any evidence they've done is use their

knowledge of who are customers and how to contact those customers.

MR. GRIESMEYER: And then my next --

THE COURT: But there's no suggestion they've used -- you've described a lot of potential trade secrets that undoubtedly would be trade secrets. There just isn't any evidence that they've used or threatened to use it.

MR. GRIESMEYER: And given the fact that we have not had a chance to conduct discovery, when we do conduct discovery and we discover evidence hypothetically --

THE COURT: Mm-hmm.

MR. GRIESMEYER: -- that they've downloaded our entire customer resource database, then we come back and ask for --

THE COURT: Well, then call my chambers.

MR. GRIESMEYER: -- another injunction?

THE COURT: Yeah, absolutely.

MR. GRIESMEYER: Okay. So the fact that we're calling this a preliminary injunction doesn't mean we can't later ask for another preliminary injunction?

THE COURT: Not on the basis of newly-discovered evidence; right. You certainly can.

MR. GRIESMEYER: Very well.

THE COURT: But, I mean, make sure it's good -- it's good stuff; right? It's solid -- solid proof.

Yeah, it's just -- I think the problem -- I'm not going to grant your PI, and it's not because I think you either do or don't have good claims. I just have such a thin record right now. I don't have the basis for making the conclusions.

MR. GRIESMEYER: I understand. I mean, such is the nature of filing for injunctive relief before we have discovery.

THE COURT: I'm not criticizing you for bringing the motion. It's just I -- as you can tell, I understand the facts pretty well. I looked at the -- there just isn't the basis here. There's going to be some tough questions. There's going to be questions about whether and to what extent this customer contact information was trade secrets. There's going to be questions about whether and to what extent there were breaches of the duty of loyalty as this group of employees prepared to leave, but I need to see those deposition transcripts where -- or the interrogatory answers, whatever, to see who said what to who, and how did this customer come to be a customer, and what was the relationship. I just need the -- I need the basis for it.

MR. GRIESMEYER: Understood, your Honor. We're going to do everything we can to get that as quickly as possible.

THE COURT: And I'll be here God willing. God

willing, I'll be here if you need me.  All right?

MR. GRIESMEYER:  Thank you, your Honor.

MR. NORRIE:  Your Honor?

THE COURT:  Thank you.

Yeah.

MR. NORRIE:  I'm sorry, if I may, Jonathan Norrie on behalf of Bell Bank.  Part of the art of good lawyering is knowing when not to talk, but I just want to be sure the Court has no questions for the bank.

THE COURT:  Oh, I'm sorry.  You know, I keep forgetting that it's separate, but this is -- I mean, you're the tagalong on them, and that's why I was -- you know, without liability there, there's none for you.  So no, I don't have any questions for the bank part of this.  I was expecting to read one brief, and then I saw there was two, and I thought, Oh, crap, because it was late, but I did read them.  No.

So I will send a note to Judge Brisbois.  I think he's out of the office this week, but I will send him a note.  I will ask him to get you in as soon as possible to talk about setting up some expedited discovery.  I think there's legitimate reason here to -- to have expedited discovery, but again, that's his call in the first instance. All right?

Thank you, everyone, and happy holidays to you,

and I'll see you whenever I see you.

MR. GRIESMEYER:  Thank you, your Honor.

MR. REED:  Thank you, your Honor.

*(Court adjourned at 1:54 p.m.)*

\*       \*       \*

I, Janell M. Gruber, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

s/ Janell M. Gruber  *Janell M. Gruber*  Date: January 5, 2026
Janell M. Gruber, RMR, CRR, CRC