## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| OLD NATIONAL BANK, | ) | |
| | ) | Case No. 0:25-cv-04636 (PJS/LIB) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **FIRST AMENDED COMPLAINT** |
| SARAH ADAMS, KASEY BERNU, | ) | |
| YVETTE CAMPBELL, KIMBERLY | ) | |
| ELLINGSON, RACHAL JOHNSON, | ) | |
| MICHAEL MCCONKEY, SHARON | ) | |
| VOLD, DANIEL YANTES, and | ) | |
| BELL BANK, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Old National Bank ("ONB" or "Old National"), for its First Amended Complaint against Defendants, Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, Daniel Yantes (together, the "Former Employees"), and Bell Bank, states as follows:

### THE NATURE OF THIS ACTION

1.      This lawsuit arises from a calculated and unlawful scheme by Bell Bank and eight former Old National employees to orchestrate the *en masse* resignation of senior bank personnel from two ONB branches (in Brainerd and Baxter, Minnesota) and to immediately transfer those employees, along with ONB's confidential information and customer relationships, to Bell Bank – one of ONB's direct competitors.

2.      The scheme was designed to cause maximum disruption to Old National's operations.  All of ONB's revenue producers in the Brainerd-Baxter Market, and nearly all of the senior managers, simultaneously resigned on the morning of Monday, December 8,

2025, forcing ONB to shutter the Brainerd branch.  That same morning (at the same time) the key personnel at ONB's Baxter branch suddenly and simultaneously resigned, forcing ONB to shut down operations in the bank lobby of that branch.

3.     The coordination among and between the Defendants was accomplished only after weeks of careful planning and coordination between them, all while the Former Employees were still employed as senior bank personnel at, and owed the utmost fiduciary duty of loyalty to, ONB.

4.     For nearly a month before their resignation, Defendants Kimberly Ellingson and Yvette Campbell – two of the most senior officers at ONB at the time – surreptitiously worked together on behalf of Bell Bank to solicit, induce, and poach a team of key employees (their direct and indirect reports) to leave Old National and follow them to Bell Bank.  Among other things, they:

> a.  Coordinated a recruiting trip to Bell Bank's office in Fargo, North Dakota on or about November 14, 2025, so their colleagues at ONB – i.e., each of the Former Employees – could discuss the details of their potential employment at Bell Bank, their departure from Old National, and the business, customer relationships, and confidential trade secret information they could take from ONB and bring to Bell Bank;[1] and
>
> b.  Obtained Old National's compensation information for each of the Former Employees, then utilized and shared that information with Bell Bank to help Bell Bank prepare employment offers and compensation packages that would be sufficiently competitive to lure the Former Employees away from ONB.

---

[1] Although Sharon Vold and Kasey Bernu were unable to join their co-defendants in person on November 14, 2025, Ms. Ellingson, Ms. Campbell, and the rest of the Former Employees eagerly shared the information obtained from Bell Bank during this meeting.

5.      On November 19, 2025 – five days after that recruiting trip – Bell Bank provided coordinated offers of employment to the Former Employees.  The next day, November 20, 2025, the Former Employees accepted their offers of employment, and agreed to leave ONB and join Bell Bank.

6.      After accepting their offers of employment from Bell Bank, the Former Employees continued to coordinate with each other (and Bell Bank) to ensure their departure from Old National would be as disruptive and harmful to ONB – and as beneficial and helpful to the Defendants – as possible.

7.      For example (and without limitation), instead of a phased, gradual departure from Old National, the Defendants concocted a coordinated scheme to suddenly and simultaneously resign from ONB without notice at the same time.  As Defendants had planned, this mass exodus of key banking executives left Old National reeling, and was so disruptive that ONB had to close its Brainerd branch, and shutter lobby operations at its Baxter branch.

8.      Similarly (and, again, without limitation), instead of informing their managers, human resources personnel, or anyone else at ONB that they had accepted an offer of employment from Bell Bank on November 20, 2025, the Defendants concocted a scheme to keep ONB in the dark for as long as possible.  Pursuant to this scheme:

   a.  The Defendants agreed amongst themselves that the Former Employees would not provide any advance notice to Old National, in order to deprive their employer (ONB) of the opportunity to prepare an orderly transition plan, or take steps to properly secure ONB's confidential trade secret information, as well as its customer relationships.

b. The Defendants further agreed amongst themselves that the Former Employees would continue working at ONB for nearly **three weeks** (all while continuing to keep their impending employment at Bell Bank a secret) – until the morning of December 8, 2025, when they simultaneously resigned.

9. As explained in greater detail below, an integral part of the Defendants' scheme was to use their final days and weeks at Old National not for the benefit of ONB (who was still their employer and to whom they continued to owe the utmost fiduciary duty of loyalty), but rather for the benefit of their future employment at Bell Bank. By refusing to inform Old National they had accepted employment at Bell Bank, the Former Employees were able to continue accessing – for weeks, without supervision or suspicion – ONB's computer systems, allowing them to misappropriate confidential trade secret information and documents that would be useful to them at Bell Bank.

10. The Former Employees also used their remaining time at ONB to jointly draft their resignation letters (many of which contained identical typographical errors), several of which were addressed to Ms. Campbell, a co-conspirator who also resigned. Ms. Campbell's leadership role in this *coup d'état* is clear; she wrote in her resignation email on behalf of the group, "our badges and corp credit cards are in our desks" – proof positive that the group of Former Employees planned in advance to walk out simultaneously.

11. Video surveillance footage from ONB's Brainerd and Baxter branches shows the Former Employees entering their branch offices in the early morning hours of December 8, 2025, prior to the start of business. That same surveillance footage shows the Former Employees removing several boxes of documents and materials from their branch (many requiring multiple trips), without any opportunity for inspection by ONB's HR

4

Department or corporate security personnel.

12.    Within minutes following their departure from ONB on December 8, 2025, Bell Bank had positioned the Former Employees to service the very same customers they had handled at ONB. On the same day as the mass resignation, ONB's highest-valued commercial banking customers were contacted and solicited to move their business to Bell Bank, based on the rationale that ONB no longer had a branch presence in the Brainerd-Baxter area and therefore could not service their banking needs.

13.    The development of successful branch locations in the Brainerd-Baxter market required decades of hard work and investment by Old National's predecessor-in-interest, Bremer Bank.

14.    As of December 8, 2025, Bell Bank did not have a footprint in that market; however, upon information and belief, Bell Bank is in the process of opening its first branch in Brainerd, Minnesota.  Rather than investing the time, effort, and money required to develop a successful branch over time, Bell Bank's "strategic shortcut" involved poaching an entire branch of senior bank personnel from Old National.  Using this strategy, Bell Bank would obtain the immediate benefit of hiring a knowledgeable and well-trained staff of professionals; equally important, the coordinated mass exodus of ONB's key personnel would severely damage (if not destroy) its competitor.  This is precisely the type of conduct that constitutes "unfair competition."

15.    Defendants executed their planned raid of ONB's branches on December 8, 2025.  The very next day, on December 9, 2025, Old National tried to resolve this matter by sending (via email and overnight delivery) cease-and-desist letters, which asked each

Former Employee to affirm in writing that he/she:

    a.  had returned to ONB, and did not knowingly possess, any of ONB's confidential or trade secret information;

    b.  had not used or disclosed to Bell Bank any of ONB's confidential or trade secret information; and

    c.  would not use, or disclose to Bell Bank, Old National's confidential or trade secret information for the purpose of soliciting ONB's customers.

16.    Notably, the Former Employees have refused to provide these requested assurances. Left with no other choice, ONB has sued to redress the serious and ongoing harm it has suffered as a direct and proximate cause of the Defendants' misconduct, as described herein. Defendants' actions breach fiduciary duties, violate trade secret and unfair competition laws, and otherwise amount to tortious interference, civil conspiracy, and unjust enrichment. ONB seeks injunctive relief, damages, and all other appropriate remedies to stop this misconduct, protect its rights, and hold Defendants accountable.

## THE PARTIES

17.    ONB is a nationally-chartered bank headquartered in Evansville, Indiana and Chicago, Illinois. It operates bank branches and provides commercial, retail, and investment banking services throughout the Midwest, including in the State of Minnesota. ONB is the successor-by-merger to Bremer Bank, N.A., with the merger effective May 1, 2025.

18.    Bell Bank is a North Dakota state-chartered banking corporation with its corporate headquarters located in Fargo, North Dakota. Bell Bank's principal place of business at which its high-level officers direct, control, and coordinate its activities is also

located in Fargo, North Dakota.  Bell Bank transacts business in this District and purposefully avails itself of the privileges of conducting business here.

19.    Kimberly Ellingson ("Ellingson") is an individual formerly employed as a Regional President of ONB – a senior executive officer position, responsible for nearly 200 employees covering, *inter alia*, the Brainerd-Baxter market.  She is currently employed by Bell Bank.  Ellingson resides in Pequot Lakes, Minnesota and is a citizen of Minnesota.

20.    Yvette Campbell ("Campbell") is an individual formerly employed as a Market President of ONB – a senior executive officer position responsible for Old National's operations in the Brainerd-Baxter market, whose direct reports included Daniel Yantes and Michael McConkey.  She is currently employed by Bell Bank.  Campbell resides in Baxter, Minnesota and is a citizen of Minnesota.

21.    Rachal Johnson ("Johnson") is an individual formerly employed as an executive in the Treasury Management Department at ONB's Brainerd branch.  She is currently employed by Bell Bank.  Johnson resides in Nisswa, Minnesota and is a citizen of Minnesota.

22.    Sharon Vold ("Vold") is an individual formerly employed as a Senior Commercial Banking Specialist, a "team leader" position at ONB's Brainerd branch.  She is currently employed by Bell Bank.  Vold resides in Little Falls, Minnesota and is a citizen of Minnesota.

23.    Michael McConkey ("McConkey") is an individual formerly employed as Vice President in the Business Banking department at ONB's Brainerd branch.  He is currently employed by Bell Bank.  McConkey resides in Brainerd, Minnesota and is a

citizen of Minnesota.

24.    Daniel Yantes ("Yantes") is an individual formerly employed as a Vice President and Relationship Manager the Business Banking Department at ONB's Brainerd branch.  He is currently employed by Bell Bank.  Yantes resides in Pequot Lakes, Minnesota and is a citizen of Minnesota.

25.    Sarah Adams ("Adams") is an individual formerly employed as Community Banking Market Manager at ONB's Baxter, Minnesota branch.  She is currently employed by Bell Bank.  Adams resides in Pequot Lakes, Minnesota and is a citizen of Minnesota.

26.    Kasey Bernu ("Bernu") is an individual formerly employed as a Relationship Banker II at ONB's Baxter branch.  She is currently employed by Bell Bank.  Bernu resides in Baxter, Minnesota and is a citizen of Minnesota.

## JURISDICTION AND VENUE

27.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because ONB asserts claims arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

28.    This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states.  ONB is a citizen of Indiana.  Bell Bank is a citizen of North Dakota.  Each Former Employee is a citizen of Minnesota.  Each Defendant is, therefore, diverse from ONB.

29.    This Court has supplemental jurisdiction over ONB's state law claims under 28 U.S.C. § 1367 because those claims are so related to ONB's federal claims that they form part of the same case or controversy.

30.    The Court has personal jurisdiction over each Defendant because each Defendant resides in, does business in, or committed wrongful acts in Minnesota that caused injury to ONB in this District.

31.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to ONB's claims occurred in the District of Minnesota, including in Brainerd and Baxter, Minnesota.

### FACTUAL BACKGROUND

**A.    ONB Invests in Confidential, Near-Permanent Customer Relationships**

32.    ONB, like its predecessor, Bremer Bank, has made substantial investments in building, maintaining, and protecting its customer relationships across Minnesota, including in the Brainerd and Baxter markets.  These investments include hiring and training skilled banking professionals, developing customized financial solutions, and delivering services tailored to the needs of commercial, small business, and retail clients.

33.    Because of these investments, ONB maintains longstanding, valuable relationships with its commercial and consumer banking clients, including customers serviced by its Brainerd and Baxter branches.  These relationships are essential to ONB's ongoing business operations, profitability, and goodwill in the communities it serves.

34.    ONB's value proposition is not based solely on competitive rates or products. It rests heavily on the depth and continuity of its customer relationships, the institutional knowledge developed over time, and the nonpublic customer information gathered and used by ONB to serve its clients effectively.  The resulting customer goodwill is among ONB's most important and valuable business assets.

35.    ONB relies on its relationship managers, commercial bankers, and other frontline personnel to serve as stewards of this goodwill.  These employees often develop deep working relationships with customers and serve as ONB's primary interface with those clients.  But the customer relationships belong to ONB (not the employee), and are backed by ONB's brand, systems, credit approvals, and institutional knowledge.  These relationships are carefully managed to ensure consistency and retention over time.

36.    The success of ONB's Brainerd and Baxter branches was built on years of work to develop these relationships and gather sensitive customer data to serve those customers effectively.

37.    In the ordinary course of business, ONB compiles and maintains detailed, nonpublic information about its customers – individually and in the aggregate – that is highly confidential and proprietary to ONB.  This confidential information includes, but is not limited to:

a.  The names and identifying information of ONB customers, including each customer's status as:

    i.  a financial services customer generally (i.e., a person or entity who needs, wants to receive, or has previously received banking, loans, treasury management services, or similar financial services), and

    ii.  a current or former customer of ONB specifically;

b.  The contact information of ONB customers, including their mailing addresses, email addresses, and telephone numbers;

c.  Personal identification information about customers, such as their birthdays, social security numbers, and names of family members;

d.  Customer business and financial information, including:

      i.   information about their accounts, such as: account numbers, account structures, account balances, lending histories, signatories, and beneficiaries;

      ii.   information about their lending needs, loan terms and rates, loan maturity dates, financial plans, and income;

      iii.   credit profiles, pricing and profitability data, internal relationship notes, and strategic banking recommendations.

    e.   Customer lists and other compilations, in whole or in part, of the information set forth in (a)-(d), above.

38.    This information is not shared outside ONB, is not available to the public, and cannot be readily compiled from public sources.

39.    ONB's confidential information was developed over a substantial period of time, and at great expense. Indeed, the vast majority of ONB's customer information took several years and hundreds of thousands of dollars to obtain and compile.

40.    ONB derives substantial economic value from its confidential information. The information is invaluable in its own right; it is the "lifeblood" of ONB without which it could not operate.

41.    Equally important, the confidential information also derives substantial economic value from its confidentiality; the information is valuable *precisely because* it is available only to ONB, and is not generally known by other banks in this highly competitive industry. ONB's confidential information would be of tremendous value to its competitors, who could use it to unfairly poach ONB's customers. For example:

    a.   The information would allow a competitor to *immediately* identify entities with banking, treasury management, or particular lending needs.

The competitor would be spared the significant costs, both temporal and monetary, that ONB incurred to develop this information.

b.   With knowledge of the customer's contact information, the competitor could send targeted solicitations directly to those entities.

c.   Armed with foreknowledge of the customer's credit profile and financial needs, the competitor could (i) perfectly tailor their marketing efforts for each individual customer; and (ii) undercut ONB's rates.

42.   The Former Employees – now at Bell Bank – are actively leveraging their knowledge of ONB's customer base, including relationship status, account profiles, lending needs, income, etc., to target key accounts and solicit a migration of business to Bell Bank.  This conduct not only jeopardizes ONB's customer relationships, it undermines the confidentiality and trust that ONB's clients place in the bank.  Indeed, the use of confidential ONB information to solicit ONB's customers threatens to convert ONB's hard-earned goodwill and data into a competitive weapon against it.

**B.   ONB Protects the Secrecy of Its Confidential Information**

43.   ONB takes the protection of its confidential, proprietary, and trade secret information seriously and implements multiple layers of safeguards to ensure that such information remains secure and inaccessible to unauthorized individuals, including competitors.

44.   ONB limits access to sensitive customer information to personnel with a legitimate business need to know, and access is protected through multiple layers of technological, physical, and procedural safeguards.  Confidential customer data (such as contact lists, relationship histories, internal notes, pricing strategies, account analytics, loan

information, customer income levels, customer account balances, loan histories, loan terms and rates, loan maturity dates, customer needs and preferences, etc.) and other confidential business data is stored on secure, password-protected platforms that are encrypted.  Access rights to internal systems and databases are role-based and are restricted through secure login credentials, multi-factor authentication, and regular monitoring of access logs.

45.    ONB maintains internal policies and procedures governing the handling of confidential information.  These include written policies on data privacy, acceptable use, information security, and internal confidentiality obligations.  All employees – including the Former Employees, prior to their departure from ONB – are required to comply with these policies as a condition of employment and are trained on the importance of confidentiality and data protection.  Employees are prohibited from copying or transferring this data to external devices, sending it to personal email accounts, or otherwise removing it from ONB's secure environment.

46.    For example, ONB's Team Member Handbook expressly identifies "Customer Lists," "Customer Preferences," "Financial Information," and "Marketing Strategies" as "confidential business information and trade secrets," instructs that "[u]nder no circumstances should a team member discuss or reveal information concerning a customer's business to those unauthorized to receive it," and states that confidential records must be "kept in a secure area at all times." During the course of their employment at ONB, during the time period from May 2, 2025, though May 9, 2025, each of the Former Employees acknowledged that he/she had received, read, understood, and would follow ONB's confidentiality, non-disclosure, and non-use policies (and every other policy) as set

forth in that handbook as follows:

    a.  Adams on May 5, 2025;

    b.  Bernu on May 2, 2025;

    c.  Campbell on May 2, 2025;

    d.  Ellingson on May 4, 2025;

    e.  Johnson on May 9, 2025;

    f.  McConkey on May 2, 2025;

    g.  Vold on May 9, 2025; and

    h.  Yantes on May 5, 2025.

47.     ONB also requires employees to comply with its Acceptable Use Policy governing the handling of confidential information, including "consumer and customer data" and "corporate confidential data." That policy requires confidential information to be stored only in "approved Old National storage such as ONB network drives or folders, cloud-based storage services, and only use shared folders for their intended purpose, ensuring information is purged when no longer needed in accordance with published record retention standards." The policy also restricts the storage of Confidential Information on portable devices. ONB reserved the right to pursue all rights, remedies, and penalties available under the law for violation of the Acceptable Use Policy.

48.     ONB's Code of Conduct similarly directs employees to safeguard confidential information and limit access on a need-to-know basis. In particular, it requires employees to "Never store confidential information on an unauthorized device like a flash drive" and requires employees to "[c]omply with all ONB security measures for company

devices." During the course of their employment at ONB, during the time period from June 9, 2025, though June 13, 2025, each of the Former Employees acknowledged that he/she had received, read, understood, and would follow ONB's policies set forth in the Code of Conduct, as follows:

    a.  Adams on June 10, 2025;

    b.  Bernu on June 9, 2025;

    c.  Campbell on June 9, 2025;

    d.  Ellingson on June 10, 2025;

    e.  Johnson on June 10, 2025;

    f.  McConkey on June 9, 2025;

    g.  Vold on June 13, 2025; and

    h.  Yantes on June 9, 2025.

49.    ONB's predecessor, Bremer Bank, likewise treated customer identifying information as confidential: Bremer's Code of Conduct stated that "All customer nonpublic information is confidential," and that an employee may never share customer information with third parties, including information the employee may believe is not confidential "such as customer names." It further provides that when employment ends, the employee must not retain or disclose intellectual property including customer lists. Any waivers of those provisions were required to be in writing.

50.    In addition to its written compliance policies and procedures, ONB has also developed, implemented, and maintains security measures to safeguard its confidential information. More specifically:

a.  All of ONB's computers, networks, and information accounts are password protected. Users are required to regularly change their passwords, and remote access is restricted (and, where permitted, requires dual-factor authentication).

b.  Computer, network, and email activity is closely monitored. ONB utilizes electronic safeguards that automatically flag any employee who attempts to forward an email message to their personal account, or who tries to download information or files to an electronic storage device (e.g., a USB "flash drive") or cloud-based storage account (e.g., "Dropbox," "Google Drive," etc.).

c.  ONB branch locations are equipped with automatic locks requiring "keycard" access, and are monitored via 24-hour video surveillance.

d.  Upon separation of employment (for any reason) employees are required to immediately return all ONB property (including laptops, keycards, and any paper copies of files), and their ability to access any computers, networks, or information accounts is terminated.

51.  As a matter of practice and procedure, when a team member's employment with ONB is terminated (either voluntarily or involuntarily), the departing employee is required to promptly return any and all documents and electronic files that constitute or contain confidential information. ONB also makes a point of reminding the departing employee of his or her ongoing obligations to maintain the confidentiality of, and never use or disclose, any confidential information that they may have obtained or developed, or to which they may have otherwise been privy, during the course of their employment with ONB.

52.  ONB's confidentiality safeguards are not merely formalities; they are integral to protecting its competitive position, maintaining customer trust, and complying with legal obligations under state and federal law. ONB has invested considerable

resources in developing and maintaining these protocols and enforcing compliance throughout the organization.

### C.    The Former Employees Had Access to ONB's Confidential Information

53.    Each of the eight Former Employees held key positions of trust and responsibility within ONB's Brainerd and Baxter, Minnesota branches.  In those roles, they had direct access to ONB's highly-sensitive nonpublic customer information, including customer identities, direct-dial and personal cell phone numbers, relationship histories, transaction status, loan information, financial information, and other confidential relationship data. Each Former Employee owed ONB duties to protect this information and not retain, use, or disclose it for competitive purposes.  For example:

   a.  Ellingson was the Region President (an officer position at ONB) and served as Credit Systems Director and Executive Vice President at ONB.  She had enterprise-level visibility into ONB's credit practices, risk frameworks, customer portfolios, and strategic credit decisions.  Ellingson had regular access to sensitive internal data, including, for instance, customer profitability reports, credit exposure summaries, loan performance analytics, and proprietary scoring models.

   b.  Johnson held the position of Treasury Management Consultant III and Vice President at ONB.  Johnson worked closely with business clients to structure deposit, liquidity, and cash management solutions.  She had access to detailed customer account structures, balances, cash flow histories, and internal relationship notes.  Johnson also participated in pricing discussions and retention strategies for ONB's most significant treasury clients.

   c.  Vold was a Senior Commercial Banking Specialist at ONB.  She played a central role in servicing and administering ONB's commercial loan and deposit accounts.  Vold had access to and knowledge of ONB's internal documentation regarding credit facilities, collateral, customer relationship histories, and operational procedures.

17

d. Campbell was a Market President at ONB. She was a senior business banker responsible for originating, growing, and managing complex business relationships. She had direct access to ONB's customer relationship management (CRM) systems, lending files, internal customer notes, and pricing and profitability data.

e. McConkey served as a Business Banking Relationship Manager III and Vice President at ONB. McConkey held responsibilities similar to Campbell's, managing a portfolio of business customers and contributing to ONB's commercial banking efforts. His role required knowledge of customers' financial structures, lending terms, and business plans.

f. Yantes was also a Business Banking Relationship Manager III and Vice President at ONB, working closely with ONB's business clients in the Brainerd area. He had visibility into ONB's customer base, account strategies, and market positioning. Yantes used ONB's proprietary data systems to manage his portfolio and coordinate with internal teams.

g. Adams held the position of Community Banking Market Manager at ONB's Baxter branch. Adams was a senior officer responsible for customer acquisition, community engagement, and team leadership. Her role gave her access to internal sales reports and customer metrics.

h. Bernu was a Relationship Banker II at ONB's Baxter branch. While more junior, Bernu was still entrusted with confidential customer and account-level information. Bernu was privy to customer financial data, onboarding procedures, and internal system workflows necessary to support relationship managers and banking operations.

54. Through their respective positions, all Former Employees were entrusted with access to ONB's secure internal systems, including its CRM platforms, loan origination and servicing systems, internal reports, customer profiles, account histories, and internal employee assessments. They used these tools not only to manage client relationships, but also to collaborate across departments and deliver ONB's financial

services under strict confidentiality obligations.

55.     Because of their seniority and their job functions, many of the Former Employees had knowledge of ONB's strategic business plans, marketing initiatives, and potential expansion opportunities within the Brainerd and Baxter markets.  They were regularly exposed to confidential team performance data, incentive structures, and internal forecasts, none of which are available to ONB's competitors or the public.

### D.    The Former Employees Coordinate a Mass Exodus to Bell Bank

56.     Despite their heightened positions of trust and influence as officers at ONB, starting in November of 2025 Ellingson and Campbell decided to "jointly explore" an alternate employment opportunity at Bell Bank – not just for themselves, but for other ONB employees (including the remainder of the Former Employees).

57.     On November 4, 2025, Ellingson asked Bell Bank to schedule an in-person recruiting meeting on November 14, 2025, in Fargo, North Dakota, for any ONB employees interested in joining Bell Bank.

58.     Instead of reporting to work at ONB on Friday, November 14, 2025, Ellingson, Adams, Campbell, Johnson, McConkey, and Yantes attended the meeting with Bell Bank in Fargo, North Dakota. During the meeting, the group discussed that others, including Vold, were part of the group scheming to defect to Bell Bank. Notably, only Johnson and Yantes took paid time off ("PTO") leave from work to attend the meeting. McConkey and Adams called in sick, to avoid using 8.0 hours of PTO.  The most senior executives, Ellingson and Campbell, didn't account for their absence to ONB at all. Consequently, McConkey, Adams, Ellingson, and Campbell quite literally attended this

meeting at Bell Bank *on ONB's time* – not their own personal time – and ensured that they were paid their full compensation from ONB for the day they spent at Bell Bank, devising a plan to leave Old National.

59.    Following the Fargo meeting, the Bell Bank recruiting process moved quickly into compensation and offer discussions – with Ellingson serving as the appointed representative for the entire group – starting on November 17, 2025.  More specifically:

      a.  Adams and Johnson met with Bernu at "Boulder's Tap," where they recruited her to join them at Bell Bank.  Adams and Johnson explained to Bernu that they, along with several other ONB employees, were joining together to leave ONB and move to Bell Bank.

      b.  Adams obtained Bernu's ONB compensation information, and conveyed it (along with her own information) along to Ellingson, so that she (Ellingson) could negotiate an employment offer and compensation package from Bell Bank for both Adams and Bernu.

      c.  Similarly, Johnson provided her own compensation information at ONB to Ellingson, so that she (Ellingson) could negotiate an employment offer and compensation package for her with Bell Bank.

      d.  Campbell also shared her ONB compensation information with Ellingson so Ellingson could provide it to Bell Bank (Campbell was also instrumental in making sure that Adams was able to attend the recruiting meeting on November 14, 2025).

      e.  Ellingson also provided the ONB compensation information for McConkey, Vold, Yantes, and herself to Bell Bank.

60.    Armed with the ONB compensation information for each member of the defecting group, Ellingson negotiated with Bell Bank on the terms and conditions of employment offers and compensation packages for each of the Former Employees,

ensuring that those terms and conditions were sufficiently favorable to each Former Employee to entice him/her to leave ONB and join Bell Bank.

61.    On November 19, 2025, Bell Bank presented the offers of employment – negotiated by Ellingson – to each of the Former Employees. Ellingson's negotiation efforts proved effective; on November 20-21, 2025, each of the Former Employees accepted their offer of employment from Bell Bank.

62.    In addition to accepting their offers of employment at Bell Bank, the Former Employees coordinated their departure from ONB. Collectively, they agreed that: (a) their last day at ONB would be December 8, 2025; and (b) they would not provide ONB with the customary two-week notice or otherwise disclose their impending departures to ONB until the hour of their departures.

63.    After accepting their offers of employment from Bell Bank, the Former Employees coordinated with one another on their uniform timing, and similar language and formatting of resignation letters – several of which were addressed to another resigning employee, Campbell – and many of which contained identical dating errors and identical typos (e.g., "December 8th,2026"), reinforcing that they were drafted in consultation with one another, even across the two branches. The coordination extended beyond the language of their resignation letters. Campbell's 7:43 a.m. resignation email stated: "Our badges and corp credit cards are in our desks," revealing a plan to simultaneously resign at the start of business hours in order to maximize operational disruption and minimize ONB's opportunity to prepare a response.

64.    Moreover, on information and belief:

a. Adams encouraged, solicited, and induced Bernu – and potentially other Former Employees – to leave ONB, join Bell Bank, participate in the simultaneous resignation on December 8, 2025, and keep ONB in the dark concerning their impending resignations for nearly three weeks;

b. Bernu asked Adams and Ellingson to obtain a favorable employment offer and compensation package from Bell Bank, and further induced, encouraged, and solicited other Former Employees to leave ONB, join Bell Bank, participate in the simultaneous resignation on December 8, 2025, and keep ONB in the dark concerning their impending resignations for nearly three weeks;

c. Campbell asked Ellingson to obtain a favorable employment offer and compensation package from Bell Bank, and further induced, encouraged, and solicited other Former Employees to leave ONB, join Bell Bank, participate in the simultaneous resignation on December 8, 2025, and keep ONB in the dark concerning their impending resignations for nearly three weeks;

d. Ellingson induced, encouraged, and solicited each of the Former Employees to leave ONB, join Bell Bank – and even negotiated the terms and conditions of their employment offers and compensation packages – participate in the simultaneous resignation on December 8, 2025, and keep ONB in the dark concerning their impending resignations for nearly three weeks;

e. Johnson encouraged, solicited, and induced Bernu – and potentially other Former Employees – to leave ONB, join Bell Bank, participate in the simultaneous resignation on December 8, 2025, and keep ONB in the dark concerning their impending resignations for nearly three weeks; and

f. McConkey, Vold, and Yantes each encouraged other Former Employees to leave ONB, join Bell Bank, participate in the simultaneous resignation on December 8, 2025, and keep ONB in the dark concerning their impending resignations for nearly three weeks.

65.    Taken together, the conduct described above – including coordinating and participating in group recruiting discussions with Bell Bank, sharing compensation and

competing-offer terms to enable Bell Bank to formulate offers to multiple ONB employees, and openly discussing a collective move and synchronized departure – constitutes affirmative encouragement and facilitation of the other Former Employees' defection and the coordinated *en masse*, no-notice resignations from ONB.

### E.    The Simultaneous Resignations Negatively Impact ONB's Business

66.    Although a few non-officer employees (e.g., branch tellers) remained at the Brainerd location, the simultaneous resignation of senior branch leadership – including commercial bankers, treasury consultants, and leadership – forced ONB to close the Brainerd branch.  A "Closed" sign was posted on the door, necessitated by the abrupt and calculated resignations of the key personnel.

67.    The Baxter branch was similarly impacted.  Though the drive-through remained operational, the resignation of both the Market Manager and Relationship Banker required the immediate closure of the lobby to customers.

68.    All the Former Employees began working immediately for Bell Bank, which seeks to directly compete with ONB in the Brainerd-Baxter region.  This same-day employment transition could not have occurred without weeks of planning, pre-resignation communications, and coordination amongst the Former Employees and Bell Bank, including offers of employment and onboarding arrangements made while the Former Employees were still employed by – and owed the utmost fiduciary duty of loyalty to – ONB.

69.    The Former Employees' collective action was designed to destabilize ONB's operations in the Brainerd and Baxter markets and create the appearance of a sudden and

total collapse of ONB's presence in the region.  The purpose and effect of the coordinated resignations were not only to damage ONB's business operations but also to facilitate an immediate transfer of customer relationships, employee goodwill, and institutional knowledge from ONB to Bell Bank.  Subsequent events confirm this strategy: customers were promptly contacted and asked to move their accounts to Bell Bank; key employees who remained at ONB were solicited; and confidential internal knowledge is being used to further Bell Bank's competitive position.

70.    The orchestration of the resignations, the overnight shift to a competitor, the disruption of branch operations, and the swift post-resignation solicitations were not independent acts.  Rather, they are part of a calculated campaign – planned jointly by the Former Employees and Bell Bank – to harm ONB's business and divert its customers, talent, and goodwill.

**F.    The Former Employees Steal ONB's Trade Secrets For the Benefit of Bell Bank**

71.    ONB's system logs reflect that, after beginning their negotiations with Bell Bank, the Former Employees repeatedly accessed ONB repositories containing confidential customer and loan information, including electronic loan files, credit/underwriting folders, and related customer relationship systems. The materials accessed include the full range of nonpublic information a commercial bank maintains about borrowers who have received credit, including confidential customer financial and operational information; underwriting analyses and internal credit memoranda; loan requests and approvals; pricing, terms, and internal profitability information; renewal and

maturity timing; collateral and guarantor information; covenant requirements and compliance history; and internal relationship strategy, notes, and communications.

72.    The Former Employees' access activity, considered in timing and scope, was notable and inconsistent with ordinary servicing needs, particularly given that the Former Employees had not disclosed their impending departure to anyone at ONB.

73.    ONB's logs further reflect that the Former Employees did not merely view these materials. In multiple instances, they accessed and ***printed*** confidential customer and loan documents from ONB's systems. This continued to occur even after the Former Employees accepted Bell Bank's offers – during the nearly three-week period they remained at ONB without disclosing their imminent departure to Bell Bank.

74.    By way of example, and without limitation, ONB's system records reflect the following activity by Campbell after she had accepted Bell Bank's offer of employment:

a.    On the morning of her departure, December 8, 2025, Campbell printed a spreadsheet containing a list of thirteen ONB customers, their loan numbers, account balances, the maturity dates of the loans, the loan status (i.e., whether it was in underwriting, submitted to the SBA, expected to be paid off, etc.), the date of submission, detailed notes about the client's income and financing needs, and the amount of the loan/requested loan, as well as key loan terms. The print log confirms that Campbell printed two copies of the spreadsheet; however ONB has only been able to locate one copy.  Upon information and belief, Campbell took the second copy of that document with her so she could use it in connection with her employment at Bell Bank.

b.    On December 4, 2025, Campbell printed four copies of a customer's Consent and Joinder of Mortgagee, which contained confidential financial information about the customer, loan terms, and financing needs.  ONB has

not been able to locate these copies; upon information and belief, Campbell took them with her so she could use them in connection with her employment at Bell Bank.

c.  On December 3, 2025, Campbell printed documents from a customer's loan file – specifically, a "First Amendment to Master Declaration of Covenants Conditions Restrictions and Easements," and an "Amended and Restated Declaration of Covenants Conditions Restrictions and Easements," which contained confidential financial information about the customer, loan terms, and financing needs. ONB has not been able to locate these documents; upon information and belief, Campbell took them with her so she could use them in connection with her employment at Bell Bank.

d.  On November 25, 2025, Campbell printed off a list of "residential lots" and "residential lot numbers tied" pertaining to a customer's secured loan. These documents contained confidential information about the customer's loan, assets and asset value, the collateral pledged, and financing needs. ONB has not been able to locate these documents; upon information and belief, Campbell took them with her so she could use them in connection with her employment at Bell Bank.

e.  On November 24, 2025, Campbell printed documents from a customer's loan file – specifically, two property appraisals, which contained confidential customer information about the customer's assets, asset value, financial status, loan terms, and financial needs. ONB has not been able to locate these documents; upon information and belief, Campbell took them with her so she could use them in connection with her employment at Bell Bank.

75.  Similarly, on November 10, 2025 – several days before the recruiting meeting with Bell Bank in Fargo, North Dakota – Campbell printed a call list spreadsheet identifying employee names, the customer loans assigned to those employees, and the associated revenue generated from those loans. Upon information and belief, Campbell provided this information to Bell Bank in order to aid in the targeted recruitment and poaching of key employees from ONB.

26

76.     By way of further example, and without limitation, ONB's system records reflect the following activity by McConkey after he had accepted Bell Bank's offer of employment:

    a.   On December 2, 2025, McConkey printed an August 2025 Proposal for Acquisition Financing for Customer A.H. This document included the client name, the proposed loan terms and conditions, descriptions of financial covenants, collateral descriptions, asset values, and fees.  ONB has not been able to locate this printed document; upon information and belief, McConkey took it with him so he could use it in connection with his employment at Bell Bank.  (On December 5, 2025, McConkey also accessed the loan file of Customer A.H. There was no legitimate business reason for McConkey to print or access *any* files for Customer A.H. at that time).

    b.   On November 26, 2025, McConkey accessed several documents from a customer's loan file, including account verification letters and covenant waivers, which contained confidential information about the customer's assets, income, financial information, lending needs, account information and balances, and lending needs.  ONB has not been able to locate these printed documents; upon information and belief, McConkey took them with him so he could use them in connection with his employment at Bell Bank.

77.     By way of further example, and without limitation, ONB's system records reflect the following activity by Bernu after she had accepted Bell Bank's offer of employment:

    a.   On December 5, 2025, Bernu printed off a loan file and closing documents for several customers, which contained confidential financial information about those customers, including their assets, loan terms, financing needs, repayment terms, and lending needs.   ONB has not been able to locate these printed documents; upon information and belief, Bernu took them with her so she could use them in connection with her employment at Bell Bank.

    b.   On November 24, 2025, Bernu printed off several account statements for ONB customers, identifying their contact information, assets, income levels,

financial status, and pending loan terms.  ONB has not been able to locate these printed documents; upon information and belief, Bernu took them with her so she could use them in connection with her employment at Bell Bank.

78.     By way of further example, and without limitation, ONB's system records reflect that during the week before her departure, Ellingson repeatedly accessed detailed spreadsheets concerning "CLT Project Finances."  Upon information and belief, Ellingson copied confidential business and financial information pertaining to ONB, for her use and benefit at ONB's competitor, Bell Bank.

79.     By way of further example, and without limitation, ONB's system records reflect the following activity by Vold after she had accepted Bell Bank's offer of employment:

    a.  On December 4, 2025, Vold printed off a customer's income tax return, containing confidential financial information concerning the customer's income, assets, loans, and financial needs.  ONB has not been able to locate this tax return; upon information and belief, Vold took it with her so she could use it in connection with her employment at Bell Bank.

    b.  On December 4, 2025, Vold printed off more than two dozen emails from her ONB account.  While the print log does not identify which emails were printed, ONB could not locate any printed emails from her account.  Upon information and belief, Vold printed off emails consisting of customer communications, which she took to use in connection with her employment at Bell Bank.

    c.  Also on December 2, 3, 4, and 5, 2025, Vold printed off more than a dozen account statements pertaining to ONB customers, identifying their contact information, assets, income levels, financial status, and pending loan terms. ONB has not been able to locate these printed documents; upon information and belief, Vold took them with her so she could use them in connection with her employment at Bell Bank.

    d.  On December 1, 2025, Vold printed off ONB's "HOW TO GUIDE RE LEASES," proprietary training materials developed by ONB, which upon information and belief Vold took with her as a resource in aid of her employment at Bell Bank.

    e.  On November 20, 2025, Vold printed off two "pipeline" reports, containing confidential financial information about business opportunities, including current and prospective customer loan information, financial information, income levels, and loan maturity dates. There would be no reason for Vold to need a printed copy of the pipeline opportunities belonging to ONB, the day she accepted her employment at Bell Bank. Moreover, ONB is unable to locate the printed copies of these documents; upon information and belief, Vold took them with her to use in connection with her employment at Bell Bank.

80. By way of further example, and without limitation, ONB's system records reflect that on December 1 and 4, 2025, Yantes repeatedly accessed a spreadsheet of "Matured and Maturing Notes through 2.28.26," containing confidential trade secret information pertaining to ONB customer finances, lending needs, loan terms, account balances, assets, and loan maturity dates. Upon information and belief, Yantes copied – e.g., by hand, or by capturing an image on his personal cell phone – the confidential and trade secret information from this spreadsheet, for use in connection with his employment at Bell Bank.

81. Upon information and belief, the Former Employees accessed and printed the materials identified above in paragraphs 74-80 in order to compete against ONB, to solicit and transition ONB customers to Bell Bank, including by equipping themselves with nonpublic borrower financial information, loan terms and pricing, renewal and maturity timing, collateral/guarantor details, covenant and risk information, and internal relationship

strategy – information that would materially assist a competitor in making tailored pitches to ONB customers immediately upon Defendants' transition.

82.     Had ONB known the Former Employees were leaving to join a direct competitor, it would have strictly monitored, limited, and/or eliminated their access to sensitive customer and loan repositories and would have implemented heightened controls to prevent any harvesting of confidential information for competitive use. The Former Employees' concealment of their accepted offers from Bell Bank defeated ONB's ability to implement these protections and to coordinate an orderly and secure transition of customer responsibilities.

83.     The Former Employees did not access and print these documents to help ONB facilitate the transition. Had the Former Employees intended to support an orderly transition, they would have disclosed their impending departures immediately after accepting their offers of employment from Bell Bank, so ONB could coordinate coverage and customer communications while safeguarding sensitive customer information from misuse by a direct competitor.

### G.    The Former Employees Admit to Retaining ONB's Confidential Information

84.     The Former Employees' retention and misuse of ONB customer information is further evidenced by admissions regarding customer contact information stored on their personal phones. In sworn statements, six of the Former Employees (Adams, Campbell, Ellingson, Johnson, McConkey and Yantes) have admitted that they stored ONB customer contact information (including customer names, telephone numbers, email addresses,

and/or related contact details) on their personal mobile phones, and that they retained such information on those devices after leaving ONB and joining Bell Bank. (Upon information and belief, Bernu and Vold have also retained ONB customer contact information on their personal cell phones).

85.    ONB policies expressly prohibit employees from storing or retaining nonpublic customer contact information on personal devices outside ONB's controlled systems, and require that customer information be safeguarded and returned or deleted from all personal devices upon separation. The Former Employees' storage and retention of ONB customer contact information on personal phones is an express violation of ONB's policies and procedures – policies and procedures which they acknowledged, read, and agreed to follow.

86.    The Former Employees' ongoing retention of ONB customer contact information on personal devices after joining Bell Bank materially facilitated, and continues to facilitate, Defendants' ability to contact ONB customers promptly upon their transition, including by enabling immediate outreach without ONB's consent and without ONB's ability to protect the customer relationships and information.

**H.    Defendants Target ONB's Customers**

87.    The Former Employees are using ONB's confidential and trade secret information to solicit ONB customers on Bell Bank's behalf.

88.    Customer C.L., located in Aitkin, Minnesota, is a long-standing and valued commercial customer of ONB.  Customer C.L.'s business relationship with ONB is based on years of personalized service and confidential financial insight maintained by ONB's

relationship managers.  Almost immediately after departing ONB and joining Bell Bank on December 8th, Campbell contacted Customer C.L., informed it that a team of ONB employees was moving to Bell Bank, and solicited Customer C.L. to move its accounts and business to Bell Bank – in part, because ONB ostensibly no longer has a presence in Brainerd, and is therefore unable to serve their needs.

89.    The decision to target this particular business so soon after the mass resignations illustrates the disclosure and use of ONB's internal and confidential customer information (and appears timed to exploit the disruption caused by the resignations).  Customer C.L. was not publicly identified as an ONB customer.  In addition, ONB's customer-specific data concerning Customer C.L. – including credit exposure, fee structures, contact history, and relationship strategy – was confidential and was developed and maintained by ONB at considerable expense.  Neither Bell Bank nor the Former Employees could have obtained such information through lawful, public means.

90.    The solicitation of Customer C.L. is not an isolated occurrence, but a demonstrable example of the kind of targeting Bell Bank has undertaken in the wake of the coordinated resignations – relying on improperly-retained information and relationships that belong to ONB.  The other Former Employees are also soliciting, or coordinating the solicitation of, other ONB customers on behalf of Bell Bank:

  a.  Adams contacted ONB customers after joining Bell Bank to solicit and/or interfere with ONB customer relationships on Bell Bank's behalf. Adams has admitted that, after resigning, she contacted a former ONB customer to tell the customer she had left ONB and to request the customer's email address.

  b.  Bernu contacted ONB customers after joining Bell Bank to solicit and/or

interfere with ONB customer relationships on Bell Bank's behalf. Bernu has admitted that since joining Bell Bank she has "connected with" ONB's customers and initiated contact with them.

c. Campbell contacted ONB customers after joining Bell Bank to solicit and/or interfere with ONB customer relationships on Bell Bank's behalf, including those who she knew had urgent or time-sensitive banking needs. Campbell admits that, after leaving ONB, she reached out to ONB customers, including Customer C.L., Customer C.R., and Customer PP8S.L. In addition, Campbell admits that after joining Bell Bank, she communicated with Customer A.S.J. Despite having been a customer of ONB for more than 40 years, Customer A.S.J. is now closing its ONB accounts and moving to Bell Bank. Remarkably, Campbell also admits that, after joining Bell Bank, she provided Customer PP8S.L advice about that customer's ***ONB loan***. This post-departure loan counseling – undertaken while Campbell was employed by a direct competitor – shows that Campbell continued to leverage ONB's customer relationship and nonpublic relationship knowledge after her resignation, creating confusion over who was servicing the customer and interfering with ONB's exclusive ability to manage its credit relationship and protect its confidential customer information.

d. Ellingson contacted ONB customers after joining Bell Bank to solicit and/or interfere with ONB customer relationships on Bell Bank's behalf. Ellingson admits that, after leaving ONB, she reached out to two ONB customers, including Customer J.F.K. Ellingson further admits she discussed with Customer T.M. moving all of his personal and business loans and deposits to Bell Bank.

e. Johnson contacted ONB customers after joining Bell Bank to solicit and/or interfere with ONB customer relationships on Bell Bank's behalf. Indeed, Johnson admits that on December 8, 2025, the day of her departure from ONB, she "reached out" to former ONB customers with who she "had particularly close business relationships." Johnson also admits she used contact information she stored in her cell phone to contact these customers. (*Id*).

f. McConkey contacted ONB customers after joining Bell Bank to solicit

33

and/or interfere with ONB customer relationships on Bell Bank's behalf. McConkey admits that, after leaving ONB, he made calls to numerous former customers, including Customer M.M. (a 7-year customer of ONB), Customer S.P. (a 5-year customer of ONB), and others. McConkey also admits that, before his departure, Customer M.M. required time-sensitive credit decisions from ONB relating to lines of credit, that he was attempting to secure a temporary extension to prevent maturity, and that the line matured on December 1, 2025. (Dkt. 28 ¶ 47). Nevertheless, McConkey gave ONB no meaningful notice that this pressing issue was going to need to be handed off to another employee because of McConkey's planned resignation; instead, he suddenly terminated his employment with no notice. Incredibly, he also admits that, after joining Bell Bank, he discussed with Customer M.M. ***the status of that ONB credit extension***. This post-departure counseling about an ONB credit facility – undertaken while McConkey was employed by a direct competitor – inserted Bell Bank's employee into ONB's active credit administration, exploited McConkey's nonpublic relationship knowledge, and interfered with ONB's exclusive ability to manage its customer relationship and credit decision-making free from a competitor's involvement.

g.   Yantes contacted ONB customers after joining Bell Bank to solicit and/or interfere with ONB customer relationships on Bell Bank's behalf. Yantes admits that, after resigning, he made calls to former customers including, but not limited to, Customer C.W.R. (a 13-year customer of ONB), and Customer B.P.R. (a customer of ONB since 2007). ONB also received a report from Customer T. H. & R., which has been a customer of ONB since 1979, that it was solicited by Yantes to move its business to Bell Bank.

91.   None of the accounts listed above is publicly identified as an ONB customer. ONB's customer-specific data concerning each of these accounts – including credit exposure, fee structures, contact history, and relationship strategy – is confidential.

92.   The timing, coordinated context, and targeted nature of these customer contacts – made immediately after an eight-employee, no-notice resignation to a direct

competitor – support the plausible inference that Defendants were using ONB's nonpublic customer and relationship information to identify which customers to contact, what to say, and how to create urgency, and that similar solicitations are ongoing.

93.    Moreover, ten of the accounts listed above represent more than forty percent (40%) of ONB's commercial loan business in the Brainerd-Baxter Market, and yet were solicited within one week of the Former Employees joining Bell Bank. Without the use of confidential information learned through the Former Employees' employment with ONB, neither they nor Bell Bank would have been able to selectively target such a large percentage of ONB's customers in the Brainerd-Baxter market so quickly.

94.    ONB did not authorize the use or disclosure of its trade secrets or confidential information by the Former Employees or by Bell Bank. Their acquisition and use of this information for competitive purposes was neither consented to nor legally permissible.

95.    The misappropriation of ONB's trade secrets and confidential data has caused and continues to cause immediate, irreparable harm to ONB, including the loss of customer goodwill, disruption of ongoing business relationships, exposure of internal business strategies, and dilution of the competitive advantage ONB spent years developing.

96.    The misappropriation also undermines the trust that ONB's customers and employees place in the Bank to safeguard sensitive information – a trust that ONB carefully cultivates through substantial investments in confidentiality and information security.

97.    Absent injunctive relief, ONB faces continued erosion of customer trust, diversion of key accounts, loss of longstanding banking relationships, and irreparable harm to its competitive standing in the communities it serves.

### I.    Bell Bank's Scheme to Cripple ONB from Within

98.    The coordinated mass resignation of ONB's Brainerd and Baxter branch employees was not a spontaneous or employee-driven event – it was orchestrated with, encouraged by, and designed to benefit Bell Bank.  Bell Bank knowingly induced, facilitated, and capitalized on this effort to cripple ONB's operations and capture its customer base, personnel, and goodwill in the region.

99.    Bell Bank onboarded all eight Former Employees effective immediately upon their resignations.  Such rapid onboarding, particularly for senior banking roles, requires advance planning, internal approvals, and coordination – steps that necessarily occurred while the Former Employees were still employed by ONB and in breach of their fiduciary obligations.  Bell Bank is now actively encouraging the Former Employees to solicit ONB customers and staff.

100.    Bell Bank's actions go far beyond normal, lawful competition.  This is not a case of independent job-switching or arms-length recruitment.  Bell Bank has leveraged its resources, recruiters, and infrastructure to stage a calculated raid on ONB's personnel and client relationships, using ONB insiders as instruments of the scheme.

101.    The pattern and timing of the solicitations – following immediately on the heels of a coordinated branch raid – demonstrates that Bell Bank is directing or endorsing the effort as part of a deliberate strategy to weaken ONB's competitive position.

102.    By knowingly encouraging ONB employees to breach their fiduciary and confidentiality duties, coordinating their resignations, onboarding them *en masse*, and using them to solicit ONB's employees and customers, Bell Bank has positioned itself not

as a passive employer, but as a central architect and beneficiary of an unlawful scheme.

**J.    Defendants' Scheme Harms ONB**

103.    As a direct and proximate result of Defendants' coordinated and unlawful conduct, ONB has suffered, and continues to suffer, substantial harm, both financial and reputational. In particular:

a.    The damage to ONB from Defendants' conduct has been sudden and immeasurable. ONB has lost nearly its entire Brainerd/Baxter-area leadership team overnight, impairing its ability to serve customers and operate those branches.

b.    ONB has already identified multiple solicitations, and at least one customer—"Customer A. S. J."—is moving its relationship to Bell Bank, resulting in a perpetual loss of annual revenue for ONB. Other longstanding customer relationships are at acute risk of being permanently lost as Defendants actively attempt to lure clients away using ONB's own trade secrets.

c.    ONB's goodwill in the community has been tarnished by the abrupt collapse of branch services and the perception that ONB can no longer support local customers. The sudden closure of ONB's local branches caused customer confusion, concern, and distrust, and created a public perception that ONB is not committed to the Brainerd-Baxter market.

d.    Internally, morale has been shaken and remaining employees face continued solicitation and uncertainty, jeopardizing ONB's ability to retain talent and maintain its operations.

e.    The branch closures caused the immediate loss of branch revenue, including lost fee income, missed commercial and consumer lending opportunities, and lost deposits. These losses will continue to mount every day that ONB's Brainerd and Baxter branches remain understaffed. ONB expects that onboarding and ramping up new personnel to equivalent levels of productivity and trust will take months, if not longer, further compounding ONB's losses.

f.  ONB has also incurred and will continue to incur substantial recruitment and training expenses to replace the departed employees – many of whom were seasoned professionals with deep institutional knowledge and long-standing client relationships. Recruiting, hiring, and training new employees to replace the Former Employees will cost ONB several hundred thousand dollars and an unknown amount of time.

g.  In addition, ONB has incurred significant costs in lost business time associated with emergency operational planning, customer communication, and crisis management efforts necessary to mitigate reputational damage in the affected communities.

h.  The loss of institutional knowledge, confidential business intelligence, and key customer and employee relationships cannot be easily replaced. The departed employees were entrusted with proprietary information about ONB's clients, internal strategies, pricing structures, performance rankings, incentive plans, and other sensitive material that, once misused, confers a permanent unfair advantage to competitors.

i.  ONB is also incurring substantial attorneys' fees and internal costs to investigate Defendants' misconduct, preserve evidence, assess potential legal claims, and seek judicial relief to prevent further harm.

104.  The disclosure or misuse of ONB's confidential information – such as customer data and strategic business planning – once revealed or exploited, cannot be "undone" with a damages award. Similarly, the ongoing solicitation of ONB customers risks customer confusion, permanent customer loss, and irreversible damage to ONB's goodwill.

105.  Defendants' acts – coordinated resignations, customer solicitations, and misuse of ONB's confidential information – threaten to permanently erode ONB's customer base, institutional knowledge, and competitive standing.

106.  Without immediate injunctive relief, ONB faces the prospect of continued

misappropriation of its confidential and trade secret information, and a cascading loss of customer relationships – all of which would cause long-term and unquantifiable damage that cannot be rectified through a damages award alone.

107.    Defendants' conduct was willful, malicious, and exhibited a deliberate disregard for the rights of ONB and its customers.  Defendants' acts were not the result of mistake, accident, or mere negligence, but instead reflect intentional wrongdoing and a conscious disregard of ONB's legal rights.

### COUNT I
### Misappropriation
(*Against All Defendants*)

108.    ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-107 of this First Amended Complaint as if fully set forth herein.

109.    By engaging in the conduct described above, Defendants have misappropriated, threaten to misappropriate, or inevitably will misappropriate ONB's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

110.    The trade secret information to which the Former Employees had access and which came into their possession includes, but is not limited to, confidential customer banking information (customers' deposit and loan account numbers; account balances and transaction histories; information concerning customers' deposit, loan, line-of-credit, and overdraft products; customers' fee, overdraft, and rate-concession histories), confidential relationship information (customers' contact information; their status as customers of ONB; the particular mix of products and services each customer uses; customers' service

preferences, cash-flow patterns, and borrowing needs), and compilations of such information (branch- and banker-specific customer lists, call sheets, and pipeline or sales reports identifying existing and prospective customers and cross-sell opportunities).

111.   ONB is the owner of that trade secret information because it is the legal entity in which rightful legal or equitable title to the trade secrets is reposed.

112.   ONB expended substantial time, energy, money, and ingenuity in compiling this information based on its own efforts and communications with clients, prospective clients, employees, prospective employees, and others.

113.   The trade secrets derive independent economic value and benefit from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic benefit from the disclosure or use of the information by using such information to poach ONB's valuable customers and employees.

114.   ONB has taken reasonable measures to keep this information secret.  As described more fully above, it has promulgated privacy and confidentiality policies and it has implemented both electronic and physical protections to keep the information secret.

115.   ONB communicated these trade secrets to the Former Employees in confidence.

116.   As set forth above, the Former Employees (and Bell Bank by virtue of its employment of the Former Employees and its actions of obtaining client information from them) misappropriated, threaten to misappropriate, or inevitably will misappropriate ONB's trade secrets by, among other thing, disclosing the identities of ONB's customers, along with their contact information and loan information, to Bell Bank, and then using

that information to unfairly compete with ONB.  The Former Employees did so without the express or implied consent of ONB.

117.    At the time of disclosure and use, the Former Employees: (a) knew that their knowledge of the trade secret information was acquired under circumstances giving rise to duties to maintain the secrecy of the trade secret information and limit its use, and (b) their disclosure to Bell Bank, or their use on their own accord or on behalf of Bell Bank, constituted a breach of their duties to maintain the secrecy of that confidential information, not disclose it to anyone other than ONB, and not use it for their own benefit or for the benefit of any other person or entity (other than ONB).

118.    The Former Employees intended to convert, or inevitably will convert, the trade secrets to the economic benefit of themselves and Bell Bank, without ONB's consent, for use while at Bell Bank.  The Former Employees and Bell Bank can obtain economic value for the disclosure and use of ONB's trade secrets, for example, by utilizing the information therein to solicit, attempt to induce, and induce ONB's clients to switch their business from ONB to Bell Bank.

119.    Bell Bank acquired, received and possesses, or inevitably will acquire, receive and possess, the trade secrets, knowing same to have been misappropriated without ONB's authorization and in violation of the Former Employees' duties to ONB.

120.    At the time Bell Bank acquired the trade secret information from the Former Employees, Bell Bank knew and/or had reason to know that their use and disclosure of that information to (and for the benefit of) Bell Bank constitutes: (a) intellectual property theft by the Former Employees, (b) a breach by the Former Employees of their duties to ONB

41

and their customers to maintain the secrecy of the information, and (c) an inducement by Bell Bank of the Former Employees' breach of duties to ONB and its customers to maintain the secrecy of the information.

121.    Bell Bank used the trade secret information provided by the Former Employees and, at the time Bell Bank used the trade secret information that the Former Employees had provided, Bell Bank knew and/or had reason to know that they had acquired the trade secret information during the course of their employment with the ONB, under circumstances giving rise to duties to maintain the secrecy of the information and limit its use.

122.    The misappropriation of these trade secrets has caused substantial harm to ONB, including the erosion of customer relationships, the loss of competitive business intelligence, customer relationships, and business expectancies.

123.    As a direct and proximate consequence of the foregoing, ONB has suffered and will continue to suffer irreparable harm, injury and loss.

124.    Defendants' conduct, as described above, constitutes misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01 et seq., and, to the extent any misused ONB information does not qualify as a statutory trade secret, a breach of the Former Employees' common-law duty of confidentiality.

## COUNT II
### Breach of Fiduciary Duty
#### (*Against the Former Employees*)

125.    ONB realleges and incorporates by reference the allegations set forth in

Paragraphs 1-107 of this First Amended Complaint as if fully set forth herein.

126.    Each of the Former Employees was an employee of ONB during the relevant period and held positions of trust, responsibility, and discretion within the bank.  Moreover, Campbell and Ellingson held high-level executive officer positions within ONB.

127.    Under Minnesota law, employees owe their employer a common law fiduciary duty of loyalty while employed.  This duty includes the obligation to act in the employer's best interests, refrain from competing with the employer, avoid self-dealing, and not misuse confidential information.

128.    The Former Employees were not entry-level personnel; rather, they held senior business banking, market leadership, and treasury roles with access to confidential customer and employee data, business strategies, and client relationships.   They represented ONB to its customers and internal teams, and were entrusted with safeguarding ONB's business interests.

129.    While still employed by ONB, the Former Employees solicited one another and coordinated with one another (and with Bell Bank) to orchestrate a mass resignation of ONB's Brainerd and Baxter leadership.  They concealed their coordinated plans, timed their resignations to inflict maximum operational harm, and provided no advance notice, despite their positions of trust, and directly contrary to the best interest of their employer, ONB.

130.    The Defendants intentionally disrupted ONB's Brainerd and Baxter branch operations, resulting in the closure of the entire Brainerd branch and a partial closure of the Baxter branch, which harmed ONB's customer relationships and reputation in the market.

131.    Individually and collectively, the Former Employees' actions – coordinating their resignations, withholding disclosure of their intentions, arranging a simultaneous exit, and accepting employment with a competitor under these circumstances – constitute multiple breaches of their fiduciary duty of loyalty.

132.    As a direct and proximate result of these breaches, ONB has suffered substantial harm, including reputational damage, the loss of key personnel, customer relationships, and business expectancies, and the wrongful use of its confidential business information.

133.    ONB is entitled to recover damages resulting from these breaches, as well as equitable relief, including injunctive relief, disgorgement of any benefits improperly received, and other remedies available under law and equity.

## COUNT III
## Aiding and Abetting / Civil Conspiracy
### (*Against All Defendants*)

134.    ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-107 and 125-133 of this First Amended Complaint as if fully set forth herein.

135.    Under Minnesota law, a party is liable for aiding and abetting a breach of fiduciary duty where: (a) a fiduciary duty existed; (b) the fiduciary breached that duty; (c) the defendant knew of the fiduciary duty and the breach; and (d) the defendant substantially assisted or encouraged the breach.

136.    Each of the Former Employees owed ONB a fiduciary duty of loyalty during the term of his or her employment.

137.    As set forth above, each of the Former Employees breached their fiduciary

duties by, among other things:

- Secretly planning a coordinated mass resignation during their employment at ONB, and contrary to the best interests of their employer;

- Inducing, soliciting, and encouraging other Former Employees to defect to Bell Bank and/or to coordinate a simultaneous, no-notice resignation from ONB;

- Timing their resignations to maximize disruption to ONB's Brainerd and Baxter branches;

- Using ONB resources to prepare for their departure to Bell Bank;

- Taking or using confidential ONB information; and

- Attempting to transfer ONB's goodwill, customer base, and operations to Bell Bank.

138.    In so doing, each individual Former Employee knew that the other Former Employees owed and were breaching fiduciary duties to ONB.  They actively coordinated, encouraged, and assisted one another's breaches by, among other things:

- Sharing resignation plans and coordinating timing;

- Addressing resignation letters to fellow co-defendants (as occurred with Campbell);

- Encouraging participation in the coordinated walkout; and

- Coordinating timing of the mass resignation to be as damaging to ONB as possible.

139.    These actions constitute substantial assistance and encouragement of each other's breaches of fiduciary duty and render each of the Former Employees liable for aiding and abetting such breaches under Minnesota law.

140.    Bell Bank also knew that the Former Employees owed duties of loyalty to ONB and were in the process of breaching them.   Bell Bank substantially assisted and encouraged the breaches by, among other things:

- Soliciting the Former Employees for coordinated hire while they were still employed by ONB;

- Encouraging a group resignation designed to shut down ONB's operations;

- Arranging for the employees to start at Bell Bank immediately after their resignations; and

- Facilitating or approving the use of ONB's customer information and goodwill.

141.    Bell Bank's actions enabled and supported the Former Employees' disloyal conduct and rendered Bell Bank a knowing participant in those breaches.

142.    Under Minnesota law, civil conspiracy is established where two or more persons or entities, by agreement, combine to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, and one or more overt acts are taken in furtherance of that agreement.

143.    Bell Bank and the Former Employees knowingly conspired and acted in concert to accomplish an unlawful purpose – namely, the mass resignation of key employees from ONB's Brainerd and Baxter branches for the purpose of crippling ONB's operations, misappropriating its trade secrets and confidential business information, interfering with its customer and employee relationships, and transferring those assets and relationships to Bell Bank.

144.    In the alternative, Defendants conspired to accomplish a purportedly lawful purpose – competition – but did so by unlawful means, including breach of fiduciary duty, breach of the duty of confidentiality, tortious interference, and trade secret misappropriation.

145.    Overt acts in furtherance of the conspiracy include, among other things:
- Coordinated resignations of senior employees from ONB's Brainerd and Baxter branches, planned in advance;

- Encouraging other Former Employees to defect to Bell Bank and/or to coordinate a simultaneous, no-notice resignation from ONB;

- Timing of resignations to occur simultaneously and without notice, leaving ONB's branches closed or functionally inoperable;

- Immediate onboarding of the departing employees at Bell Bank;

- Use of ONB's confidential customer and proprietary business information to solicit ONB's customers and top employees; and

- Direct outreach to ONB's customers to transfer their relationships to Bell Bank.

146.    Each Defendant knowingly participated in this scheme, either by initiating it, assisting it, or knowingly accepting and exploiting its benefits.

147.    As a direct and proximate result of this civil conspiracy, ONB has suffered substantial damages, including the loss of key personnel, confidential information, goodwill, customer relationships and business expectancies.

148.    All Defendants are jointly and severally liable for the damages caused by the conspiracy and the unlawful acts committed in furtherance thereof.

149.    ONB is entitled to compensatory damages, punitive damages, and all other

available remedies under law and equity as a result of Defendants' concerted misconduct.

150.    As a direct and proximate result of Defendants' actions, ONB has suffered and will continue to suffer irreparable harm and damages, including but not limited to reputational injury, disruption to its operations, and loss of confidential and proprietary information, customer relationships, and business expectancies.

151.    ONB is entitled to recover damages resulting from this conduct, as well as equitable relief, including injunctive relief, disgorgement of any benefits improperly received, and other remedies available under law and equity.

### COUNT IV
### Tortious Interference with Existing Business Relationships and Expectancies
#### (*Against All Defendants*)

152.    ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-107 of this First Amended Complaint as if fully set forth herein.

153.    ONB maintains longstanding, valuable relationships with its commercial and consumer banking clients, including customers serviced by its Brainerd and Baxter branches.  These relationships are essential to ONB's ongoing business operations, profitability, and goodwill in the communities it serves.

154.    These customer relationships are embodied in banking contracts and agreements between ONB and its customers, including deposit account agreements, loan and credit agreements, treasury management agreements, and related banking contracts.

155.    At all relevant times, Defendants were aware of these customer relationships. The Former Employees managed or serviced many such customers while employed by ONB, and Bell Bank hired those employees specifically for the purpose of transferring

those relationships.

156.    Defendants intentionally and wrongfully interfered with these existing business relationships by soliciting ONB's customers, attempting to transition their banking relationships to Bell Bank, and using ONB's confidential customer information for that purpose.

157.    These efforts to divert ONB's customer relationships were not the result of ordinary market competition. They were coordinated, timed, and facilitated by the misuse of ONB's internal knowledge and confidential information and by the operational disruption caused by the coordinated walkout.

158.    In addition to existing customer relationships, ONB had valid business expectancies regarding future transactions and continued dealings with prospective and long-standing clients.  These expectancies arose from ONB's established market position, its investments in client service, and the strong performance of its Brainerd and Baxter banking teams prior to the resignations.

159.    Defendants knew of ONB's prospective business opportunities and intentionally interfered with those expectancies by orchestrating a coordinated departure designed to cripple ONB's local operations, by immediately redirecting customer outreach to Bell Bank, and by targeting specific high-value customers who had ongoing and expected future dealings with ONB – including customers who have since informed ONB they intend to move their banking relationships to Bell Bank.

160.    This interference was accomplished through improper means, including coordinated disloyal conduct while the Former Employees were still employed by ONB,

use of ONB's confidential and proprietary information, and the forcing the abrupt closure of customer-facing services at the Brainerd and Baxter branches.

161.    ONB is entitled to compensatory damages, punitive damages for willful and malicious interference, and injunctive relief preventing further solicitation of ONB customers through improper means.

## COUNT V
### Unjust Enrichment
*(Against Bell Bank)*

162.    ONB realleges and incorporates by reference the allegations set forth in Paragraphs 1-107 of this First Amended Complaint as if fully set forth herein.

163.    Under Minnesota law, a claim for unjust enrichment arises when a party knowingly receives something of value to which it is not entitled, and retention of that benefit would be unjust and inequitable.

164.    Bell Bank has knowingly obtained and retained substantial benefits derived from ONB through wrongful conduct, including:

- ONB's confidential and trade secret business information, such as customer identities, contact information, and loan information;

- The goodwill and customer relationships that ONB cultivated and supported over time through its investments in people, systems, and service;

- The benefit of ONB's internal training, market development, and operational infrastructure, which Bell Bank and the Former Employees leveraged to transition customers away from ONB with minimal cost or effort; and

- Business opportunities and banking relationships wrongfully diverted

from ONB to Bell Bank as a result of the coordinated mass resignation and follow-on solicitations.

165.   Bell Bank did not pay for, create, or earn these assets and benefits, and was not entitled to acquire them through surreptitious, coordinated conduct that undermined ONB's operations.

166.   Allowing Bell Bank to retain the benefits of this conduct – obtained through breaches of fiduciary duty, misuse of information, and coordinated disruption – would be unjust and inequitable.

167.   ONB has no adequate remedy at law that would fully compensate for the unjust enrichment derived from the misappropriation of its confidential information and customer relationships.

168.   ONB is entitled to equitable relief requiring Defendants to disgorge all benefits wrongfully obtained and retained, including the value of any misappropriated customer accounts and the use of ONB's confidential and trade secret information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Old National Bank, respectfully requests that the Court enter judgment in its favor and against Defendants, Bell Bank, Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, and Daniel Yantes, jointly and severally, and grant the following relief:

A.    An injunction:

    i.    Enjoining Defendants from using, disclosing, or retaining any of ONB's trade secrets or confidential and proprietary information, including but not limited to customer lists, customer data, or business strategies;

       ii.    Enjoining Defendants from soliciting or diverting ONB customers, business, or accounts using any ONB trade secrets, confidential information, or insights derived from their former roles at ONB, including, but not limited to knowledge of the existence of ONB's customer relationships learned through their former employment with ONB; and

       iii.   Enjoining Bell Bank and the Former Employees from destroying, altering, concealing, or failing to preserve any evidence related to ONB's claims, including communications, documents, emails, text messages, call logs, and other records related to the coordinated departures, ONB's employees, or ONB's customers;

B.     Compensatory damages in an amount to be proven at trial (but in excess of $75,000) for the loss of customer relationships, revenue, goodwill, and employee resources;

C.     Disgorgement of all compensation, benefits, or profits wrongfully obtained by Defendants as a result of their misconduct;

D.    Exemplary and punitive damages as permitted by law;

E.     Prejudgment and post-judgment interest as allowed by law;

F.     Restitution and imposition of a constructive trust over any funds, benefits, or business obtained through the use or misuse of ONB's trade secrets or confidential information;

G.    An order requiring Defendants to return and/or destroy all ONB property, information, documents, or data in their possession, custody, or control, including any copies or derivatives;

H.    An award of attorneys' fees, expert witness fees, and costs incurred in prosecuting this action, including, but not limited to, those available under the Defend Trade Secrets Act, the Minnesota Uniform Trade Secrets Act, and the Minnesota Deceptive Trade Practices Act; and

I.     Such other and further relief as the Court deems just and proper under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, ONB hereby demands

a trial by jury on all issues so triable.

Dated: February 3, 2026                     Respectfully submitted,
                                            **OLD NATIONAL BANK, Plaintiff**

                                            By:  /s/ *Mack H. Reed*
                                                     One of Its Attorneys


Mack H. Reed (MN No. 398703)
Bethany R. Jewison (MN No. 505680)
LEWIS BRISBOIS BISGAARD & SMITH, LLP
90 South 7th Street, Suite 2800
Minneapolis, Minnesota 55402
Phone: (612) 428-5000
Fax: (612) 428-5001
mack.reed@lewisbrisbois.com
bethany.jewison@lewisbrisbois.com

          and

Christopher S.  Griesmeyer (IL No.  6269851, *pro hac vice*)
Zachary Mulcrone (IL No. 6300387, *pro hac vice*)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Phone: (312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com