**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Old National Bank,

        Plaintiff,

v.

Sarah Adams, Kasey Bernu, Yvette
Campbell, Kimberly Ellingson, Rachal
Johnson, Michael McConkey, Sharon
Vold, Daniel Yantes, and Bell Bank,

        Defendants.

Court File No. 0:25-CV-04636 (PJS/LIB)

**EMPLOYEE DEFENDANTS'**
**STATEMENT OF THE CASE**

---

Defendants Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, and Daniel Yantes (collectively, "Employee Defendants") submit their Statement of the Case to the Court pursuant to the Court's Pretrial Scheduling Notice and Order [ECF No. 72, "Order"].

## I.     Facts of the Case

The Employee Defendants left an employer that did not meet their standards for customer service and employee care, but they continued to serve Plaintiff Old National Bank's ("ONB") customers until the day they left, and they took no confidential information or trade secrets.

For years (and in some cases, decades) the Employee Defendants were happy employees of Bremer Bank. Bremer's strong reputation in the community attracted employees like Yantes and McConkey, who brought long-standing customer relationships from another bank. Bremer felt like a family, and many customers were also friends. But

everything changed when ONB acquired Bremer.

The Employee Defendants struggled to adapt to ONB's antiquated technology, lack of training, and untimely responses to customer needs. The burden of fielding constant customer complaints and being unable to perform at their usual levels was onerous. The Employee Defendants experienced frustration, anxiety, and dread; the impact of working at ONB took a serious toll on their well-being, but their concerns fell on deaf ears at ONB. When they could take no more, each one decided to leave. They talked about their plans with their friends at work, and some even received offers from other banks. When they learned they could move to Bell Bank, they decided to stay together as a team. They continued working hard until they left ONB.

Before resigning, the Employee Defendants prepared checklists of outstanding customer needs, printed instructions to assist remaining ONB employees, and set out-of-office email replies to ensure customers knew who to contact after they were gone. They worked hard for ONB and its customers until the day they left, and they surrendered access cards, credit cards, and computers as they departed with their personal belongings.

ONB elected to close its Brainerd branch and the lobby of its Baxter branch. This was not necessary, as the Employee Defendants were not required for the branches to open or operate. Business bankers were frequently out of the office visiting customers, and ONB even required all of them to be out of the office when they were called to ONB's Alexandria, Minnesota location.

After departing, some of the Employee Defendants reached out to customers to share the news that they were no longer at ONB. They reassured customers that someone

2

else at ONB would pick up where they left off, and they maintained relationships they'd

developed over years of living and working in the community.  They did not improperly

solicit ONB's customers.

**II.**     **Particularized facts which support the claimed defenses, including any applicable statutes as identified by number**

    **A. Count I: Misappropriation (18 U.S.C. § 1836 *et seq*; Minn. Stat. § 325C.01 *et seq*.)**

        1. The Employee Defendants do not know what specific information ONB claims they took or used when they left.  The only information they had consisted of customer names and phone numbers in their personal cell phones.  Some of these predated their employment at Bremer Bank. Some contacts were their personal relationships.  Others were customers with whom the Employee Defendants developed trust over time.

        2. ONB published various employees' personal cell phone numbers in their email signature blocks, and the Employee Defendants were expected to be available to customers, colleagues, and ONB leadership.  ONB did not offer company cell phones, nor did it pay for the use of employees' personal cell phones.

        3. ONB had no policy prohibiting employees from saving names and phone numbers, nor did it have a policy requiring employees to delete names and phone numbers from their phones when they resigned or retired.

        4. The Employee Defendants did not take printed information from ONB when they left.  They accessed customer information while still employed

3

and performing their jobs at ONB. While Ellingson's role did not involve directly overseeing customers, the others made concerted efforts to ensure customers would not fall through the cracks.  These efforts included:

a. Bernu prepared detailed notes on all of her outstanding tasks and left folders containing "pending" and "completed" items.

b. Yantes set an out-of-office reply that offered an alternative contact at ONB, and he left a list of pending action items.

c. Adams sent pending items to her team so they could handle ongoing customer matters when she was gone.

d. Vold left detailed notes for her manager, drafted specific instructions for ONB employees to handle borrower-based certificates and working capital spreads, and activated an out-of-office message with a list of four alternative contacts who could assist customers.

e. Campbell left a detailed spreadsheet, printed emails on which she highlighted the most important information, and organized everything in folders with notes about each customer's needs.

f. Johnson copied other ONB team members on her emails and scheduled a future customer meeting on another team member's calendar to ensure the customer's needs were not forgotten.

    g.  McConkey set his out-of-office message to direct customers to an alternative ONB contact.  He also provided the new contact with a detailed update on all pending customer issues.

5.  Bell Bank made individual offers to the Employee Defendants.  They negotiated their own offers, and they each accepted. Bell Bank did not orchestrate or coordinate the Employee Defendants' resignations or departures from ONB.

6.  The Employee Defendants did not give advance notice because they were not required to do so and they believed ONB would walk them out as soon as they gave notice.  Until they left, the Employee Defendants continued serving ONB's customers.  Bell Bank told the Employee Defendants not to bring any of ONB's information, so they didn't.  Instead, they departed with their personal belongings, which included:

    a.  Johnson's painted portrait from a "Best of Bremer" awards trip, seven awards earned through Bremer and Junior Achievement, an hour glass, a glob, a bobble head, family photos, and her children's artwork;

    b.  Campbell's college diploma, awards from Bremer, a plaque recognizing participation in the Blandin Leadership and Kiwanis Club, and family photos;

    c.  Yantes' family photos, art, a Minnesota hockey stick state cut-out, and an award;

d. Ellingson's Bremer mugs, a 25-year service award, personal items such as dental floss and a sewing kit, and family photos;

e. Bernu's fan, awards won during her time with Bremer, family photos, and a phone charger;

f. Adams' air purifier, devotional cards, two Bremer awards, a Leadership Cornerstones plaque, a Bremer Leadership Academy certificate, and family photos;

g. Vold's inspirational calendar, family photos, a family mouse pad, and her notary stamp; and

h. McConkey's family photos, Bremer awards, and artwork.

7. The Employee Defendants did not improperly use ONB information to solicit ONB customers. They contacted customers and friends to share their news. For example, Yantes contacted customers that followed him from Wells Fargo to Bremer years prior. Some of his customers were close personal friends in the hockey community.

8. Other Employee Defendants reached out to customers to share a contact name at ONB who could continue assisting the customer.

**B. Count II: Breach of Fiduciary Duty and Count III: Aiding and Abetting / Civil Conspiracy**

1. The Employee Defendants' efforts to leave status updates and notes for colleagues were in ONB's best interests, as these efforts helped to avoid customer disruption.

6

2. None of the Employee Defendants were bound by employment agreements that would require them to provide advance notice of resignations or retirements. They were all at-will employees.

3. None of the Employee Defendants solicited others to leave ONB and join Bell Bank. They each decided to leave ONB for their own reasons, and through various channels, such as:

   a. Campbell felt unsupported when ONB would not allow her to fill a role that opened when a high performing staff member left. She was repeatedly told that ONB expected to lose some customers and employees, and that was "okay." Campbell was overwhelmed, working 12+ hour days, trying to help customers who didn't receive timely responses from ONB's help desk. She reached out to a contact, who introduced her to Bell Bank.

   b. Bernu was working 60+ hours per week, often without meal breaks, trying to troubleshoot customer issues created by ONB's systems. Her mental and physical health suffered, and several customers approached her to offer connections with other banks they knew were hiring. When she learned Adams and Johnson were leaving to go to Bell Bank, Bernu told them she wanted to go too.

   c. Yantes learned that ONB designated certain types of customers in "discouraged entities." This included some of his customers

7

(including resorts), and he was worried that he would lose longstanding customer relationships because ONB did not want to do business with their industries. Yantes had already accepted an offer at another bank when he learned that he may have an opportunity to join Bell Bank.

d. After 26 years with Bremer, ONB offered Ellingson a choice: take a severance package and leave, or accept a reduced role trying to upgrade ONB's loan operating system. She quickly learned her new role was a stale project that lacked support, and the goals would not be achievable. Ellingson suffered chronic headaches and became very unhappy. She learned her friends at work were also unhappy and planning to leave, so she contacted a former colleague to ask his advice. He introduced her to Bell Bank.

e. Johnson was overwhelmed by customer complaints associated with ONB's botched system conversion. She suffered severe anxiety, experienced rapid weight loss, and was in tears almost daily. Her 55 hour work weeks were full of customer complaints about ONB's antiquated technology, untrained and unqualified staff, and ONB's unwillingness to help. She was approached with opportunities from other banks before she selected Bell Bank.

f. McConkey had experienced a previous conversion from community bank to national bank, and he was not happy to go

8

through another transition.  He received minimal training prior to the ONB conversion, and it seemed that ONB developed policies and procedures as the process unfolded.  McConkey could not adequately serve customers because ONB did not issue timely credit decisions.  His wife was a teacher in the community who fell victim to ONB's inadequacy when her first paycheck after the conversion bounced.  He explored opportunities at two alternative banks and chose Bell Bank because it felt like "home."

g.  Adams was hopeful about the transition to ONB's systems, but once the conversion occurred, her feelings shifted.  ONB did not trust her to perform her duties, and ONB did not share the customer focus she'd grown to enjoy at Bremer.  She started pursuing other options in October 2025.

h.  After 28+ years in administrative and loan work at Bremer, Vold learned her position at ONB would require more deposit work. She was frustrated by the failures of ONB's online banking system and the inability (or unwillingness) of other ONB personnel to help.  She considered retiring.  Vold reviewed Bell Bank's posted job description for a Commercial Loan Coordinator position and became excited about the prospect of a role that would allow her to continue focusing on loan processing.

**C. Count IV: Tortious Interference with Existing Business Relationships and Expectancies**

1. The Employee Defendants do not know the existing contracts with which they are accused of interfering, or any contracts that were breached before or after they left ONB.

2. The Employee Defendants are not aware of any business prospects that ONB lost as a result of their departure, as none are identified in ONB's First Amended Complaint.

## III.    Claimed Damages

The Employee Defendants do not seek damages in this lawsuit and have not yet asserted affirmative defenses.

Dated: March 9, 2026                               **SPENCER FANE LLP**

                                       */s/ Ariel K. Lierz*
                                       Randi J. Winter, #391354
                                       Heidi J. Bassett, #386386
                                       Ariel K. Lierz, #397355
                                       100 South Fifth Street, Suite 2500
                                       Minneapolis, MN 55402
                                       Phone: (612) 268-7007
                                       rwinter@spencerfane.com
                                       hbassett@spencerfane.com
                                       alierz@spencerfane.com

                                       ***Counsel for Employee Defendants***

10