**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| OLD NATIONAL BANK, | ) | |
| | ) | Case No. 0:25-cv-04636 (PJS/LIB) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **OPPOSITION TO JOINT RULE** |
| SARAH ADAMS, KASEY BERNU, | ) | **12(b)(6) MOTION TO DISMISS** |
| YVETTE CAMPBELL, KIMBERLY | ) | **THE FIRST AMENDED** |
| ELLINGSON, RACHAL JOHNSON, | ) | **COMPLAINT** |
| MICHAEL MCCONKEY, SHARON | ) | |
| VOLD, DANIEL YANTES, and | ) | |
| BELL BANK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

i

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................... 1

LEGAL STANDARD ............................................................................................... 2

BACKGROUND FACTS .......................................................................................... 3

   I.   The Former Employees resigned en masse, without warning. ................................3

   II.  Defendants misappropriated ONB's confidential/trade secret information.....................4

   III.  Defendants used ONB's information to solicit ONB's customers. ...................................6

ARGUMENT ....................................................................................................... 7

   I.   ONB states a plausible misappropriation claim ........................................................7

      A.   ONB pleads the existence of trade secrets............................................................7

         1.   ONB specifies the trade secrets. ................................................................7

         2.   No heightened pleading standard applies. .....................................................9

         3.   The trade secrets are not readily ascertainable. ..........................................10

         4.   ONB describes reasonable efforts to maintain secrecy. ...............................12

         5.   ONB was not required to address how quickly the information goes obsolete. ........13

      B.   ONB pleads misappropriation................................................................................13

         1.   ONB alleges direct use and disclosure. ......................................................14

         2.   ONB's allegations support an inference of trade secret use. ........................15

         3.   ONB alleges acquisition and retention of trade secret information far
            beyond contact data. ................................................................................15

         4.   ONB alleges surrounding circumstances that make misappropriation plausible.......16

         5.   Rule 8 does not require ONB to plead around Defendants' "personal relationship"
            defense. ...................................................................................................17

      C.   Defendants' "speculation" and "obvious lawful explanation" arguments invert
         Rule 12. ......................................................................................................18

         1.   Facts pled on information and belief are permissible.....................................19

         2.   "Lawful obvious alternative explanations" do not authorize a court to choose
            Defendants' story over ONB's.................................................................20

         3.   Defendants' proposed "lawful obvious alternative explanation" is neither obvious
            nor consistent with the pleaded facts......................................................21

      D.   The Court cannot credit Defendants' denials of liability in the preliminary injunction
         materials.....................................................................................................22

         1.   ONB did not "embrace" the preliminary injunction declarations. ..........................22

         2.   The declarations are not exculpatory..........................................................24

      E.   If ONB's trade secret claim fails, its breach of confidentiality claim would remain
         viable. .........................................................................................................26

II.    ONB states a plausible breach of fiduciary duty claim in Count ...................................27

    A.    Minnesota law prohibits competition while on the payroll. ...........................27

    B.    ONB pleads far more than just "preparing to leave." .................................30

    C.    ONB does not rely on "group pleading." ...............................................32

    D.    MUTSA does not displace the duty of loyalty claim. ................................34

III.   ONB states plausible aiding and abetting/conspiracy claims. .........................36

    A.    The pleaded acts constitute aiding and abetting. ......................................36

    B.    The same allegations support conspiracy-based liability. ...........................38

IV.    ONB states a plausible tortious interference claim. ......................................40

    A.    ONB pleads tortious interference with contract..........................................40

    B.    ONB pleads tortious interference with business expectancy.........................43

V.     ONB states a plausible claim for unjust enrichment in Count V. ....................45

    A.    ONB sufficiently alleges both required elements. .....................................45

    B.    Bell Bank's "adequate remedy at law" argument is not a basis for dismissal
       on a Rule 12 motion. .....................................................................46

CONCLUSION ................................................................................... 47

## <u>TABLE OF AUTHORITIES</u>

**Rules**

FED. R. CIV. P. 12(b)(6) ...................................................................................... 36
FED. R. CIV. P. 8(a)(2) ......................................................................................... 2

**Statutes**

18 U.S.C. § 1839(5)............................................................................................ 14
Minn. Stat. § 325C.01......................................................................................... 14
Minn. Stat. § 325C.07(a)-(b)(2) .................................................................... 26, 34

**Cases**

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948 (8th Cir. 2023)....... 10, 19
*Allied Supply Co. v. Brown*, 585 So. 2d 33 (Ala. 1991)................................... 31
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)............................................................. 3, 19
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................2, 3, 19, 20
*Benfield, Inc. v. Moline*, 2006 WL 452903 (D. Minn. Feb. 22, 2006)........................... 28
*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009)...................................... 21
*Cardiovascular Sys., Inc. v. Petrucci*, 2022 WL 2133743 (8th Cir. June 14, 2022) ........ 41
*CH Bus Sales, Inc. v. Geiger*, 2019 WL 1282110 (D. Minn. Mar. 20, 2019)................. 14
*Central Specialties, Inc. v. Large*, 18 F.4th 989 (8th Cir. 2021) ............................... 40, 41
*Conseco Fin. Servicing v. N. Am. Mortg.*, 381 F.3d 811 (8th Cir. 2004) ......................... 8
*Deluxe Fin. Servs. v. Shaw*, 2017 WL 3327570 (D. Minn. Aug. 3, 2017)...................... 10
*Dunnigan v. Fed. Home Loan Mortg. Corp.*, 184 F. Supp. 3d 726 (D. Minn. 2016)....... 22
*Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027 (8th Cir. 2020).......................... 32
*Folger v. City of Minneapolis*, 43 F. Supp. 3d 922 (D. Minn. 2014).............................. 17
*Gorog v. Best Buy Co.*, 760 F.3d 787 (8th Cir. 2014)...................................... 22
*Guidant Sales Corp. v. George*, 2006 WL 3307633 (D. Minn. Nov. 14, 2006) ............. 28
*Haddley v. Isanti Cnty.*, 2015 WL 13697929 (D. Minn. Nov. 18, 2015) ...................... 30
*Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818 (Minn. 1950) ..................................... 38
*Katch, LLC v. Sweeter*, 143 F. Supp. 3d 854 (D. Minn. 2015) ............................... 11, 13
*Kjesbo v. Ricks*, 517 N.W.2d 585 (Minn. 1994) ............................................... 42
*Lagniappe Logistics, Inc. v. Buras*, 2017-0701 (La. App. 1 Cir. 1/4/18) ..................... 32
*Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845 (8th Cir. 2014) ... 46
*McDonough v. Anoka Cty.*, 799 F.3d 931 (8th Cir. 2015) ............................................ 20
*Medafor, Inc. v. Starch Med. Inc.*, 2009 WL 2163580 (D. Minn. July 16, 2009)............. 7
*Metropolitan Transp. Network, Inc. v. Collaborative Student Transp. of Minn., LLC*,
6 N.W.3d 771 (Minn. Ct. App. 2024) ........................................................... 43
*Micro Display Sys., Inc. v. Axtel, Inc.*, 699 F. Supp. 202 (D. Minn. 1988)..................... 34
*Morton v. Becker*, 793 F.2d 185 (8th Cir. 1986)............................................... 3

i

*Orbit Sports LLC v. Taylor,* 546 F. Supp. 3d 832 (D. Minn. 2021) ................................. 23

*Orbital Eng'g v. Short Elliott Hendrickson,* 2025 WL 3251425
(D. Minn. Nov. 21, 2025) .................................................................................................. 10

*Palliative Plus LLC v. A Assure Hospice, Inc*., 2025 WL 284920 (Tex. App. Jan. 24,
2025) ................................................................................................................................... 32

*Polaris Indus., Inc. v. Mangum,* 690 F. Supp. 3d 966 (D. Minn. 2023) .................... 27, 35

*Prime Therapeutics LLC v. Beatty,* 354 F. Supp. 3d 957 (D. Minn. 2018) .................. 7, 9

*Protégé Biomedical, LLC v. Z-Medica, LLC,* 394 F. Supp. 3d 924 (D. Minn. 2019)........ 26

*Quality Sys., Inc. v. Warman,* 132 F. Supp. 2d 349 (D. Md. 2001 .................................. 31

*R. L. Mlazgar Assocs. v. Focal Point,* 2024 WL 4544097 (D. Minn. June 14, 2024)...... 10

*Rehab. Specialists, Inc. v. Koering,* 404 N.W.2d 301 (Minn. Ct. App. 1987) ......27, 28, 31

*Royal Realty Co. v. Levin*, 244 Minn. 288 (Minn. 1955) ................................................. 41

*Sanitary Farm Dairies, Inc. v. Wolf*, 261 Minn. 166 (1961) ..................................... 27, 28

*Schlief v. Nu-Source, Inc.*, 2011 WL 1560672 (D. Minn. Apr. 25, 2011) ...........26, 31, 35

*Schumacher v. Schumacher*, 627 N.W.2d 725 (Minn. Ct. App. 2001)............................ 44

*SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173 (D. Minn.
2003) ................................................................................................................................... 35

*Syngenta Seeds, LLC v. Warner*, 2021 WL 679289 (D. Minn. Feb. 22, 2021)............... 14

*TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc*., 2013 WL 6827348 (D. Minn.
Dec. 26, 2013) .............................................................................................................. 14, 26

*United Prods. Corp. of Am. v. Cederstrom*, 2006 WL 1529478 (Minn. Ct. App. June 6,
2006) ................................................................................................................................... 11

*Waxing the City Franchisor v. Katularu,* 2024 WL 3887109 (D. Minn. Aug. 20, 2024) .. 8

*Weatherly v. Ford Motor Co*., 994 F.3d 940 (8th Cir. 2021) .................................... 13, 17

*WEG Elec. Corp. v. Pethers*, 2016 WL 1441793 (D. Minn. Apr. 12, 2016.............. 11, 13

*Western Plains, L.L.C. v. Retzlaff Grain Co., Inc*., 870 F.3d 774 (8th Cir. 2017) .......... 32

*Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179 (Minn. 1999)....................... 36

*Xechem, Inc. v. Bristol-Myers Squibb Co*., 372 F.3d 899 (7th Cir. 2004) ...................... 17

Plaintiff, Old National Bank ("ONB"), hereby responds in opposition to Defendants' Joint Rule 12(b)(6) Motion to Dismiss the First Amended Complaint (Dkt. 67).[1]

## PRELIMINARY STATEMENT

On December 8, 2025, before the Brainerd-Baxter branches of ONB opened for business, the leadership teams of those branches entered ONB's facilities, removed multiple boxes of materials, and then resigned *en masse* to join Bell Bank. This was not a coincidental set of job changes, but a raid planned by Defendants to disrupt ONB's operations and arm Bell Bank for immediate customer capture. In the days before their departure, while concealing their pending resignations, the Former Employees printed ONB's confidential loan and customer information, and absconded with it. Within hours of their resignations, the Former Employees began using that trade-secret information to target ONB's customers and urge them to move their banking relationships to Bell Bank. Within one week, customers representing more than forty percent (40%) of ONB's commercial loan business in the Brainerd-Baxter market had been solicited.

That conduct forms the basis of ONB's claims. In the First Amended Complaint, ONB pleads that Defendants violated trade secret laws, breached their fiduciary duties to ONB, aided and abetted each others' breaches, tortiously interfered with ONB's customer relationships, and were unjustly enriched. (Dkt. 64, the "FAC").

Defendants now move to dismiss. Their motion, however, is an effort to win on the

---

[1] ONB refers to Defendants Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, and Daniel Yantes as the "Former Employees."

pleadings by throwing a grab-bag of dismissal theories at the Court and inviting a merits determination under the guise of Rule 12. They ask the Court to credit their preferred "innocent" narrative despite the fact that it conflicts with ONB's well-pled allegations, and they insist ONB was required to anticipate and plead around Defendants' fact-bound defenses (for example, that certain customer relationships allegedly pre-dated ONB)—a burden Rule 8 does not impose.

Defendants also demand a level of specificity that the Federal Rules do not require. None of ONB's claims triggers Rule 9(b), yet Defendants fault ONB for not cataloging each trade secret and each act of misappropriation with proof-level detail before discovery. They press Minnesota Uniform Trade Secret Act ("MUTSA") displacement as a broad dismissal device even though MUTSA displaces only claims based *solely* on trade secret misappropriation, and Counts II-V rest on independent wrongful conduct beyond trade secret misuse. And most notably, Defendants urge the Court to import sworn denials and a competing factual narrative from the preliminary-injunction record to override ONB's allegations. Rule 12(b)(6) does not permit dismissal by weighing competing explanations or importing a merits record; it asks only whether ONB has plausibly alleged unlawful conduct. ONB has done so. The Court should deny the Motion.

## <u>LEGAL STANDARD</u>

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"; it "does not need detailed factual allegations." FED. R. CIV. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

On a motion to dismiss, the court must take the "well-pleaded allegations of the

complaint as true, and construe the complaint, and all reasonable inferences arising therefrom, most favorably to the pleader." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). A complaint survives a Rule 12(b)(6) motion if it contains sufficient factual matter to "state a claim to relief that is plausible on its face"—meaning that the pleaded facts permit the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Plausibility is not akin to a probability requirement. *Iqbal*, 556 U.S. at 663.

## BACKGROUND FACTS

### I. THE FORMER EMPLOYEES RESIGNED EN MASSE, WITHOUT WARNING.

On the morning of December 8, 2025, ONB's revenue producers in the Brainerd-Baxter market—and nearly all senior managers—resigned simultaneously. (FAC, ¶ 2). The Brainerd branch was forced to shutter, and the Baxter branch was forced to shut down lobby operations. (*Id.*, ¶¶ 2, 66-67). Surveillance footage shows the Former Employees entering the Brainerd and Baxter branches before business hours and removing multiple boxes of documents and materials, often over multiple trips, without ONB having an opportunity to inspect what was taken. (*Id.*, ¶ 11).

The December 8 walkout was not spontaneous; it followed weeks of coordinated planning among the Former Employees to move as a team to Bell Bank and to time their departures to maximize disruption to ONB. (FAC, ¶¶ 8-10, 56-65). In November 2025, Bell Bank arranged an in-person recruiting meeting in Fargo that ONB employees attended during ONB work hours. (*Id.*, ¶¶ 56-58). The employees who attended that meeting worked in concert to expand and solidify a group move to Bell Bank—encouraging one another to

join, aligning their acceptances, and using Ellingson as the group's representative to negotiate compensation and offers on behalf of multiple departing employees. (*Id.*, ¶¶ 59-60).

The Former Employees accepted Bell Bank's offers on November 20-21, 2025, but their impending departures were deliberately concealed and choreographed. (FAC, ¶ 61). The Former Employees agreed among themselves to continue working at ONB for nearly three weeks without disclosing their plans to ONB, agreed their last day would be December 8, 2025, and agreed to provide no advance notice so as to deprive ONB of any ability to prepare an orderly transition, secure customer and loan information, or protect customer relationships. (*Id.*, ¶¶ 8, 62). The coordinated nature of the plan is reflected in synchronized resignation timing and shared resignation-letter anomalies and language, underscoring that this was a planned, collective departure—not a set of independent resignations. (*Id.*, ¶¶ 10, 63-65).

## II.    DEFENDANTS MISAPPROPRIATED ONB'S CONFIDENTIAL/TRADE SECRET INFORMATION.

ONB invested substantial time and expense developing customer relationships and compiling nonpublic customer and loan information used to serve those customers. (FAC, ¶¶ 32-36, 39-41). ONB maintained nonpublic customer and relationship information, including customer identities, contact information, relationship histories and notes, and loan and account information, including in compilations (such as customer lists). (*Id.*, ¶¶ 37, 71, 110). This information was not generally known or readily ascertainable through ordinary effort and it derived independent economic value from remaining confidential.

(*Id.*, ¶¶ 38, 40-41).

ONB implemented layered controls to safeguard this information, including secure, password-protected and encrypted systems, role-based access rights, multi-factor authentication, and monitoring, along with written policies restricting copying, transfer, and retention of nonpublic customer information outside ONB systems. (FAC, ¶¶ 43-45). ONB's separation procedures required departing employees to return ONB property and confidential materials, and reinforced continuing confidentiality obligations. (*Id.*, ¶¶ 50-51). ONB's policies also expressly prohibited employees from retaining nonpublic customer contact information on personal devices outside ONB's controlled systems and required that information be returned or deleted from all personal devices upon separation. (*Id.*, ¶ 85).

Nevertheless, after accepting their offers from Bell Bank, the Former Employees repeatedly accessed ONB repositories containing confidential customer and loan information, including underwriting analyses, credit memoranda, loan requests and approvals, pricing and profitability information, maturity timing, collateral and guarantor information, covenant history, and internal relationship strategy and communications. (FAC, ¶ 71). The timing and scope of this access activity was unusual, and notable given the concealed departure. (*Id.*, ¶¶ 72-73, 82-83).

Campbell's print activity provides a concrete example. On the morning of December 8, 2025, Campbell printed a spreadsheet listing thirteen ONB customers and their loan numbers, balances, maturity dates, loan status, detailed notes about the client's income and financing needs, requested loan amounts, and key loan terms. (FAC, ¶ 74(a)).

5

The print log reflected two copies, but ONB later located only one; on information and belief, Campbell took this document to Bell Bank. (*Id.*).

Logs show similar conduct by the other Former Employees in the days leading up to the walkout, including printing/accessing customer loan files, proposals, account statements, pipeline reports, and other sensitive materials containing nonpublic loan, pricing, collateral, maturity, and relationship intelligence that ONB later could not locate. (FAC, ¶¶ 76-80). Further, after their departures, the Former Employees retained ONB customer lists and contact information on their personal mobile phones, in violation of ONB policy. (*Id.*, ¶¶ 84-86). These activities were not undertaken to assist an orderly transition and were inconsistent with routine servicing needs. (*Id.*, ¶¶ 72-73, 81-83).

## III.    DEFENDANTS USED ONB'S INFORMATION TO SOLICIT ONB'S CUSTOMERS.

On the same day as the mass resignation, the Former Employees began contacting and soliciting ONB's highest-valued commercial customers to move their business to Bell Bank, with ONB's abrupt branch disruption used as the rationale for the pitch. (FAC, ¶¶ 12, 66-67). ONB identifies multiple specific examples of post-departure customer solicitation and competitive outreach by the Former Employees after joining Bell Bank. (*Id.*, ¶¶ 88-90).

The targeting was selective and rapid. Within one week, customers representing more than forty percent (40%) of ONB's commercial loan business in the Brainerd-Baxter market were solicited. (FAC, ¶ 93). At least one customer with an ONB relationship exceeding forty years has already moved its banking relationship to Bell Bank. (*Id.*, ¶ 90(c)). None of the solicited accounts was publicly identified as an ONB customer, and

ONB's customer-specific relationship and credit information (credit exposure, fee structures, contact history, relationship strategies, etc.) was also nonpublic. (*Id.*, ¶ 91).

ONB pleads that the coordinated walkout, pre-departure harvesting of sensitive materials, retention of customer contact information, and immediate targeted solicitation caused concrete harm, including disruption to branch operations and customer relationships, loss of goodwill, and ongoing injury in the Brainerd–Baxter market. (FAC, ¶¶ 2, 66-67, 95-97, 103).

## ARGUMENT

### I.     ONB STATES A PLAUSIBLE MISAPPROPRIATION CLAIM.

In Count I, ONB states plausible claims for trade secret misappropriation and breach of the common law duty of confidentiality.

### A.     ONB pleads the existence of trade secrets.

#### 1.     ONB specifies the trade secrets.

A "trade secret" is "information" that "(1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 967 (D. Minn. 2018) (quotations omitted). "Customer information that is protected and not readily ascertainable can constitute a trade secret."[2] *Waxing the*

---

[2] Defendants cite *Medafor, Inc. v. Starch Med. Inc.*, 2009 WL 2163580, at *1 (D. Minn. July 16, 2009), where the court found the following descriptions to be overbroad: "business methodologies, formulas, devices, and compilations of information, including suppliers and customers." ONB provides far more specific descriptions than that.

*City Franchisor v. Katularu*, 2024 WL 3887109, at *7 (D. Minn. Aug. 20, 2024); *see also Conseco Fin. Servicing v. N. Am. Mortg.*, 381 F.3d 811, 819 (8th Cir. 2004) (holding that "lead sheets and the information contained in its customer files" are trade secrets).

ONB alleges misappropriation of "confidential customer financial and operational information; … loan requests and approvals; pricing, terms, and internal profitability information; renewal and maturity timing; collateral and guarantor information; covenant requirements and compliance history; and internal relationship strategy, notes, and communications."[3] (FAC, ¶ 71). In addition, ONB alleges the misappropriation of compilations such as customer lists, contact information, call sheets, and "pipeline or sales reports identifying existing and prospective customers and cross-sell opportunities." (*Id.*, ¶¶ 37, 110). This information is not generally known or readily ascertainable, has value as a result of its secrecy, and is the subject of reasonable efforts to protect its privacy. (*Id.*, ¶¶ 38-52).

As a more concrete example, ONB alleges that on the morning of the mass resignation, Campbell printed and absconded with a spreadsheet containing a list of thirteen ONB customers; the customers' loan numbers and account balances; the maturity dates of the loans; the loan status; submission dates; detailed notes about the clients' income and financing needs; and key loan terms. (FAC, ¶ 74(a)). In addition, ONB alleges that, several days before his departure, McConkey printed and took from ONB a Proposal for

---

[3] During the preliminary injunction hearing, the Court noted that ONB had "described a lot of potential trade secrets that undoubtedly would be trade secrets." (Dkt. 50, at 41:5-6). In particular, the Court agreed that information such as customer income, customer needs, and loan maturity dates are trade secrets. (*Id.*, at 9:23-25; 38:16-19).

Acquisition Financing for a particular customer whose information McConkey had no business reason to access. (*Id.*, ¶ 76). That document included the client name, the proposed loan terms and conditions, descriptions of financial covenants, collateral descriptions, asset values, and fees. (*Id.*). Similarly, ONB alleges that, on December 5, 2025, Bernu printed off a loan file and closing documents for several customers, which contained information about their assets, loan terms, financing needs, repayment terms, and lending needs. (*Id.*, ¶ 77). ONB also alleges that the Former Employees improperly retained ONB customer lists and contact information—*six of them even admitted it*. (*Id.*, ¶ 84). ONB includes more examples in its pleading.

### 2.    No heightened pleading standard applies.

Defendants argue that ONB does not "adequately identify its trade secrets" because it is relying on vague "broad categories." (Dkt. 67 (the "MTD") at 2, 12). According to Defendants, "the hallmark of an adequately pleaded trade secret is the specificity with which it is described." (*Id.*, at 10-11). Yet, they provide no citation for the extraordinary proposition that a heightened pleading standard applies to trade secret claims. Instead, Defendants rely on a quote from a preliminary injunction decision which notes that, to succeed *on the merits* of a misappropriation claim, a plaintiff must specifically define its trade secrets. (*Id.*, at 10) (quoting *Prime Therapeutics*). Defendants are not responding to a preliminary injunction motion, so the standard set forth in *Prime Therapeutics* is inapposite.

Trade secret plaintiffs do "**not** need to identify trade secrets with specificity" as doing so "would paradoxically jeopardize protecting those trade secrets." *Deluxe Fin.*

*Servs. v. Shaw*, 2017 WL 3327570, at *4 n.3 (D. Minn. Aug. 3, 2017) (emphasis added); *see also Orbital Eng'g v. Short Elliott Hendrickson,* 2025 WL 3251425, at *3 (D. Minn. Nov. 21, 2025) ("Given their sensitivity, trade secrets need not be identified in detail or specifics to survive a motion to dismiss."). It is "sufficient at the pleading stage" to plead "general categories" of trade secrets. *R. L. Mlazgar Assocs. v. Focal Point,* 2024 WL 4544097, at *4 (D. Minn. June 14, 2024) (denying dismissal where plaintiff listed general categories such as "contact lists," "customer lists," and "financial data."). "[T]he exact nature of the trade secret is a matter for discovery." *Id.* (quotations omitted).

Consistent with that, the Eighth Circuit, in *Ahern*, reversed and vacated the district court's dismissal of a trade secret claim, finding that the plaintiff *had* adequately pleaded a trade secret by identifying broad categories such as "customer lists, rental information, pricing information, and marketing strategies." *Ahern Rentals, Inc. v. EquipmentShare.com, Inc*., 59 F.4th 948, 955 (8th Cir. 2023); *see also Deluxe,* at *4, 2017 WL 3327570 (denying dismissal where plaintiff identified general categories such as "customer pricing data" and "account details").

ONB has far exceeded its minimal pleading burden.

### 3.    The trade secrets are not readily ascertainable.

ONB pleads that its customer information is not obtainable from public sources through ordinary effort. Defendants argue ONB's customer information is "readily ascertainable" because every individual and business needs financial services. (MTD at 12-13). But a universe of potential customers is not the same thing as a curated list of ONB's

actual customers coupled with nonpublic relationship and loan intelligence.[4] Within one week of joining Bell Bank, "more than forty percent (40%) of ONB's commercial loan business in the Brainerd-Baxter Market" was solicited by the Former Employees. (FAC, ¶¶ 91-93). That is the opposite of pulling names from a phone book and cold-calling the community at random—it is targeted exploitation of a nonpublic customer base.

Defendants rely on several decisions about whether customer lists count as trade secrets, but none establish a *per se* rule against the protectability of customer lists—only that they "generally" do not qualify. (MTD at 13) (citing *WEG Elec. Corp. v. Pethers*, 2016 WL 1441793, at *2 (D. Minn. Apr. 12, 2016); *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 868 (D. Minn. 2015); *United Prods. Corp. of Am. v. Cederstrom*, 2006 WL 1529478, at *5 (Minn. Ct. App. June 6, 2006)). Critically, each of those decisions was issued on a TRO/preliminary-injunction record—where the court weighs evidence and likelihood of success—not on a Rule 12(b)(6) motion testing plausibility. None of those cases holds that customer lists can *never* be trade secrets, and none supports dismissal where, like here, the plaintiff alleges that its customer information is nonpublic, valuable because secret, and protected by confidentiality measures. (FAC, ¶¶ 38-46, 91-93).

Moreover, ONB's trade secrets are not limited to "lists" of ONB customers. Even if a competitor could identify a subset of potential customers in the market, it cannot readily

---

[4] Defendants also suggest that ONB's customer banking relationships are necessarily known to "everyone to whom ONB's customers write checks." (MTD at 12). Even if ONB were claiming that knowledge of a single customer relationship (as opposed to customer lists) were protectable, Defendants' argument rests on factual assumptions outside the pleadings.

ascertain which ones bank with ONB, which ones have loans coming due on what dates, what their income and financing needs are, or how ONB priced, structured, and managed those relationships. (FAC, ¶¶ 37(d), 71, 74(a)).

### 4. ONB describes reasonable efforts to maintain secrecy.

Defendants argue that ONB fails to plead reasonable secrecy measures because ONB never alleges any policy prohibiting employees from retaining customer names and phone numbers after separation. (MTD at 14). This argument ignores all the other categories of trade secrets at issue and mischaracterizes ONB's pleadings. In reality, ONB alleges that the Former Employees' retention of ONB customer contact information on personal phones "is an express violation" of policies that they "acknowledged, read, and agreed to follow." (FAC, ¶ 85). Those "policies expressly prohibit employees from storing or retaining nonpublic customer contact information on personal devices outside ONB's controlled systems, and require that customer information be safeguarded and returned or deleted from all personal devices upon separation." (*Id.*).

Beyond that, ONB pleads protection of "confidential customer data" (including contact lists): the information is stored on "secure, password-protected platforms that are encrypted," with "role-based" access restrictions using secure credentials, multi-factor authentication, and monitoring of access logs. (FAC, ¶ 44). ONB pleads complementary handling restrictions barring employees from "copying or transferring this data to external devices, sending it to personal email accounts, or otherwise removing it from ONB's secure environment." (*Id.*, ¶ 45). And ONB pleads exit controls providing that upon separation of

employment, "employees are required to immediately return all ONB property…." (*Id.*, ¶ 50).

These allegations plausibly plead reasonable efforts to maintain secrecy.

### 5.    ONB was not required to address how quickly the information goes obsolete.

Defendants also argue that some information may quickly become obsolete, losing its economic value such that it ceases to be a trade secret. (FAC, at 13). According to Defendants, ONB was required to allege whether the information at issue is "current, rapidly changing, or outdated." (*Id.*). But Defendants did not cite, and ONB could not find, any decision requiring a trade secret plaintiff to identify that type of information in its pleading.[5] The supposed obsolescence of information is a merits defense, not a pleading requirement. ONB was not required to anticipate and plead around that, or any other, potential defense. *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 943 (8th Cir. 2021).

In any event, Defendants' "quickly obsolete" argument does not fit the trade secrets ONB pleads, which are durable relationship and credit intelligence that retains value across lending cycles. (FAC, ¶¶ 37(d), 71).

### B.    <u>ONB pleads misappropriation.</u>

ONB pleads misappropriation of trade secrets. At the pleading stage, trade secret claims do not rise or fall on a "smoking gun" allegation identifying each trade secret and each particular act of Defendants' use.

---

[5] Defendants cite *WEG* and *Katch* which, again, are preliminary injunction/TRO decisions. (MTD at 13). Whether the trade secret information had gone obsolete by the time of a requested injunction is a question separate from whether it was ever protectable.

Misappropriation includes both acquisition by improper means and "disclosure or use" without consent when the information was obtained under a duty to maintain secrecy. 18 U.S.C. § 1839(5); Minn. Stat. § 325C.01, subd. 3. A plaintiff states a claim by alleging facts that permit a reasonable inference that the defendant improperly acquired, retained, disclosed, or used trade secret information, even if the plaintiff cannot yet plead "the name of any particular person who on a particular occasion actually used a particular item of confidential information" to benefit the competitor. *TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc*., 2013 WL 6827348, at *6-7 (D. Minn. Dec. 26, 2013) (cleaned up).

Circumstantial facts may support misappropriation because "surrounding circumstances may give rise to a reasonable inference of misappropriation at the pleading stage even without a direct allegation of a specific use or disclosure." *Syngenta Seeds, LLC v. Warner*, 2021 WL 679289, at *13 (D. Minn. Feb. 22, 2021). "Misappropriation is plausible" where, as here, "a departing employee has retained trade secrets under suspicious circumstances and there is reason to believe that the employee has used or disclosed the trade secrets in her new employment." *Id.* Courts dismiss only when, unlike here, a trade secret complaint offers "mere fears" untethered to plausible factual allegations of acquisition, disclosure, or use. *CH Bus Sales, Inc. v. Geiger*, 2019 WL 1282110, at *10 (D. Minn. Mar. 20, 2019).

### 1. ONB alleges direct use and disclosure.

ONB alleges that the Former Employees improperly "stored ONB customer contact information … on their personal mobile phones, and that they retained such information … after leaving ONB and joining Bell Bank." (FAC, ¶ 84). ONB then alleges actual

solicitation using that retained information, including, among other things, that: Campbell contacted ONB "Customer C.L." on December 8, 2025, and solicited the customer to move its accounts and business to Bell Bank, while also giving another ONB customer advice about an ONB loan; Johnson "reached out" to former ONB customers on December 8 using contact information stored in her phone; Ellingson contacted ONB customers and discussed moving a customer's loans and deposits to Bell Bank; Adams and Bernu initiated contact with ONB customers after joining Bell Bank; and McConkey made calls to numerous former customers and discussed the status of an ONB credit extension. (*Id.*, ¶¶ 88, 90(e)-(g)). Those allegations are of direct "use" and "disclosure."

### 2. ONB's allegations support an inference of trade secret use.

ONB alleges that customers "represent[ing] more than forty percent (40%) of ONB's commercial loan business in the Brainerd-Baxter Market … were solicited within one week of the Former Employees joining Bell Bank." (FAC, ¶ 93). ONB also alleges that "[w]ithout the use of confidential information learned through the Former Employees' employment with ONB, neither they nor Bell Bank would have been able to selectively target such a large percentage of ONB's customers in the Brainerd-Baxter market so quickly." (*Id.*, ¶ 93). This selective, rapid targeting is persuasive circumstantial evidence of misappropriation, and distinguishes plausible claims from "mere fears."

### 3. ONB alleges acquisition and retention of trade secret information far beyond contact data.

Contrary to Defendants' assertion that "[t]he only information ONB alleges the Employee Defendants actually took are customer names and phone numbers," (MTD at

16), ONB alleges acquisition and retention of confidential customer and loan information after the Bell Bank offers were accepted. Specifically, ONB alleges the Former Employees "accessed and printed confidential customer and loan documents" from ONB systems in the weeks before resignation, and that ONB could not later locate various printed outputs. (FAC, ¶ 73). Those loan documents were not generic forms. They contained the kinds of nonpublic intelligence competitors use to target solicitations: loan balances, maturity dates, underwriting status, detailed notes about borrower income and financing needs, etc. (*Id.*, ¶¶ 71, 74, 80-81).

### 4.    ONB alleges surrounding circumstances that make misappropriation plausible.

ONB alleges a coordinated, no-notice departure that deprived ONB of the usual transition period in which access is restricted and materials are secured. (FAC, ¶ 62). ONB further alleges surveillance footage showing Former Employees entering the Brainerd and Baxter branches before business hours on December 8 and removing multiple boxes of materials without inspection. (*Id.*, ¶ 11). Those allegations supply a coherent explanation for why ONB lacks direct visibility into every item taken and they reinforce the plausibility of misappropriation, particularly when combined with immediate solicitation and the missing printouts.

Taken together, ONB alleges far more than a generalized fear that employees might have walked out with trade secrets and a competitor might use them. This kind of pattern is sufficient to plead misappropriation at the Rule 12 stage.

### 5.    Rule 8 does not require ONB to plead around Defendants' "personal relationship" defense.

In arguing that ONB failed to plead "use or disclosure," Defendants contend ONB has made a "sudden about-face" from the preliminary-injunction proceedings and supposedly conceded it would not be improper for the Former Employees to solicit customers with whom they had personal relationships before joining Bremer/ONB. (MTD at 16). As a threshold matter, that is not a proper basis for dismissal: statements at oral argument are not pleadings and cannot be used to decide a Rule 12(b)(6) motion. *See Folger v. City of Minneapolis*, 43 F. Supp. 3d 922, 930 (D. Minn. 2014).

Even putting that aside, Defendants' argument is improper. On the back of this purported "concession," Defendants insist ONB must plead, customer by customer, that each Former Employee learned each customer's contact information through ONB rather than through a preexisting relationship, effectively requiring ONB to negate a "prior relationship" explanation at the outset. (*See* MTD at 14). A plaintiff is not required to anticipate affirmative defenses and plead facts negating them. *Weatherly*, 994 F.3d at 943; *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Complaints need not contain *any* information about defenses and may not be dismissed for that omission.").

In any event, ONB pleads exactly what Defendants say is missing: that the Former Employees obtained, retained, and used ONB's customer contact information through their confidential employment relationship with ONB (as opposed to, for instance, obtaining the information from prior personal relationships). ONB alleges that, by virtue of their

employment, ONB communicated to the Former Employees in confidence ONB customer contact information; that ONB owns those trade secrets; that the Former Employees improperly stored ONB customer information on their phones and retained it after leaving ONB; and that they selectively targeted key ONB customers using "confidential information learned through the Former Employees' employment with ONB." (FAC, ¶¶ 53, 84-85, 93, 110-11, 115). Those allegations plausibly plead acquisition and use through the confidential relationship—more than enough at the pleading stage.

### C.    Defendants' "speculation" and "obvious lawful explanation" arguments invert Rule 12.

ONB alleges that the Former Employees printed sensitive materials immediately before resignation, that those documents are now missing, and that, on information and belief, the Former Employees took those documents to use at Bell Bank. (FAC, ¶¶ 73-81). ONB also alleges that immediately before resignation, the Former Employees repeatedly accessed compilations of ONB customer data that they would have had no business reason to access at that point and, on information and belief, copied that information for use at Bell Bank. (*Id.*).

Defendants relabel the allegations ONB made "upon information and belief" as "speculative" and as "conclusory" because ONB did not present definitive proof, at the pleading stage, that the Former Employees actually absconded with any particular document. (MTD at 17). Then, after stripping out the supposedly "speculative" allegations that ONB pled on information and belief, Defendants ask the Court to credit a "lawful obvious alternative explanation. (*Id.*). Specifically, they ask the Court to infer that the

Former Employees accessed, printed, and discarded those documents merely as part of their job. (*Id.*). In other words, Defendants ask the Court to credit a defense narrative that is directly contrary to the misappropriation scheme ONB has pled. Rule 12 does not allow this.

### 1.    Facts pled on information and belief are permissible.

The Eighth Circuit has rejected the premise that allegations made "upon information and belief" are categorically insufficient under *Twombly* and *Iqbal*. *Ahern*, 59 F.4th at 956–57. *Ahern* holds that pleading on information and belief is proper where the relevant evidence is in the defendant's possession and control, and the complaint supplies enough factual context to make the inference plausible. *Id.* That is exactly the posture here.

ONB pleads discrete acts of printing and access immediately before the coordinated departure, including access to documents for which the employees had no legitimate business purpose, coupled with missing hard-copy outputs, a no-notice resignation executed without the customary two-week transition period, and a pre-business-hours removal of boxes of materials without inspection. (FAC, ¶¶ 11, 62, 71-83). ONB also alleges as fact—not on information and belief—that "[t]he Former Employees **did not** access and print these documents to help ONB facilitate the transition." (*Id.*, ¶ 83) (emphasis added). Those allegations make the inference of retention and misuse plausible: the suspicious timing, lack of business purpose, missing outputs, and uninspected removal of materials coherently point to misappropriation rather than routine job activity. Whether those printed documents were retained, where they went, and what became of them are

quintessentially facts within Defendants' control, and *Ahern* makes clear ONB is not required to plead that proof before discovery. 59 F.4th at 956–57.

Accordingly, there is no reason for the Court to disregard ONB's "upon information and belief" allegations as speculative.

### 2.  "Lawful obvious alternative explanations" do not authorize a court to choose Defendants' story over ONB's.

Because the Court cannot disregard the allegations ONB pled "on information and belief," Defendants' "lawful obvious alternative explanation" argument necessarily fails. Rule 12 is not a mechanism for choosing between competing narratives. *Twombly*, 550 U.S. at 556-57. The court may not "ferret[] out the most likely reason for the defendants' actions" by crediting a defense narrative over the plaintiff's allegations. *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quotations omitted). Accordingly, Courts may consider "obvious alternative explanations" only insofar as those explanations flow from and fit the well-pleaded facts.

Once ONB's allegations are accepted as true, Defendants' narrative that "they were just doing their jobs" and that "the documents were purged as part of their jobs" is not an "alternative explanation" consistent with the pleading; it directly contradicts what ONB alleges happened. Where, as here, Defendants' "alternative" story depends on rejecting ONB's pleaded allegations, that is a merits dispute for discovery, not a Rule 12 basis for dismissal.

### 3. Defendants' proposed "lawful obvious alternative explanation" is neither obvious nor consistent with the pleaded facts.

Even if the Court were to disregard the allegations ONB pled "on information and belief," Defendants' "lawful obvious alternative explanation" theory still would not work. The Eighth Circuit has made clear that Rule 8 "does not require a plaintiff to plead facts tending to rebut all possible lawful explanations," as doing so would "invert the principle that the complaint is construed most favorably to the nonmoving party." *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 596–97 (8th Cir. 2009) (quotations omitted). Thus, "a defendant is **not** entitled to dismissal if the facts are merely consistent with lawful conduct." *Id.* (emphasis added).

Here, Defendants' "lawful obvious alternative explanation" fails to account for the pleaded sequence of events. It does not explain, for instance, why—if they were truly interested in coordinating a smooth transaction—none of the eight Former Employees provided customary two-week notice; why, in the days and hours immediately before resigning, they repeatedly accessed and printed ONB's most sensitive customer and loan information they had no legitimate business reason to review at that point; why they printed multiple copies of the same sensitive documents; or why they entered branches before business hours on the day of resignation and removed boxes before ONB could inspect what was being taken. On these allegations, Defendants' "obvious" explanation is neither obvious nor reconcilable with the pleaded timeline and conduct.

**D.** **The Court cannot credit Defendants' denials of liability in the preliminary injunction materials.**

In responding to ONB's earlier preliminary-injunction motion, each of the Former Employees submitted a supporting declaration. Those declarations included several admissions that the Former Employees had misappropriated certain categories of ONB's confidential and trade secret information, and that they had used the information to solicit ONB's customers. When ONB amended its pleading, it did what Rule 8 permits: it alleged some of those admissions as facts supporting its claims.

Now, Defendants ask the Court to look past the four corners of the First Amended Complaint, parse the full content of the preliminary-injunction declarations, and credit Defendants' self-serving denials—even where those denials are offered to contradict ONB's well-pleaded allegations. (MTD at 16-17). That is not how Rule 12 works. A Rule 12(b)(6) motion tests the sufficiency of the complaint, not the weight of competing evidence.

### 1. ONB did not "embrace" the preliminary injunction declarations.

Defendants try to justify their approach by invoking the Eighth Circuit's doctrine permitting courts to consider certain documents "necessarily embraced" by the complaint. (MTD at 16) (citing *Dunnigan v. Fed. Home Loan Mortg. Corp.*, 184 F. Supp. 3d 726, 734 (D. Minn. 2016)). But that doctrine is not a free pass to import testimonial narratives at the pleading stage. It exists to prevent artful pleading where a claim rests on a claim-defining document (most commonly a contract) and the plaintiff omits it. *See Gorog v. Best Buy*

*Co.*, 760 F.3d 787, 791-92 (8th Cir. 2014) (concluding that an agreement was necessarily embraced where it was the sole basis for the complaint).

The "necessarily embraced" doctrine is reserved for documents whose contents are alleged in a way that makes the document itself integral to the claim. Here, Defendants' preliminary injunction declarations were not made part of the Rule 12 record. ONB did not attach the declarations as exhibits, did not expressly incorporate the declarations by reference, and did not adopt the truth of Defendants' broader narrative. Defendants did not even attach the declarations to their Motion.

Moreover, none of ONB's claims are "based on" the declarations or even on the admissions within them. ONB is suing on Defendants' misappropriation and misuse of ONB's confidential and trade secret information—claims ONB first asserted *before* any Former Employee submitted a declaration or made the cited admissions. The declarations are merely a source of party-opponent admissions that corroborate the misconduct ONB alleges. Whether those admissions were made in a declaration, an email, or orally is immaterial to the elements of ONB's claims; what matters is the misconduct those admissions reflect.

Courts in this District have rejected the maneuver Defendants attempt here—*i.e.*, using preliminary injunction submissions to reshape the Rule 12(b)(6) record. *Orbit Sports LLC v. Taylor* draws the common-sense line that materials submitted during the preliminary injunction briefing "will only be considered in connection with that motion," while the Rule 12(b)(6) record is drawn from the complaint and materials it necessarily embraces. 546 F. Supp. 3d 832, 835 n.1 (D. Minn. 2021). Defendants ask the Court to do

the opposite: to decide a pleading motion on an evidentiary record assembled for injunctive relief.

The Court should confine its analysis to the allegations in the First Amended Complaint.

### 2.    The declarations are not exculpatory.

Even accepting Defendants' premise for the sake of argument, their declarations do not actually negate ONB's allegations or exculpate them from liability.

Defendants assert that "each" Former Employee denied "taking or using any confidential information." (MTD at 16). In reality, none of the declarations went that far. The denials Defendants cite are threadbare and carefully cabined—often framed as "I did not take ONB documents," in a context that appears directed to the narrow question of whether ONB documents were physically present in the boxes removed on the morning of resignation. Those narrow denials do not speak to much of what ONB alleges: misappropriation in the weeks leading up to resignation; retention of ONB information in personal devices; and use of ONB's confidential compilations to target customers after joining Bell Bank. Nor do such denials resolve the critical legal point that misappropriation is not limited to "ONB documents." The statute protects "information" and compilations; Defendants do not defeat a trade secret claim only by saying they did not carry out paper.

More importantly, the declarations affirmatively *support* ONB's theory of misappropriation and use. Not one Former Employee claims to have zero ONB customer information stored on his or her phone. Several (Adams, Campbell, Johnson, McConkey, and Yantes) admit that only some—*i.e.*, **not all**—of the ONB customer contact information

retained on their phones was derived from personal relationships. And Ellingson does not claim that *any* of the ONB customer contact information in her phone was limited to personal relationships. Accordingly, the very portions of the declarations Defendants seek to invoke are *inculpatory* in that they confirm possession of confidential information sourced from ONB instead of personal relationships.

The solicitation admissions are similar. Seven of the Former Employees admit some ONB customer solicitation, but none specify that they *only* solicited ONB customers they had preexisting personal relationships with:

- Adams and Campbell admit soliciting some customers with whom they are friends, but do not specify whether those friendships predated Bremer/ONB or arose from their work at Bremer/ONB, and they do not assert that their declarations capture every solicitation.

- Ellingson admits soliciting a customer with whom she is friends without specifying whether the relationship arose out of her employment; she also admits soliciting another ONB customer without claiming any friendship at all.

- Johnson admits soliciting ONB customers and says some are close friends, but does not claim she solicited *only* her friends.

- McConkey and Yantes admit soliciting some customers they "brought to Bremer" and with whom they are friends, but do not assert that all solicitations were limited to those customers or friends.

- Bernu provides no declaration testimony establishing that her solicitations were limited to personal relationships.

That is the opposite of the clean, categorical exculpation Defendants ask the Court to accept on a motion to dismiss. At best for Defendants, these are factual disputes about scope, timing, source, and use—exactly the kinds of disputes courts cannot resolve on a Rule 12 motion.

### E.    If ONB's trade secret claim fails, its breach of confidentiality claim would remain viable.

ONB pleads, in the alternative to its trade secret claim, that the Former Employees owed ONB a common-law duty of confidentiality. (FAC, ¶¶ 37-52, 108-124). ONB alleges that, to the extent any Defendant misused ONB information that does not qualify as a statutory trade secret, Defendants breached the duty of confidentiality by retaining and using ONB's confidential customer and loan information to solicit ONB customers and compete on Bell Bank's behalf. (*Id.*, ¶ 124).

Defendants contend ONB's common-law confidentiality theory is displaced by MUTSA because it is nothing more than the trade-secret misappropriation claim. (MTD at 19-20). According to Defendants, ONB failed to plead "something more" than a trade secret claim, as required to avoid MUTSA displacement. (MTD at 19-20). But Defendants cite only cases addressing duplicative "tagalong" claims that seek the same relief for the same defined body of information as the trade secret claims. (*Id.*) (citing *Protégé Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 940 (D. Minn. 2019); *Schlief v. Nu-Source, Inc.*, 2011 WL 1560672, at *6 (D. Minn. Apr. 25, 2011)).

ONB is not pursuing a duplicative confidentiality theory for trade secrets. Instead, ONB is preserving an alternative remedy for any confidential information that may fall short of the statutory definition of trade secret—precisely the scenario Minn. Stat. § 325C.07(b)(2) contemplates. In that posture, there is no "overlap" problem to solve now. The theories are mutually exclusive by design: if a given item is ultimately found to be a

trade secret, ONB's remedy runs through DTSA/MUTSA; if it is confidential but not a trade secret, the duty-of-confidentiality theory supplies the remedy.

When this very scenario occurred in *TE Connectivity,* the court rejected the argument that MUTSA required dismissal of non-trade-secret confidentiality theories at the pleading stage and held that "MUTSA does not displace [the] claims to the extent that they are based on confidential information that does not reach the level of trade secrets." 2013 WL 6827348, at *5; *see also Polaris Indus., Inc. v. Mangum*, 690 F. Supp. 3d 966, 973–74 (D. Minn. 2023) (rejecting MUTSA displacement for claims based on mixed trade secret and confidential information). The court further observed the practical problem Defendants' position creates: it would be "counterintuitive" to dismiss alternative confidentiality theories now, only to learn later—after discovery—that the challenged information does not qualify as a trade secret, leaving the plaintiff without a remedy for plainly confidential information. *Id.,* at *5 n.3.

## II.    **ONB** STATES A PLAUSIBLE BREACH OF FIDUCIARY DUTY CLAIM IN COUNT

### A.    <u>Minnesota law prohibits competition while on the payroll.</u>

ONB alleges that the Former Employees breached the fiduciary duty of loyalty to ONB by, among other things, encouraging their co-workers to leave simultaneously for a competitor of ONB. (FAC, ¶¶ 125-33).

Under Minnesota law, every employee owes a common-law fiduciary duty of loyalty to their employer which "prohibits her from soliciting the employer's customers for herself, or from otherwise competing with her employer, while she is employed." *Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 304 (Minn. Ct. App. 1987); *see also Sanitary*

27

*Farm Dairies, Inc. v. Wolf*, 261 Minn. 166, 175 (1961) (holding that an employee "cannot feather his own nest at the expense of his employer while he is still on the payroll"). This duty obligates employees to act in their employer's best interests and forbids them from directly or indirectly competing, soliciting, or undermining their employer while still on the payroll. *Rehab. Specialists*, 404 N.W.2d at 305 (noting that even "passive" activity can constitute a breach of the duty of loyalty).

Encouraging coworkers to leave for another employer is a grave breach of an employee's duty of loyalty. Indeed, "[o]ne way an employee may unfairly compete is by soliciting his co-workers to terminate their employment and join him at a direct competitor."[6] *Guidant Sales Corp. v. George*, 2006 WL 3307633, at \*4 (D. Minn. Nov. 14, 2006) (holding plaintiff sufficiently pled breach of loyalty claim where employee solicited others to move jobs with him). In *Benfield,* for instance, an employee convinced three other employees to quit on the same day, leaving the employer short-staffed and at a competitive disadvantage. *Benfield, Inc. v. Moline*, 2006 WL 452903, at \*9 (D. Minn. Feb. 22, 2006). The court denied defendant summary judgment "[b]ecause there [was] a genuine question of material fact regarding whether [defendant] solicited his coworkers to leave simultaneously and without notice to join [the plaintiff's] competitor." The court explained, "[i]n preparing to compete, an employee may not commit fraudulent, unfair, or wrongful

---

[6] "Clearly an employee is not advancing the interests of his employer when he suggests that customers can do as well or better by discontinuing their present patronage and transferring their business elsewhere in the immediate future." *Sanitary Farm*, 261 Minn. at 175. That proposition applies equally to an employee's interactions with coworkers about moving to a competitor.

acts, such as ... *solicitation leading to a mass resignation of the firm's employees.*" *Id.* (quotations omitted, emphasis added).

Here, the Former Employees' conduct represents a textbook breach of the duty of loyalty. While still employed by ONB, they encouraged each other to carry out a covert, premeditated plan to resign *en masse* and join Bell Bank, a direct competitor. (FAC, ¶¶ 1, 9, 64). Not one of the eight Former Employees gave customary two-week notice. Instead, after accepting positions at Bell Bank, they collectively agreed to remain at ONB for several weeks, concealing their impending resignations until the hour of their departures on December 8, 2025. (*Id.*, ¶ 62). They agreed to time their resignations to maximize disruption: ONB's revenue producers and nearly all senior managers in the Brainerd–Baxter market resigned simultaneously, forcing ONB to shutter the Brainerd branch and to shut down Baxter's lobby operations. (*Id.*, ¶ 2).

That kind of synchronized, no-notice walkout does not happen by coincidence. It necessarily required active coordination and mutual encouragement. Each participant had to persuade others to commit to the same exit date, the same no-notice approach, and the same operationally-damaging timing. (FAC, ¶¶ 62-63). In addition to uniform resignation timing, ONB alleges shared resignation language and formatting, identical dating errors and typographical anomalies across resignation letters, and group communications referencing "our badges and corp credit cards," all reinforcing an orchestrated, coordinated departure rather than parallel independent decisions. (*Id.*, ¶¶ 10, 63-64).

Taken as true, these allegations plausibly state a breach-of-loyalty claim under Minnesota law.

**B.** **ONB pleads far more than just "preparing to leave."**

Defendants argue that Count II fails because "preparing to leave is permissible," and ONB has pled nothing more than employees "preparing" to resign. (MTD at 21-24). Defendants mischaracterize ONB's allegations and misapprehend the law.

ONB pleads far more than just "preparation" to change jobs. It alleges that, while still employed by ONB, the Former Employees took coordinated, affirmative steps to compete against ONB's interests. They:

- Coordinated a meeting with Bell Bank in Fargo attended by several ONB employees, some of whom were on the clock. (FAC, ¶¶ 56-58).

- Encouraged, solicited, and induced one another to resign and join Bell Bank. (*Id.*, ¶¶ 59(a), 64).

- Planned for immediate competitive engagement upon joining Bell Bank. (*Id.*, ¶¶ 69-70).

- Coordinated their timing and agreed to conceal their resignations until the last moment—eschewing customary notice—while they continued working at ONB. (*Id.*, ¶¶ 62-64).

- Leveraged that concealment period to access and print sensitive ONB customer and loan materials in the days and hours before resigning. (*Id.*, ¶¶ 73-80).

- Executed a synchronized, same-day departure that forced operational disruption in the Brainerd–Baxter market. (*Id.*, ¶¶ 2, 62-67).

These coordinated, on-the-payroll acts taken to advance a competitor's interests and impair ONB's operations are not mere "preparation."

The decisions Defendants cite do not compel dismissal. Contrary to what Defendants imply, *Haddley v. Isanti Cnty.*, 2015 WL 13697929, at *16 (D. Minn. Nov. 18, 2015) does *not* announce an exhaustive checklist of the only conduct that can breach the

duty of loyalty. (MTD at 23). *Haddley*, instead, describes mere examples of Minnesota courts have found actionable. Even on Defendants' framing, ONB's allegations fit comfortably within at least two of the three categories *Haddley* describes.

*Schlief,* also cited by Defendants, does not change the analysis. (MTD at 23). *Schlief* involved a very different posture: a single employee allegedly copied information and started a competing business. 2011 WL 1560672, at *6. The duty-of-loyalty claim rose and fell on alleged trade-secret theft, prompting the court to treat the claim as duplicative of trade-secret law. Here, Count II is not a repackaged trade-secret claim. It is grounded in coordinated coworker solicitation, concealment, and a timed mass resignation—independent acts of disloyal competition that Minnesota law recognizes as actionable.

Nor does *Rehab. Specialists* help Defendants. *Rehab. Specialists* recognizes that employees may take ordinary preparatory steps to compete, but makes clear that the duty of loyalty prohibits "competing with [one's] employer while [one] is employed." 404 N.W.2d at 304. Nothing in that decision immunizes an orchestrated plan to conceal resignations, strip the employer of key personnel in a single synchronized event, and leverage the remaining time on the payroll to position a competitor for immediate customer targeting. Nothing in Minnesota law suggests that soliciting coworkers to leave for a direct competitor is merely "preparation."

Further, despite the fact that Minnesota duty-of-loyalty law applies here, Defendants cite several decisions decided under the laws of Maryland, Alabama, Texas, Louisiana, and Nebraska. (*See* MTD at 24) (citing *Quality Sys., Inc. v. Warman*, 132 F. Supp. 2d 349 (D.

Md. 2001)[7]; *Allied Supply Co. v. Brown*, 585 So. 2d 33 (Ala. 1991); *Palliative Plus LLC v. A Assure Hospice, Inc*., 2025 WL 284920 (Tex. App. Jan. 24, 2025); *Lagniappe Logistics, Inc. v. Buras*, 2017-0701 (La. App. 1 Cir. 1/4/18); *Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027 (8th Cir. 2020)[8]). No Minnesota court has cited any of those decisions or, as far as ONB can tell, ever adopted the duty-of-loyalty laws of those states. In any event, these decisions merely stand for the proposition that simultaneous resignation, without "something more," is not enough to succeed on a breach-of-loyalty claim. ONB's claim is based on far more than a simultaneous resignation.

---

[7] *Quality Sys. v. Warman* underscores an important principle Defendants ignore. It distinguishes between permissible, informal discussions among a small circle of close friends and conduct that becomes disloyal when a ringleader leverages position to orchestrate defections or when the effort expands beyond a tight-knit group. ONB's theory falls in the latter category. ONB is not complaining about "normal workplace intercourse," and it does not allege a benign exchange among close friends. It alleges a coordinated raid on branch leadership—spanning roles and branches—engineered to produce a mass departure to a direct competitor.

[8] Defendants cite *Farmers Edge,* decided under Nebraska law, for the unremarkable proposition that "resigning as a group is not a de facto breach of loyalty." (MTD at 23). But *Farmers Edge* bears little resemblance to what ONB alleges. There, employees departed over the course of a month, and the record did not suggest a coordinated, same-day, no-notice walkout engineered to disrupt operations or carry customers to a competitor. Here, by contrast, ONB alleges precisely that kind of coordinated raid. Moreover, *Farmers Edge* cuts against Defendants when read in full. In discussing *Western Plains, L.L.C. v. Retzlaff Grain Co., Inc*., 870 F.3d 774 (8th Cir. 2017), the *Farmers Edge* court recognized that it *would* be a breach of loyalty to "resign[] en masse to ensure their customers would follow them from their employer to the competitor." That is precisely the theory ONB pleads here.

## C.    ONB does not rely on "group pleading."

Defendants contend that Count II fails because ONB supposedly lumps the Former Employees together without pleading individualized facts.[9] (MTD at 20-21). This is the same, recycled "group pleading" refrain Defendants pressed against the original Complaint, and it is even less persuasive now.

Count II is not pled as a generic "everyone breached their duties of loyalty" conclusion. Instead, ONB provides separate paragraphs and sub-paragraphs describing each Former Employee's disloyal conduct. (FAC, ¶¶ 56-65). For each Former Employee, ONB separately alleges, at a minimum, that he or she encouraged other Former Employees to leave ONB for Bell Bank, participate in the simultaneous resignation, and keep ONB uninformed until the moment of departure. (*Id*.). Moreover, the pleading is not generic. ONB names Ellingson and Adams as senior officers who "surreptitiously worked together on behalf of Bell Bank" to solicit and poach colleagues. (*Id*., ¶ 4). ONB alleges a specific recruiting trip to Bell Bank's Fargo office on November 14, 2025, and names those ONB employees who participated in the meeting without clocking out from ONB that day. (*Id*., ¶ 58). ONB also pleads discrete recruiting acts in separate subparagraphs—for example, that Adams and Johnson recruited Bernu at Boulder's Tap, and they supplied ONB compensation information to Ellingson to support group offer negotiations. (*Id*., ¶ 64).

---

[9] Defendants accuse ONB of filing a "kitchen sink complaint"—a pleading in which a plaintiff brings every conceivable claim against every conceivable defendant. Defendants are wrong. ONB states the breach of loyalty claim against only the Former Defendants and the unjust enrichment claim against only Bell Bank. In the other counts, ONB is careful to separate out each Defendant's acts from the others'.

To the extent Defendants' complaint is that ONB uses consistent language to describe parallel conduct by multiple actors, that is not "group pleading"—it is ordinary pleading where multiple defendants engaged in the same type of misconduct. Group pleading is problematic when the complaint makes it impossible to discern who is alleged to have done what. Here, ONB identifies each Former Employee by name and ties each to specific inducement and coordination allegations. (FAC, ¶ 64).

Stripped down, Defendants' point is really a demand for evidentiary particulars—who said what, to whom, on what date, and in what words—before discovery. Rule 8 does not require that level of granularity, and breach of loyalty claims are not subject to Rule 9's heightened pleading standard. ONB has alleged individualized factual predicates sufficient to place each Former Employee on notice of the conduct alleged, which is all that is required.

### D.  MUTSA does not displace the duty of loyalty claim.

Defendants argue MUTSA displaces ONB's duty of loyalty claim to the extent it is based on the misuse of confidential information. (MTD at 24-25). But MUTSA displaces only "conflicting tort, restitutionary, and other law … providing civil remedies for misappropriation of a trade secret," and it preserves "other civil remedies that are not based upon misappropriation of a trade secret." Minn. Stat. § 325C.07(a)-(b)(2). Thus, courts hold that MUTSA displacement does *not* apply when claims "have 'more' to their factual allegations than the mere misuse or misappropriation of trade secrets." *Micro Display Sys., Inc. v. Axtel, Inc.*, 699 F. Supp. 202, 205 (D. Minn. 1988) (denying dismissal because the

complaint had "sufficient fact allegations in addition to the misappropriation of trade secrets").

The cases Defendants cite (*Schlief* and *SL Montevideo*) do not announce categorical displacement of duty-of-loyalty theories. (MTD at 25). *Schlief* held MUTSA displaced a breach-of-confidentiality theory because it was pleaded as "nothing more than" the trade secret claim. 2011 WL 1560672, at *6. Similarly, *SL Montevideo* held that MUTSA displaced a tortious-interference theory because it was based only on "the mere misuse or misappropriation of trade secrets." *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1179 (D. Minn. 2003). Those holdings reinforce the same rule: displacement applies only where the non-MUTSA claim is coextensive with trade secret misappropriation and has no independent factual basis.

ONB's claim is different than the claims in *Schlief* and *SL Montevideo*. ONB's duty of loyalty claim is anchored in conduct that stands independent of trade secret misuse: a coordinated employee-raiding campaign carried out while the Former Employees were still on ONB's payroll, including recruiting colleagues to defect and orchestrating a synchronized, no-notice resignation designed to cripple operations. Those disloyal acts constitute "more" than trade secret misappropriation and therefore fall outside MUTSA displacement.

Even if Defendants reframe their request as partial displacement "to the extent" Count II references trade secret information, Rule 12(b)(6) does not allow for that. *See* FED. R. CIV. P. 12(b)(6) (allowing motions for "failure to state a claim upon which relief may be granted," not to excise or otherwise limit *portions* of claims). In any event, it would

35

be premature to determine what part of the breach of loyalty claim (if any) is displaced. In *Polaris*, for example, the court held that it was premature to determine MUTSA displacement as to any part of the claim. 690 F. Supp. 3d at 973–74. In that case, there was overlap between the alleged trade secrets and the alleged confidential information at issue. Nevertheless, the court denied dismissal, noting, "[w]hether or not the allegedly unreturned property may be found to contain trade secrets, confidential information that is not a trade secret, both, or neither, this determination is not properly an issue for the Court prior to discovery and the parties' examination of these materials." *Id.* Here, too, any fine-grained displacement question can be addressed, if necessary, on a developed record.

## III.  **ONB** STATES PLAUSIBLE AIDING AND ABETTING/CONSPIRACY CLAIMS.

### A.  <u>The pleaded acts constitute aiding and abetting.</u>

ONB adequately pleads, in Count III, that each Defendant aided and abetted the Former Employees' breaches of the duty of loyalty to ONB. (FAC, ¶¶ 134-51).

Minnesota recognizes aiding-and-abetting liability for tortious conduct, including breaches of fiduciary duty. To state such a claim, a plaintiff must plausibly allege an underlying tort, the defendant's knowledge of a breach of duty, and substantial assistance in the breach. *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999). ONB pleads each element.

First, ONB pleads underlying torts. As set out above, ONB alleges that the Former Employees breached their duty of loyalty by coordinating in secret to resign *en masse* without notice, crippling ONB's Brainerd-Baxter operations, and they absconded with ONB's sensitive data and used it to solicit ONB clients and employees on behalf of Bell

Bank.[10] (*See supra*).

Second, ONB pleads knowledge. ONB alleges that "each individual Former Employee knew that the other Former Employees owed and were breaching fiduciary duties to ONB," and also that Bell Bank knew. (FAC, ¶¶ 138-140).

Defendants argue Count III nevertheless fails because ONB has not pleaded that Defendants knew others were committing torts. (MTD at 27). That argument ignores both the express allegations and the pleaded mechanics of the scheme. A coordinated, stealth mass resignation for a direct competitor is not an accident. ONB alleges close coordination and mutual encouragement to execute a synchronized resignation designed to force branch disruption, followed by solicitation of ONB's highest-value customers almost immediately thereafter. (FAC, ¶¶ 2, 62-67, 88-93). ONB further alleges deliberate efforts, over the course of weeks, to keep the plan concealed—including coordinating resignation timing and withholding notice until the moment of departure—along with unusual access and printing activity, missing hard-copy outputs, and removal of boxes of materials. (*Id.*, ¶¶ 11, 62-64, 73-80). Taken together, those allegations support the inference that the Former Employees understood the wrongfulness of what they were doing while still on ONB's payroll, and that Bell Bank understood it was inducing and capitalizing on ongoing breaches of loyalty. This is more than enough to satisfy the knowledge prong at the pleading stage.

---

[10] Because ONB's aiding and abetting claim is based on "more" than trade secret misappropriation, MUTSA does not displace it. (*See supra*, § II.D).

Third, ONB pleads substantial assistance and encouragement. The Former Employees did not merely resign around the same time, they actively facilitated each others' disloyal conduct by coordinating strategy and execution—sharing resignation language and timing, acting in concert to effectuate a synchronized walkout, and then leveraging the coordinated move to target ONB's customers. (FAC, ¶¶ 10, 62-64, 67). That collective execution is substantial assistance. The alleged breach was inherently cooperative and could not have been achieved, in the manner alleged, by any one employee acting alone.

Bell Bank's role, as pleaded, was more direct still. ONB alleges Bell Bank recruited the Former Employees as a group, aligned their start dates to follow immediately after the coordinated resignations, and provided the platform, incentive, and opportunity for immediate competitive solicitation. (FAC, ¶¶ 62-64). Bell Bank also gave its tacit approval to the use of ONB's proprietary customer information, as evidenced by Bell Bank's immediate outreach to those customers. On these allegations, Bell Bank substantially assisted and encouraged the disloyal conduct that injured ONB.

Taken together, ONB plausibly alleges each element of an aiding-and-abetting claim against each Defendant.

### B.     The same allegations support conspiracy-based liability.

Conspiracy is "a combination of persons to accomplish an unlawful purpose or a lawful purpose by unlawful means." *Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (Minn. 1950). For the same reasons as the aiding and abetting claim, ONB plausibly alleges concerted action sufficient to support conspiracy-based vicarious liability.

Defendants argue ONB has not sufficiently alleged an "agreement" to support civil conspiracy. (MTD at 28–29). They are wrong. ONB alleges an agreement toward a common unlawful objective (or, at minimum, a lawful objective pursued by unlawful means). Specifically, ONB alleges a group recruiting meeting at Bell Bank's Fargo office attended by identified ONB employees while they were still employed by ONB, followed by coordinated negotiations through Ellingson as their "appointed representative." (FAC, ¶ 59). ONB also alleges that "Defendants agreed amongst themselves that the Former Employees" would: work for three more weeks at ONB without any one of them giving the customary two-week notice; keep their impending resignations secret to deprive ONB of the opportunity to prepare an orderly transition and to secure its confidential and trade secret information; and simultaneously resign the morning of December 8, 2025. (*Id.*, ¶¶ 8, 62).

ONB also pleads overt acts that corroborate agreement rather than coincidence—facts that make parallel, independent decision-making implausible. ONB alleges, for instance, that the Former Employees synchronized their resignations to force operational disruption and, in the wake of that disruption, solicited ONB's highest-value customers. (FAC, ¶¶ 2, 62-67, 88-93). That sequence is not happenstance. In addition, ONB pleads multiple indicia of joint planning: shared resignation-letter anomalies; shared phrasing about badges and corporate credit cards; cross-referenced resignation notices; coordinated, pre-business-hours entry into the branches; and removal of multiple boxes of materials on the resignation date. (*Id.*, ¶¶ 10, 63). Those coordinated overt acts—together with the pleaded recruiting meeting, unified negotiation posture, and express agreement on timing

and secrecy—are more than sufficient to plead concerted action and an actionable agreement at the Rule 12 stage.

**IV.   ONB STATES A PLAUSIBLE TORTIOUS INTERFERENCE CLAIM.**

In Count IV, ONB pleads tortious interference based on Defendants' coordinated effort to divert ONB's customer relationships.

### A.   ONB pleads tortious interference with contract.

A tortious-interference-with-contract claim requires "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Central Specialties, Inc. v. Large*, 18 F.4th 989, 999 (8th Cir. 2021) (quotations omitted). ONB pleads each element. (FAC, ¶¶ 152-161).

First, ONB pleads protectable contractual and business relationships. ONB alleges that its customer relationships are governed by banking "contracts and agreements," and that ONB has longstanding customer relationships and expectancies in the Brainerd–Baxter market. (FAC, ¶¶ 152-56). In addition, ONB pleads that its "customer relationships are embodied in banking contracts and agreements between ONB and its customers, including deposit account agreements, loan and credit agreements, treasury management agreements, and related banking contracts." (*Id.*, ¶ 154). ONB then alleges that Defendants interfered with those contractual relationships by attempting to transition the customers to Bell Bank. (*Id.*, ¶ 156). ONB also pleads a concrete example, alleging that "Customer A.S.J." is moving its banking relationship to Bell Bank in the wake of Defendants' coordinated conduct. (*Id.*, ¶ 103). At the pleading stage, those allegations more than suffice to identify

the existence and types of contracts at issue and to put Defendants on notice of the contractual relationships ONB contends were targeted.

Second, ONB plausibly pleads knowledge. ONB alleges that the Former Employees serviced and managed ONB's customer relationships and, thus, necessarily knew of ONB's customer contracts and relationships, and that Bell Bank recruited and deployed the team in that customer-relationship context. (FAC, ¶¶ 3-4, 12, 152-158).

Third, ONB pleads intentional interference. ONB alleges that, within minutes of the synchronized resignations, ONB's highest-value customers were contacted and solicited to move their business to Bell Bank.[11] (FAC, ¶ 12).

Defendants respond that ONB cannot state a claim for tortious interference because it has not pleaded any "breach" of any customer contract. (MTD at 30-31). That is not the governing rule. In its most recent reported decision on the subject, the Eighth Circuit held, despite courts often listing "breach" as an element of the claim, that "an explicit breach of contract is **not required**" under Minnesota law to sustain a tortious interference with contract claim. *Cent. Specialties, Inc. v. Large*, 18 F.4th 989, 998 (8th Cir. 2021) (emphasis added).[12] In coming to this conclusion, the Eighth Circuit quoted the Minnesota Supreme

---

[11] Because ONB's claim is based on "more" than trade secret misappropriation, MUTSA does not displace it. (*See supra*, § II.D). The same goes for the tortious interference with business expectancy claim discussed below.

[12] Defendants cite *Cardiovascular Sys., Inc. v. Petrucci*, 2022 WL 2133743, at *2 (8th Cir. June 14, 2022) for the proposition that breach of contract is required to state a tortious interference claim. (MTD at 31). But there was no argument in *Petrucci* regarding whether tortious interference with contract encompasses more than inducing an actual breach of contract, so the decision does not address that question. In any event, *Petrucci* is an

Court's guidance that tortious interference with contract is broader than merely inducing a breach of contract because it includes "any act injuring or destroying persons or property which retards, makes more difficult, or prevents performance, or makes performance of a contract of less value to the promise." *Royal Realty Co. v. Levin*, 244 Minn. 288, 292 n. 4 (Minn. 1955) (quotations omitted). ONB comfortably satisfies this element by alleging that—whether or not any customer "breached" a contract in the technical sense—customers like "Customer A.S.J." terminated or transferred their banking relationships.[13]  (FAC, ¶¶ 2, 12, 103, 152-161).

Fourth, ONB plausibly pleads lack of justification. "Ordinarily, whether interference is justified is an issue of fact, and the test is what is reasonable conduct under the circumstances." *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994). Here, ONB pleads interference accomplished through independently wrongful means—disloyal conduct while employed, concealment, coordinated disruption, and misuse of confidential customer and relationship information—supporting a plausible inference that the interference was "without justification." (FAC, ¶¶ 4-9, 37-52, 72-86, 152-161).

---

unreported decision, and this Court is bound by the Eighth Circuit's decision in *Cent. Specialties*.

[13] Defendants also argue that customers are free to choose their bank and ONB has no "exclusive" right to provide banking services. (MTD at 31). Customer autonomy is not the issue. Tortious interference does not require that the third party lack freedom to contract. As explained above, the claim is not limited to inducing a technical contract breach, it also reaches conduct that makes performance more difficult or less valuable. For that reason, the *Robertson* and *Cutter* decisions Defendants cite—each applying a breach-centric formulation—do not address the governing standard and do not support dismissal here.

Fifth, ONB pleads damages. Specifically, ONB alleges the loss and impairment of customer relationships and business expectancies, disruption to branch operations, and resulting harm from the solicitation and diversion campaign. (FAC, ¶¶ 2, 12, 160-161).

### B.    ONB pleads tortious interference with business expectancy.

Minnesota law recognizes a claim for tortious interference with prospective business advantage where a plaintiff pleads (1) a reasonable expectation of economic advantage, (2) the defendant's knowledge of that expectation, (3) intentional tortious or illegal interference with the expectation, (4) a reasonable probability the plaintiff would have realized the advantage in the absence of the wrongful act, and (5) damages. *Metropolitan Transp. Network, Inc. v. Collaborative Student Transp. of Minn., LLC*, 6 N.W.3d 771, 784 (Minn. Ct. App. 2024). ONB pleads each element. (FAC, ¶¶ 152-161).

First, ONB pleads a reasonable expectation of economic advantage from its existing customer relationships in the Brainerd–Baxter market, including ongoing banking relationships and continuing business opportunities with those customers. (FAC, ¶¶ 153-156).

Second, ONB plausibly pleads Defendants' knowledge because the Former Employees serviced and managed those customer relationships and Bell Bank recruited and deployed the team in that customer-relationship context. (FAC, ¶ 12).

Third, ONB pleads intentional interference through independently wrongful means. ONB alleges that Defendants interfered with ONB's customer relationships through disloyal conduct while still employed, concealment and coordinated disruption, and misuse of ONB's protected customer and relationship information. (FAC, ¶¶ 4-9, 72-86, 152-161).

Defendants argue that ONB has not identified the third party that is the source of the expectancy. (MTD at 32). Not so. ONB identifies an impacted customer relationship—"Customer A.S.J."—and alleges that customer moved its banking relationship to Bell Bank in the wake of Defendants' coordinated conduct. (FAC, ¶ 103).

Fourth, ONB plausibly pleads a reasonable probability it would have realized the expected advantage absent Defendants' wrongful conduct. ONB alleges longstanding, established customer relationships serviced by the departing bankers, followed immediately by diversion efforts tied to the synchronized resignation and disruption. (FAC, ¶¶ 12, 33, 153-156). Those allegations support the straightforward inference that, but for Defendants' interference, ONB would have continued to realize economic value from those relationships.

Fifth, ONB pleads damages from the diversion of customer relationships and resulting loss of business and goodwill. (FAC, ¶¶ 90, 96-96, 103). Defendants insist ONB must allege more to show but-for probability. (MTD at 33). But ONB alleges, for example, that "Customer A.S.J." had been an ONB customer "for more than 40 years" before being solicited and transitioning to Bell Bank. (FAC, ¶ 90(c)). At the pleading stage, that history, coupled with the alleged coordinated disruption and immediate solicitation, plausibly supports the inference that ONB would have retained that business expectancy absent Defendants' interference.

Accordingly, ONB plausibly states a claim for tortious interference with prospective business advantage.

## V. **ONB** STATES A PLAUSIBLE CLAIM FOR UNJUST ENRICHMENT IN **COUNT V.**

### A.    <u>ONB sufficiently alleges both required elements.</u>

Under Minnesota law, unjust enrichment requires that (1) the defendant knowingly received or retained a benefit, and (2) it would be inequitable for the defendant to retain the benefit without paying for it. *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001). ONB pleads both elements. (FAC, ¶¶ 162-68).

First, ONB alleges a concrete benefit that Bell Bank received: ONB's confidential business information such as "customer identities, contact information and loan information"; the goodwill and customer relationships ONB cultivated over time; the benefit of ONB's internal training, market development, and infrastructure; and banking relationships.[14] (FAC, ¶ 164). ONB further alleges that Defendants obtained and retained this information and then Bell Bank used it to solicit ONB's highest-value customers immediately after the coordinated resignations, by, among other things, positioning the Former Employees to service and solicit the same customers they handled at ONB. (FAC, ¶¶ 12, 103).

Second, ONB alleges why the retention of those benefits would be unjust: Defendants obtained these advantages through wrongful conduct—breaches of loyalty and confidentiality while still employed, concealment and coordination designed to maximize disruption, and misuse or retention of ONB's confidential information—rather than

---

[14] Defendants argue that the only benefit conferred upon Bell Bank is the "general knowledge" of the Former Employees." (MTD at 35). For the reason just explained, that is incorrect.

through fair competition. (*See, e.g.,* FAC, ¶¶ 49, 72-86). Those allegations plausibly support the conclusion that Defendants should not be permitted to retain the resulting business advantages without compensating ONB.

Accordingly, ONB plausibly states an unjust enrichment claim.

### B.     Bell Bank's "adequate remedy at law" argument is not a basis for dismissal on a Rule 12 motion.

Bell Bank argues that the unjust enrichment claim fails because ONB has an adequate remedy at law. (MTD, at 35-36). But Bell Bank does not identify any particular legal remedy it contends is "adequate"—which claim, which measure of damages, and which theory of recovery would supposedly make equity unavailable. Instead, it gestures generally at "various other claims," while simultaneously arguing that ONB has not and could not possibly plead them.[15] (*Id.*, at 36). That is not a coherent Rule 12 argument. Bell Bank cannot insist, on the one hand, that ONB has no viable legal claims and therefore no legal relief, while also insisting, on the other, that ONB must be barred from pursuing unjust enrichment because some unspecified legal remedy would be adequate if ONB could prove it.

---

[15] Bell Bank cites *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845 (8th Cir. 2014), which holds that a plaintiff's failure to prevail on a legal claim does not automatically render legal remedies "unavailable." It presupposes, however, an identifiable legal-remedy framework to evaluate.

## **CONCLUSION**

For all the reasons explained above, ONB respectfully requests that the Court deny the Motion to Dismiss. If the Court grants dismissal of any claims, ONB respectfully requests leave to replead.

Dated: March 10, 2026

Respectfully submitted,

**OLD NATIONAL BANK, Plaintiff**

By:  */s/ Mack H. Reed*
　　　One of Its Attorneys

Mack H. Reed (MN No. 398703)
Bethany R. Jewison (MN No. 505680)
LEWIS BRISBOIS BISGAARD & SMITH, LLP
90 South 7th Street, Suite 2800
Minneapolis, Minnesota 55402
Phone: (612) 428-5000
Fax: (612) 428-5001
mack.reed@lewisbrisbois.com
bethany.jewison@lewisbrisbois.com

　　　and

Christopher S. Griesmeyer (IL No. 6269851, *pro hac vice*)
Zachary Mulcrone (IL No. 6300387, *pro hac vice*)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois 60606
Phone: (312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com