UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Old National Bank, Plaintiff, vs. Sarah Adams, Kasey Bernu, Yvette Campbell, Kimberly Ellingson, Rachal Johnson, Michael McConkey, Sharon Vold, Daniel Yantes, and Bell Bank, Defendants. | File No. 25-CV-4636 (PJS/LIB) Minneapolis, Minnesota May 4, 2026 2:00 p.m. |

---

BEFORE THE HONORABLE PATRICK J. SCHILTZ
UNITED STATES DISTRICT COURT JUDGE

**(MOTION HEARING)**

Proceedings reported by certified stenographer; transcript produced with computer.

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Grieman Rome & Griesmeyer LLC<br>CHRISTOPHER S. GRIESMEYER, ESQ.<br>205 West Randolph St<br>Suite 2300<br>Chicago, IL 60606 |
| | Lewis Brisbois Bisgaard & Smith LLP<br>MACK H. REED, ESQ.<br>90 South 7th Street<br>Suite 2800<br>Minneapolis, MN 55402 |
| For Defendants Adams, Bernu, Campbell, Ellingson, Johnson, McConkey, Vold, and Yantes: | Spencer Fane LLP<br>HEIDI J. BASSETT, ESQ.<br>ARIEL K. LIERZ, ESQ.<br>100 South Fifth Street<br>Suite 2500<br>Minneapolis, MN 55402 |
| For Defendant Bell Bank: | Bradford Andresen Norrie & Camarotto<br>JONATHAN P. NORRIE, ESQ.<br>3600 American Boulevard West<br>Suite 670<br>Bloomington, MN 55431 |
| Court Reporter: | JANELL M. GRUBER, RMR, CRR, CRC<br>300 South Fourth Street<br>1005 U.S. Courthouse<br>Minneapolis, MN 55415 |

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT: We are here today on the case of Old National Bank versus Sarah Adams, et al. The case is Civil Number 25-4636.

If I could have the attorneys make their appearances, please. Begin over here.

MR. GRIESMEYER: Good afternoon, Your Honor. Chris Griesmeyer on behalf of the plaintiff.

MR. REED: Good afternoon, Your Honor. Mack Reed on behalf of plaintiff.

THE COURT: Good afternoon.

MS. BASSETT: Good afternoon, Your Honor. Heidi Bassett on behalf of the eight individual defendants, and my colleague Ariel Lierz is here as well.

MR. NORRIE: Good afternoon, Your Honor. Jonathan Norrie on behalf of Bell Bank.

THE COURT: All right. And good afternoon to all of you.

So let's see, who's taking the lead on the defense side? Ms. Bassett, are you doing that?

MS. BASSETT: Your Honor, if it's acceptable to the Court, we decided that I would argue the first two counts, trade secret misappropriation and breach of

fiduciary duties, and then Mr. Norrie would argue the remaining three.

THE COURT: Sure. However you want to do it. So Ms. Bassett, let me have you then at the podium. And just let me know when you're ready to go there.

MS. BASSETT: Thank you, Your Honor.

THE COURT: If you want -- that's pretty low, that podium. If you want, there's a button that's kind of where your belt buckle is. Right.

MS. BASSETT: I'm pretty short, so I don't know if it's -- it's probably more impactful for the others.

THE COURT: This courtroom was used today for a -- like a high school moot court tournament or something, so I suspect we had shorter people using that podium. I wasn't part of it, but all right.

So let's -- let's start -- let's start with the breach of the duty of loyalty claim, okay? And I know you know this, but just to kind of remind us all, we're in a different posture than we were the last time we were together. There, Old National Bank was seeking a preliminary injunction, and they had the burden of proving a likelihood of success on the merits and irreparable harm. And in considering that, I was allowed to consider really any evidence the parties wanted to submit, and that was then.

This is much different. As you know, I'm just looking at the four corners of the complaint. I can't look at those declarations. Those -- those are not embraced by the complaint. That's not what the Eighth Circuit has in mind.

I pretty much just have to look at the four corners of the complaint, and my only question is whether these claims are plausible. "Plausible" doesn't mean I think they're good claims. It doesn't mean I think they're likely to win. It's just plausible, and I have to make that assessment giving them all fair inferences on their side.

So where something happens and one could infer a pure motive or one could infer an impure motive, I have to assume impure motive for our purposes today. So that being the case, you know, my overall impression is we have a lot of really weak claims here, but I think some of them probably cross the plausibility threshold. So let's start with the duty of loyalty.

MS. BASSETT: Thank you, Your Honor.

THE COURT: We got a bunch of employees who leave.

MS. BASSETT: Yes.

THE COURT: They keep secret their intent to leave.

MS. BASSETT: Correct.

THE COURT: They all leave at the same time. They

all show up with their boxes and haul stuff out. They all show up at the new employer, you know, minutes later. They get on the phone and start to recruit, which is -- they have every right to do as long as they don't misappropriate trade information.

And the argument is that taking the inference for them -- again, taking the inference for Old National Bank that these employees didn't just leave, which they have every right to do, they didn't -- they just talked to their friends about leaving, which they have every right to do, but they purposely left in such a way to inflict maximum damage on Old National Bank and thereby increase their chances of being able to swipe their clients when they start at the new bank. I mean, why -- why isn't that at least plausible enough to go forward?

MS. BASSETT: Your Honor, because respectfully, that's not what the duty of loyalty analysis asks of us. First, we want -- we have to ask whether there was any solicitation while they were employed.

THE COURT: There was none.

MS. BASSETT: There was none.

THE COURT: There was no allegation of that; correct?

MS. BASSETT: I think we all agree on that.

So then the second question becomes, did they

otherwise compete with their employer? And the allegations that are in the amended complaint, save for what Your Honor just identified, the fact that they did all of this together, none of the rest of the allegations constitute competition. It's not competition to walk to work together.

THE COURT: Well, I mean, the duty of loyalty isn't limited to competition. I mean, if you -- if you are working for an employer and you're stealing from it, you're breaching your duty of loyalty. You're not competing, you're -- it's just stealing.

So the accusation here is, at least with respect to the -- and forgive me, there's a lot of names here. I can't remember who's -- who's who, but there's a couple of these ringleaders that are -- the allegation is are recruiting the other employees and -- and going to people who otherwise wouldn't quit and saying, Come on with us as part of this thing.

I think that would breach the -- I think the case law's pretty clear that if I'm still employed by Employer A, and while I owed that employer a duty of loyalty, I'm going to my co-employees and encouraging them to quit, I think that would breach the duty of loyalty.

MS. BASSETT: That's why it's important not to treat it as a group pleading, and that's -- that's where the amended complaint is primarily deficient in this claim,

because the parties -- the defense and the Court are forced to parse through to figure out, what are the claims against each?

As to at least four of the individual defendants, that allegation cannot be sustained, because, for example, with respect to Defendants McConkey, Vold, and Yantes, the only allegation ONB makes in the amended complaint is that they encouraged others to leave, not that they solicited.

THE COURT: And I agree -- I agree with you. There are some specifics. There's --

MS. BASSETT: Yes.

THE COURT: -- the two people who take the third person out to the -- the tavern and --

MS. BASSETT: Right.

THE COURT: -- so on. Okay, that's a specific allegation of recruiting. I understand that she has a different view and all that, but again, we're just here on the complaint and the allegations.

MS. BASSETT: Right.

THE COURT: So I would separate out encouraging other employees to leave, and I agree that that claim is not plausible against some of the employees. It just sort of says, everybody encouraged everybody else, which we have no reason to believe -- I mean, there could have been one person who was the ringleader who encouraged everybody. I

mean, we just don't know.

And -- but with respect to the -- even those employees, they still are alleged to have acted in concert with their other employees to leave in a way to inflict maximum damage on the employer they were leaving, and I think that would violate the duty of loyalty.

I mean, don't you -- let's say that discovery went forward, and it -- and I -- I'll just take -- there's no Smith here. So let's just say there was an employee named Smith, and we -- we -- we saw text messages from Smith with Bell Bank saying, I think I've got three in the bag. I'm going to go try to convince five others. What about timing?

And Bell Bank says, Well, geez, if you all leave together, that would really cripple them and give us a chance to swoop in and get their clients.

And Smith, while she's still employed, says, Okay, let's do it that way. These -- these SOBs, they have it coming.

That would be a -- that would be a violation of the duty of loyalty; right?

MS. BASSETT: Potentially.

THE COURT: I would think so on my hypothetical. It would -- well, they're kind of alleging something like that, right, that -- that there were -- the employees all got together, and they said, Let's leave at exactly the same

time. Let's keep the fact that we're going to leave totally confidential so we can just ambush them and quickly get to our new place and get on the phone and grab clients while they're down.

MS. BASSETT: The distinction -- and I agree with Your Honor that -- that on some level that could be plausible, but the distinction still comes down to the allegations made in the amended complaint against each of them, and that's not what's alleged as to some of the employees.

That's -- the only allegation that's made is essentially that they cooperated and went along, not that they actually took any action.

THE COURT: Well, they quit.

MS. BASSETT: Yes.

THE COURT: They kept it secret that they were going to quit.

MS. BASSETT: Yes, which --

THE COURT: And they quit at exactly --

MS. BASSETT: -- they could do.

THE COURT: -- the same time as their co-employees.

MS. BASSETT: Right.

THE COURT: And they showed up minutes later at the new employer. Those allegations are made against each

and every one of the individual defendants.

MS. BASSETT: Yes, those allegations are.

THE COURT: And then the question is, well, what -- what are fair inferences from that? One inference is they did nothing that violated the duty of loyalty. They just agreed as a group of friends and colleagues who were not happy where they were to move to a new employer, which they have every right to do.

Another inference is, they timed and planned their departure in a way to harm their employer, which they can't do while they're still under a duty of loyalty to that employer.

MS. BASSETT: If it -- if that was the -- if that was the premises that -- the premise that Your Honor read in the amended complaint and you believe that that's plausible, our arguments are preserved in the record, and I -- I won't --

THE COURT: Okay.

MS. BASSETT: -- argue with the Court about it.

THE COURT: Like I said, I don't -- as a judge, I run across this all the time where I read a claim, and it strikes me, This seems pretty weak to me. But, you know, it's really hard -- when I start to write the order in my head dismissing the claim, I find myself talking a lot about the facts. I find myself giving inferences the opposite way

that I'm supposed to give inferences. I think it's just going to be hard to dismiss the claim.

Let's go to the trade secrets claim.

MS. BASSETT: Certainly.

THE COURT: I'm 100 percent with you on the issue that it isn't enough to say the employees had access to trade secrets, which of course they did while they were there. That was their job. And they left and they, after leaving, started soliciting clients. That in and of itself, I agree, isn't enough.

Now, it's possible -- this whole -- we struggle -- every one of these restrictive covenant cases that I have now, we're struggling with the same issue, and that is, are the names and contact information of clients trade secrets?

And what's happened -- I don't remember if we talked about this at the last hearing, but what has happened is this. The legislatures and the courts have been putting pressure on or even banning noncompetes and nonsolicits.

What employers are doing is writing these incredibly broad confidentiality clauses and essentially using them almost as nonsolicitations, even though -- so, like, I don't know -- and I'll ask your opponents. I don't know, like, they seem to think that -- that your clients could never, ever, ever call the personal number of somebody who used to be their clients because that's a trade secret.

You can't use a trade secret.

So, like, for the rest of their life, they can't call this number? I mean, it's just -- it just doesn't make any sense.

At the same time, you can see a context in which the fact that somebody is a customer of a firm or somebody who's extremely hard to reach has a number that almost nobody has that -- that you could see how that could be a trade secret. But by and large, I'm not really warm to the idea that pure contact information is a -- is a trade secret.

But they do allege more here, and, you know, they allege -- and again, keep in mind, I have to assume these allegations are true, and I have to take inferences. We have things like -- you know, we have the backdrop of -- we've already talked about. We have a bunch of people who are about to leave. They're not telling their employer that they're about to leave. They're going to leave at exactly the same time. They're leaving in a way to create maximum harm to the -- the employer. These are the allegations.

And then they have these things, like on the morning of the departure, Ms. Campbell prints a spreadsheet with confidential information regarding 13 customers. She prints two copies. She left only one. Again, I have to give them inferences. The inference would be that she took

the other one. She wasn't supposed to take the other one. The only reason she would take the other one is to use it, use the information.

I mean, you know, how do I dismiss that on a -- on a 12 -- Rule 12 motion?

MS. BASSETT: Because it still doesn't satisfy all three questions that have to be asked. What was the trade secret that each individual again had?

THE COURT: Well, I'm just talking about this one, Campbell.

MS. BASSETT: Right. Okay.

THE COURT: All right?

MS. BASSETT: So with respect to Campbell --

THE COURT: It was a spreadsheet regarding -- I don't -- I don't remember if the briefs -- I take my own notes and I'm not sometimes not a great notetaker.

MS. BASSETT: No, you're correct, Your Honor. It's alleged that she took customer contacts and that she printed documents, which included spreadsheets, some documents related to a real estate file, and a call list that was printed about a month prior to her --

THE COURT: Yeah. Well, this one I'm talking about was the morning they were leaving.

MS. BASSETT: Okay. That was the --

THE COURT: As she was -- as she was walking out

the door --

MS. BASSETT: That was the spreadsheet.

THE COURT: -- the allegation is she's printing information and --

MS. BASSETT: Right.

THE COURT: -- she prints two copies and --

MS. BASSETT: Right.

THE COURT: -- when the other people get there, there's one copy. Where did the other copy go?

MS. BASSETT: Now, with respect to Ms. Campbell specifically, the next question then becomes, did she acquire whatever she had through her confidential relationship? For the spreadsheet, arguably yes, because it was in ONB's computer system. I think that they --

THE COURT: Yeah, she'd only have access to this as an employee; right?

MS. BASSETT: Based on what we know so far, we -- I think the Court would have to presume that.

THE COURT: Yeah.

MS. BASSETT: It becomes much more tenuous when it comes to the customer contacts in her cell phone, because there's nowhere in the --

THE COURT: Yeah, I'm not -- I'm not really worried about the --

MS. BASSETT: Okay.

THE COURT: -- the contact stuff.

MS. BASSETT: So then the third --

THE COURT: There's a lot of other stuff that is mentioned.

MS. BASSETT: But then the third question becomes, when, how, or where did she use that spreadsheet? And that's not alleged. The only allegation that's made is that she called three customers. They don't allege that that spreadsheet contained those customers' information at all.

THE COURT: Well, I don't think you have to use a trade secret to be liable in taking a trade secret. Improperly misappropriating a trade secret is itself a violation of the law, whether you eventually use it or not.

MS. BASSETT: Well, it -- that would depend on the context in which she took it.

THE COURT: Well, I assume -- she's on her way out the door. Again, I have no idea if any of this is true. I just have to assume what's in the complaint is true.

She's on her way out the door. On her way out the door, she's -- she prints two copies of what looks to me like trade secrets, and she, the allegation is, keeps one for herself and leaves one there.

And, I mean, she's on her way over to Bell Bank to start working for them and she's doing this on her way out the door. That seems at least plausible that she's acquired

trade secrets there.

MS. BASSETT: I think that at a minimum, ONB would need to at least allege that the information contained in that spreadsheet was a trade secret.

THE COURT: They did.

MS. BASSETT: That it -- they alleged that it was a confidential document.

THE COURT: Yeah.

MS. BASSETT: But --

THE COURT: But, I mean, that it had confidential -- I can't remember exactly what they said about it, but they --

MS. BASSETT: I think we're on the same page, though. I understand what you're saying.

But ONB could -- without identifying it, it doesn't put a defendant on notice of what it is they're defending against.

THE COURT: Yes, it does. It's -- it's that thing she printed two copies of on the way out the door.

MS. BASSETT: And if she printed --

THE COURT: She would presumably remember what she printed two copies of on the way out the door and kept one and left one. So I think it gives her notice.

What about -- they also say with respect to Mr. McConkey that several days before he left, he printed

and took a proposal for acquisition financing for a particular customer, and the allegation in the complaint is he had no legitimate business reason whatsoever to access this. They don't explain why, but that's what they say.

MS. BASSETT: They said he had no legitimate reason to access it at that time.

THE COURT: Mm-hmm.

MS. BASSETT: Because the proposal was from the prior August. So the proposal was outdated, for starters, and all of the employee defendants, according to ONB's own pleading, continued to work until they left. So for Mr. McConkey to continue working, if a customer asked him a question about something that they worked on last August, it would be entirely reasonable. And this is where the obvious alternative explanation analysis comes in.

If they were working, doing their jobs until the last day of their employment, and even if that morning they were wrapping up things or forwarding things to other colleagues to pick it -- to pick it up after they left, that's an obvious alternative explanation as to why they continued to access the same things that were always required in the scope of their work.

THE COURT: But they -- they have pled -- with respect to this -- this particular thing, the pleading is that he didn't have a legitimate -- I agree with you

completely. The fact that people are looking at confidential information while they're still working there, it's not only permissible for them to do so, it's their job. It's their obligation to do so. So that in and of itself I'm not concerned about.

What I'm concerned about is the complaint says that McConkey had no legitimate business reason while employed by Old National Bank to look at this particular thing. The implication being, he wanted to take this as a -- as an example or because there was something in there that was going to help him recruit. I don't -- I don't know, but again, how do I dismiss that on a Rule 12 motion?

MS. BASSETT: I think that this one might be a little distinguishable from Your Honor's concern about Ms. Campbell, because the amended complaint alleges that he printed the proposal from last August on December 2nd.

THE COURT: Mm-hmm. After he -- he knew he was leaving.

MS. BASSETT: He knew he was leaving, yes.

THE COURT: Mm-hmm.

MS. BASSETT: But remember that ONB has --

THE COURT: And that -- we have to keep -- I have to remind you that also keeps pleading he didn't have a legitimate business reason for printing that.

Now, that could be wrong. He could have his

deposition taken, and in the first two sentences of his answer could make it perfectly clear that he had a perfectly legitimate reason for it, but this is all about allegations today.

MS. BASSETT: Yes, of course. But ONB, remember, had a lot of protections in place. It pleaded all of these protections in place to catch unusual activity. So if he was doing something improper, by ONB's only pleading, something in the system would have triggered.

THE COURT: Well, that --

MS. BASSETT: They're closely monitored.

THE COURT: Yeah, none of these plans are 100 percent. I get that, and this is an unusual claim in that I noticed -- because they had software that kept anybody from downloading stuff on their thumb drives -- usually this is all about thumb drives, these trade secrets cases. We're left -- it's a very old school -- printing stuff on your way out the door, it's a very old school trade secrets claim, but they still do make these allegations, and it's just hard for me to know how to dismiss these.

They say on December 5th, Ms. Bernu printed off a loan file and closing documents for several customers. You know, I don't know anything about that, but that's a specific allegation against a specific employee. It's just -- it -- it's -- it just -- again, I keep saying this,

but it's just hard for me to know how I can dismiss that on a Rule 12 motion.

MS. BASSETT: We're talking about Kasey Bernu; is that correct?

THE COURT: Mm-hmm.

MS. BASSETT: Okay. I wanted to make sure I'm on the right --

THE COURT: Yeah, I'm sorry. Yeah.

MS. BASSETT: -- on the right defendant.

I don't want to be repetitive to the Court. Their allegation is she printed account statements on November 24th, and --

THE COURT: I have December 5th in my notice.

MS. BASSETT: Yes, and that was the next part.

THE COURT: Okay.

MS. BASSETT: That she printed a loan file and closing documents for several customers, and at the same time, ONB says that her job was to support relationship managers. So -- and I -- obviously I accept if the -- if the Court is not persuaded that there are obvious alternative explanations, but simply saying documents were printed that you've printed throughout the course of your work, but now we can't find them, so you stole them, that doesn't rise to the level of plausibility.

That's simply consistent with someone stealing

them. But when there is all of this other information, they've worked there for decades, they've always engaged in this activity, and now because they're planning to leave, suddenly their normal activity is suspicious, doesn't get us over that line to plausibility. It's only possibility.

THE COURT: Well, I mean, that's your argument. I -- I get it, but it's -- it isn't just that. It's -- from their perspective again, this is someone who -- who's -- had agreed that she was going to leave, who wasn't telling her employer that she was going to leave, who was plotting with her other co-employees to leave in such a way as to inflict maximum damage on her former employer.

In that milieu, what might be an obvious, innocent explanation isn't so obvious or isn't so innocent. I mean, there's -- there's two potential inferences here, and on a Rule 12 motion, I have to take their inference.

So, you know, I -- the thing is is I could -- I could pick through all this and sort of, like, say, Well, with respect to this employee, what's alleged? With respect to that employee, what's alleged?

But I'm going to let the loyalty claim go forward. They're all going to get deposed anyway. They're all going to have to answer questions about this anyway. I just -- I'm just not sure it would be worth the candle to write a 50-page order picking through all this when, with a summary

judgment motion, I'm guessing a lot of these claims are going to die on the vine once your employees testify and provide their explanations. I remember some of this from our last hearing, where there was some really obvious, innocent explanations for some of this behavior.

It's just -- I'm just telling you what I'm struggling with here.

MS. BASSETT: Understood. May I ask Your Honor to take a look at one in particular?

THE COURT: I'm sorry?

MS. BASSETT: May I ask you to take a look at one of the defendants in particular?

THE COURT: Yes, of course.

MS. BASSETT: On the trade secret claim --

THE COURT: Uh-huh.

MS. BASSETT: -- Sharon Vold. Now, obviously a misappropriation claim requires not only that you acquired the trade secret but also that you used or disclosed it. And as to Ms. Vold, they allege that she took printed documents, such as a how-to lease guide and a pipeline report that she obtained through her employment, but the amended complaint does not anywhere allege that she used or disclosed anything.

THE COURT: Well, A, is that -- I could be wrong, but is it true that if I steal a trade secret but don't use

it, I haven't misappropriated a trade secret until I use it?

MS. BASSETT: Use it or disclose it?

THE COURT: Yeah. So if I -- if I work for Coke, and I steal the secret formula and I take it home and put it in my drawer, I haven't misappropriated a trade secret until I disclose it or use it?

MS. BASSETT: Well, I don't think they actually alleged that she took it home.

THE COURT: I'm just asking. You said that --

MS. BASSETT: You mean if it's stolen.

THE COURT: -- you don't have a trade secret claim unless use it's used or disclosed.

MS. BASSETT: If someone doesn't have the right to otherwise access it or print it, for example, so they would have stolen it, then that could still be misappropriation.

THE COURT: But she didn't have the right to the stuff she printed out; right? I mean, she had the right to print it out while she was an employee, but she wouldn't have had the right to take it with her; is that correct?

MS. BASSETT: We don't know what it is, and so we don't know if she had the right to take it with her.

THE COURT: Well --

MS. BASSETT: In theory --

THE COURT: -- it was a how-to guide to -- I can't remember what it was a how-to guide to. You just told me.

MS. BASSETT: Leases. Something about real estate leases.

THE COURT: Yeah.

MS. BASSETT: Yes. I think we're missing a significant piece here, though, Your Honor, and that is the subject of reasonable efforts to protect secrecy. That applies whether we call it confidential information or trade secrets.

THE COURT: Sure. And they've alleged a whole bunch of things they did to protect their -- their confidential information.

MS. BASSETT: Not according to what the amended complaint says. That's the concern that we have.

THE COURT: It's got several paragraphs about things they did to safeguard their information.

MS. BASSETT: Right, and the actual --

THE COURT: It was need to know. It was password protected. There was monitoring software that would prevent it from being downloaded onto a private, you know, thumb drive. They allege a bunch of things.

MS. BASSETT: And they also say that when files are no longer needed, they're discarded.

THE COURT: Mm-hmm.

MS. BASSETT: Another obvious alternative explanation.

THE COURT: For?

MS. BASSETT: For why -- for example, when something is printed a month ago and now they can no longer find the copy.

THE COURT: Well, I think they're talking about a routine, you know, document deletion thing that most people have. It's -- it's -- I don't think -- I don't think you can win on that they didn't take -- I don't think you even argue that in your brief that they don't -- they didn't take enough measures to keep it secret.

Okay. Anything more you want to say on the issue of trade secrets?

MS. BASSETT: Not on that issue, Your Honor. I think that -- I think that the Court understands our position.

Just so that I understand whether we should make the argument or not, am I correct that the Court is not concerned about the contacts on cell phones for purposes of this argument?

THE COURT: You know, I -- as a general matter, I think it's highly, highly unlikely that that is a trade secret. I mean, as I say, I don't know how it can be. And I've never had an employer explain to me how it's legal to forbid someone from calling a number or reaching out to someone that they met through their work for the rest of

their lives.

I mean, if you actually wrote that into a -- on a clause in a contract, it would never survive, but they're trying de facto to do the same thing.

Now, as I also said, I could see that there's a certain type of phone number or a certain type of knowledge about a client that maybe could be confidential. Let's just say the business sold some incredibly rare service that, you know, few people in the world even know who needs this particular service, like a treatment for a particular rare disease or something. That I could see the fact that this person got services from this company, is one of the very few people in the world who need these services, I could see that would be a valuable trade secret.

But the fact that somebody banked at Bank A instead of Bank B, that strikes me is probably not a trade secret. And the fact that somebody's got a phone -- you can find anybody's phone number online, especially if you're willing to pay. You can find anybody's phone number. I know as a judge. We try very hard to protect our personal information, and it keeps popping up on the internet, so -- so I can't, like, tell you I'm ruling that it's not a trade secret. I can tell you that the wind is very much on your -- at your back on that one.

MS. BASSETT: In that case, Your Honor, I will

reserve my argument specific to that subject, and then if I -- depending on what my colleague argues, maybe I will follow up with the Court if there's any --

THE COURT: Sure. You're welcome to come back up.

MS. BASSETT: Thank you.

THE COURT: Okay. Thank you.

I think what I'll do is just let me talk to -- let's see. Mr. Griesmiller? Did I say -- I know --

MR. GRIESMEYER: It's Griesmeyer.

THE COURT: I know I stumbled on this last time. I probably did. Is it Griesmiller or Gries --

MR. GRIESMEYER: It's Griesmeyer.

THE COURT: Griesmeyer.

MR. GRIESMEYER: Griesmeyer, yes.

THE COURT: Griesmeyer.

MR. GRIESMEYER: Unfortunately.

THE COURT: Yeah, I'm sorry. Mr. G.

So let me know when you're ready to go there.

MR. GRIESMEYER: Your Honor, you -- I think you definitely -- you understand obviously the issues. You understand that we are at the pleading stage. And certainly the obvious alternative explanations that opposing counsel keeps offering, what that is is that's an invitation for you to, you know, construe facts in the favor of the defendant, which is exactly what 12(b)(6) says you can't do.

THE COURT: It's always -- I mean, *Iqbal* and *Twombly* create this really delicate line drawing for us; right? On the one hand, there's language in there about if you just plead something and, like, you know, it could be innocent or it could not be and it's basically, you know, equal that -- that that's not a plausible claim, that you have -- you need something to kind of push it over.

On the other hand, we have a bunch of other law that tells us on a Rule 12 motion if A is a fair inference and B is a fair inference, you have to take the inference for the plaintiff. And I think that's this kind of case here.

I mean, you -- the whole staged leaving together in secret, blah, blah, blah, I'm sure there could easily be innocent explanations for that. But the fact that -- you know, that your inference that you're alleging, it's not implausible. It's certainly possible. These wouldn't be the first group of employees to leave in a way to screw the old employer, and that would violate the duty of loyalty, so I think -- I think that has to go forward.

The trade secret claims, it's -- I think that's a little closer call. Tell me -- and if we talked about this last time, I apologize. I don't remember, and I -- I haven't read the transcript, but what's your view on this client name, client contact information? I just have a

real --

MR. GRIESMEYER: Sure.

THE COURT: Trade secrets are, I mean, stuff that is protected. It's forever.

MR. GRIESMEYER: True.

THE COURT: Unless it becomes public, and I -- so what does that mean? Like, if one of these employees has the cell phone number of a client, they're never allowed to call that again?

MR. GRIESMEYER: Judge, what I don't want to do is lose the forest for the trees here.

THE COURT: Yeah.

MR. GRIESMEYER: So in our complaint, in our amended complaint, these are the categories of trade secrets that we allege in paragraphs 71 to 73: Customer financial and operational information, underwriting analysis, internal credit memoranda, loan requests, loan approvals, loan pricing terms, loan terms, loan internal profitability information, loan renewal, and maturity date.

THE COURT: All that's trade secrets.

MR. GRIESMEYER: Exactly.

THE COURT: I don't have a problem.

MR. GRIESMEYER: And so --

THE COURT: All of that I think you did enough to try to keep secret. The problem is you've listed a bunch of

categories of trade secret information that every bank has. What you need to go further is to plausibly allege with respect to each of these employees that they took it.

MR. GRIESMEYER: And we do. We do that in for -- with respect to Ms. Campbell paragraph 74 through 79.

THE COURT: Yeah. You do it with respect to some, and you've heard me -- you heard me mention some, but there's some not so much. You kind of rely heavily on the contact information in the phone.

MR. GRIESMEYER: Well, with respect to -- the only -- the only two employees where we don't identify in our first amended complaint specific documents and specific files that they accessed, took with them, that contain all of these categories of information, not just customer names, customer contact information, but things like pricing terms, loan maturity date, all of this stuff. They took that with them. The only two employees that their print logs don't show that they printed that stuff and took that stuff are Adams and Johnson. And with respect to those two employees, we do allege that they admit that in their phones they do have customer names and contact information.

THE COURT: Those are -- those are your weakest claims in my opinion.

MR. GRIESMEYER: Sure. And those are -- but there is a policy and there was a -- and the idea that these

employees, you know, were allowed to use their cell phones and were allowed to have this information in their cell phones, all of that stopped once Old National came in.

That might have been the way things happened at Bremer, but once Old National came in, there were new policies. There's a new sheriff in town with new policies and new procedures. Every single one of these employees was trained on those policies, acknowledged them, agreed that they would follow them. And those policies included a confidentiality policy that says, I will not keep client names and contact information in my cell phone. I will not leave with that information. I won't.

They knew that. They did it anyways. So that's --

THE COURT: So that might be a breach of contract action you'd have against them. I'm not sure that makes them trade secrets for purposes of the statute.

MR. GRIESMEYER: Understood.

THE COURT: Yeah.

MR. GRIESMEYER: Understood. But -- and so the other point, though, right, is it's not just a matter of client names and contact information. It's the fact that after they left, they specifically targeted a specific group of clients.

THE COURT: The 40 percent. Yeah, sure.

MR. GRIESMEYER: Sure, and --

THE COURT: And I forgot to mention that, but that's a --

MR. GRIESMEYER: Right.

THE COURT: Yeah. I do think -- you know, my inclination is that you do have -- we're looking if you have enough plus factors. It isn't -- in every one of these cases, employee works at old employer, has access to trade secrets. Goes to new employer. That's not enough.

You need something -- something that makes us think that they might have taken trade secrets with them, and you've -- you've mentioned a number of things. Printouts. You've pled that, you know, and -- with respect to some of them there's no legitimate business reason.

Let me ask you just -- I was curious with respect to the printouts. Do you have -- did you look at, like, the history of the particular employee? Like Mr. McCon -- I forget -- McConkey. So Mr. McConkey prints out this thing. Did you look to see, did he regularly print out stuff like this even pre November of 2025?

MR. GRIESMEYER: We did, we did. And we allege -- in our complaint, we allege that the print activity and the access activity for these employees during that three-week period after they've accepted employment at Bell and before they notify us that they're leaving that the activity was

highly excessive and unusual compared to the prior activity.

THE COURT: So you did go back and look at their prior --

MR. GRIESMEYER: We did.

THE COURT: -- print histories, and this is a -- it's aberrational, the printing they're doing.

MR. GRIESMEYER: It is.

THE COURT: Okay. I was just curious about that. The -- I'm sorry, just give me one second here.

I'm just curious. You have like with respect to this McConkey printout, you say that there was no legitimate business reason for him to do that, but you don't explain. I'm just looking for an example. So, like, why? Why was that -- why would he have not had a legitimate business reason to print the -- whatever this was, Proposal for Acquisition Financing at the time he printed it?

MR. GRIESMEYER: Sure. Well, because it -- because of the timing of it, because it's dated from August of 2025, and also I believe because of the nature of his position, the nature of his role with the company.

THE COURT: Okay. So your people you're working with there say that given his role and given the timing, they can't think of a legitimate reason for it?

MR. GRIESMEYER: Exactly.

THE COURT: Okay. Sorry, I'm just making sure I

don't have any questions I wanted to ask you.

So getting back to a question that we've talked about, the -- that is client names and contact information. So these employees did not have nonsolicitation clauses; right?

MR. GRIESMEYER: That is correct.

THE COURT: So as long as they don't misappropriate trade secrets or otherwise violate the law, there's nothing that keeps them from showing up to Bell Bank, picking up the phone and -- and soliciting people who happen to be customers of Old National Bank?

MR. GRIESMEYER: That is correct.

THE COURT: Okay. I just want to make sure we agree on that. So in your view what they did here is, among other things, they used their knowledge of the amount of business that people were doing with Old National Bank to target them, which is how they ended up targeting 40 percent in seven days or something; right?

MR. GRIESMEYER: That is correct. Not just the amount of business, but also whose loans were happening to be maturing soon, who would need refinancing soon, you know, who guarantors were, what the loan amounts were, all of the -- all of that stuff, yes. That's how they figured out who to target.

THE COURT: A couple of the things that when you

went through specifically about particular employees misappropriating trade secrets, you talked of Ms. Campbell giving an ONB customer advice about an ONB loan and McConkey discussing the status of an ONB credit extension with an ONB customer.

I have a vague memory from the last time we were here that they at least portrayed -- I don't know if it was these two communications, but some of these communications is helping ONB, helping ONB's customers, making sure that they knew that they had deadlines or whatever. Is that a -- would that be a misappropriation of trade -- I'm not asking you to agree.

MR. GRIESMEYER: Mm-hmm.

THE COURT: Hypothetically speaking, somebody's got some loan coming due or that needs renewal or that was in process, and he calls McConkey and says, I heard you left. What am I supposed to do?

And McConkey says to him, You've got four more days. You know, talk to so-and-so at ONB. I assume that's not misappropriation, or do you think it is?

MR. GRIESMEYER: It is misappropriation --

THE COURT: You think it is?

MR. GRIESMEYER: -- for him to take the information about, you know, when this particular customer's loan is maturing.

THE COURT: Let's say it's in his head, so he has no choice but to take it, because he has to take his head with him when he goes. So it's in his head, and this customer calls him, and he -- he tells him, you know, accurate information about the status of his loan and encourages him to talk to somebody at ONB about getting the extension or renegotiating it, whatever. Is that -- is it your view that the trade secret laws literally prevent a former ONB employee from talking to former ONB customers about their business there?

MR. GRIESMEYER: It depends on who -- who brings that up. So if the -- so if the former customer says, you know, Mr. McConkey, it's great to hear from you. You know, I understand that you've left. Hey, what do I do? I've got this loan here with ONB that matures on such-and-such a date.

THE COURT: Right.

MR. GRIESMEYER: Okay. Well, then Mr. McConkey hasn't misappropriated that information. This is information that the customer has and the customer is voluntarily disclosing.

THE COURT: So instead the customer says, We just talked yesterday about this loan, and I just want to make sure I still got the four days or whatever.

And McConkey, based on his memory of yesterday's

conversation, talks to him about it, says, Yeah, you still have the four days.

MR. GRIESMEYER: Again -- again, if this is something that the customer is bringing up and bringing it to McConkey, that's not a misappropriation. But if it's a document that McConkey took, and it's a document that McConkey is looking at and figuring out which customers do I call and making those calls --

THE COURT: Yeah, this is why I just -- honestly, I think this -- I think I need a factual record on this. And, you know, I -- my inclination is to let these claims go forward. And if I do that, I do expect you -- when you look at e-mails or text messages and you look at the testimony, if there's things that clearly aren't, then that they should drop out of the claim. I shouldn't have to dismiss them at summary judgment.

Obviously if you have a good-faith argument, you have a good-faith argument. That's fine. But I'm guessing that discovery's going to sort a lot of this, but we're at the inference stage here, not at discovery.

With respect to these other claims, claims III, claims IV, claims V -- Count V, if hypothetically I or the jury decide there was no breach of the duty of loyalty by any of the employees and we decide there was no misappropriation of trade secrets by any of the employees,

how would you recover on any of these other claims?

MR. GRIESMEYER: I don't think we would. I think they would rise and fall with that. I think the --

THE COURT: Okay. So what's the -- what's the point of the claims? You know, I -- you have a -- you have a civil conspiracy claim. If they didn't do anything wrong, then they obviously didn't conspire to do anything wrong. And if they didn't do anything wrong, then nobody aided and abetted something wrong. These are just the sort of throw-in claims that I just don't -- I don't know why they matter one way or the other at this stage.

MR. GRIESMEYER: Right. Well, we don't know what discovery is going to reveal; right? And there may be other wrongful conduct, right, that we're not aware of. But certainly, you know, the -- if none of the activity that we allege they've engaged in, if none of that at all constitutes any type of a tort, right, and they haven't committed a tort, well, then, okay, there's not going to be tortious interference, and of course there's not going to be any type of civil conspiracy or aiding and abetting.

THE COURT: So one -- if there is wrongdoing, then I understand how at least one of these claims, maybe a couple, give you the rope into Bell Bank.

Now, I'm wondering what your theory is against Bell Bank, because Bell Bank is your competitor. It doesn't

owe you any duties whatsoever. It can -- it can hire away your employees as much as it wants. It can hire away experienced attorneys with goodwill -- I mean experienced employees with goodwill. It can do that all it wants.

It can time its offers to make sure it's inflicting as much damage as -- you know, this is what business competitors do to each other. It doesn't violate any law. So what is it -- given that Bell Bank doesn't have any obligations to you, what is it -- what do you think your best claim at this point, based on what you know, is against Bell Bank?

MR. GRIESMEYER: Sure. Well, I think it is the civil conspiracy aiding and abetting, and I think it is also the unjust enrichment claim. And so the theory as to Bell is -- everything you said about a competitor, you know, is correct to an extent.

You know, what a competitor can't do is when a senior-level officer executive of the competitor comes to them and says, Let me be your agent on the inside and let me go find people to recruit and bring to you, and accepting that, they know that that's a breach. They know that this -- the president is breaching their fiduciary duty.

THE COURT: Yeah, that could be, to like -- you have to be kind of running an agent inside of the competitor.

MR. GRIESMEYER: Which is exactly --

THE COURT: You would know that the agent is violating her duty of loyalty, and you would be aiding and abetting that bad duty.

MR. GRIESMEYER: Which is exactly what we allege with respect to Ms. Ellingson and Ms. Campbell.

THE COURT: Yeah. This is, again, where a factual record is going to help us.

Okay. I -- I don't -- I don't see any point in doing anything with these other three. They don't expand the scope of discovery in any way, and I think it's just best that we get a full record here. You do the pruning that you're going to have to do after you get a full record, and then we'll -- we'll probably -- I'm sure we'll be back on probably cross motions for summary judgment would be my guess. But I'll be a senior judge by then, so hopefully I'll have a little -- a little more time. All right. Thank you.

MR. GRIESMEYER: Thank you, Your Honor.

THE COURT: Let's see. Mr. Norrie. Sorry, I've already taken lots of wind out of your sails.

MR. NORRIE: That's okay, Your Honor.

THE COURT: So is there -- I know you've got these -- these claims. I don't see them as difference makers. I don't think they're going to make anybody liable

who won't already be liable if -- if we find a breach of a duty of loyalty or a misappropriation. And if we don't find any, I don't know how they would create any liability, and so they're kind of throw-in claims.

My inclination, as I said, is just to let them go forward, because they're not going to in any way -- unless I'm missing something -- expand the scope of discovery. And I'm hoping that I'll never see these claims again and then we just come back here on a full factual record and we can do trade secrets and we can do breach of the duty of loyalty.

And I -- I know that you would rather that I dismiss the claims now, but other than that, is -- am I missing something about the scope of discovery or the length or expense of the proceeding?

MR. NORRIE: Your Honor, I can't say that you're missing anything necessarily about the scope of discovery, but with all due respect, I think what we're missing are some really key points of law that are required for the claims to go forward.

THE COURT: Mm-hmm.

MR. NORRIE: And so I think as a matter of rigor for the Court, we need to make an appropriate decision to not let claims that haven't been appropriately established on the pleading stage survive.

And as a -- as a perfect example, the tortious interference with contract claim. Well, the big problem there is, I have no idea what contract they're talking about. They haven't specifically identified, Here is a contract. There are these oblique references in the complaint to deposit accounts and loan and credit agreements and treasury management agreements --

THE COURT: Well, all banks, their relationship with all their customers is contractual.

MR. NORRIE: Yep.

THE COURT: They have numerous contracts. And you're right, there certainly isn't an allegation that any were breached. My own view is Minnesota law requires a breach, but as you know very well, the Eighth Circuit has spoken two different ways on this, and the Minnesota Supreme Court has spoken two different ways on this. I think the better -- the better interpretation is that that's still an element of -- of a cause of action, but it's -- it's ambiguous right at this point.

So -- and I'm also not sure how they claim -- even if a breach is not required, there's that language about makes it more difficult, expensive, whatever to -- so I don't see how that's alleged, unless causing the customer to -- to not breach their contract but basically end their contract legally to go to a different bank, I don't know if

that counts as something that makes a contract more expensive. It's -- it's a --

MR. NORRIE: And that's the problem, Your Honor, with -- with the plaintiff's position here is they're conflating that case law from the 1950s case that the Minnesota Appellate Courts have -- have essentially gutted, have said that this doctrine has shifted substantially since that time, and it is no longer good law.

And I recognize that there is -- there is some degree of imperfection in terms of what the Eighth Circuit has said, but -- right? We can -- we can take this back to an *Erie* analysis, right, and simply say for this Court --

THE COURT: Yes, but I'm still bound -- I understand, but I'm -- if the Eighth Circuit has done -- if the Eighth Circuit says that something is Minnesota law --

MR. NORRIE: Yeah.

THE COURT: -- I have to follow what they say is Minnesota law, even if my own take on Minnesota law is different, unless there's been an intervening something.

Now, the problem here is the Eighth Circuit has said both, and within a couple of years of each other they've said both.

MR. NORRIE: And in fact -- so in the *Central Specialties* case in what this Court has observed was dicta for a good reason, because it was absolutely not germane to

the resolution of the case, right, it offers --

THE COURT: Whereas in the later case, it was.

MR. NORRIE: It offer --

THE COURT: It was the core holding on that issue.

MR. NORRIE: Right. It offers that commentary in the *Cardio Systems* case the following year in 2022, the Eighth Circuit, which is cited on page 31 of our opening memorandum. So now we have a case where the Eighth Circuit a year after *Central Specialties* reaffirms the correct position of Minnesota law.

And then we have three years after *Central Specialties*, the Minnesota Court of Appeals reaffirms the requirement of breach. And so I -- I don't think that there is an ambiguity in the sense I think that there is an imperfection, but as a matter of *Erie* doctrine, I think it's very clear starting in 1982 with the *Furlev* case and *Kjesbo* and *Kallok*, right, they make it very clear what the state of the law is in Minnesota. So I think this Court could confidently rule on that basis.

THE COURT: Okay.

MR. NORRIE: And if it --

THE COURT: Although I'm not sure what good -- what good it would do. It's just not -- not going to really move the ball one way or the other.

MR. NORRIE: And I think, Your Honor, in terms of

a practical sense of importance, right, a claim that can, as that claim can under some circumstances attach attorneys' fees; right? The existence of that claim or not in a piece of litigation can matter to the development of that litigation, because particularly of the presence of a potential attorneys' fees hook.

And so I think it becomes not necessarily just a function of what's going on in discovery, but if there is a theoretical claim out there that might have attorneys' fees as opposed to a claim that doesn't have attorneys' fees, that has a different impact on the life of a piece of litigation.

THE COURT: Okay. On the conspiracy/aiding and abetting claim and unjust enrichment, I think those are pretty tied up with the first two claims, because -- you know, if there's nothing bad that happened, there's nothing to aid and abet or to conspire. And if there's nothing bad that happens, there's nothing unjust about any enrichment. And I realize if I pushed it really hard, I might be able to find a route to dismissing those, but it would be kind of artificial, and it would be subject to them being -- just being reinstated if the discovery turned out in a way that was unfavorable to your side.

MR. NORRIE: Perhaps, Your Honor, but not necessarily with respect to the issue of preemption in

particular with the Minnesota Uniform Trade Secrets Act. I mean, I -- in my opinion, that's a really problematic element of this existing complaint is that we have all of these overlapping claims that bootstrap elements of the trade secret claim --

THE COURT: Yeah, but if it -- I got the argument, but --

MR. NORRIE: Yep.

THE COURT: But if I were to go through the -- like the loyalty claim and the trade secrets claim -- well, not the trade secrets claim. It is the trade secrets claim. But if I cross out the -- when, for example, on the duty of loyalty they're listing the suspicious circumstances, one of the suspicious circumstances they list is the alleged stealing of trade secrets. They're not seeking to recover for the stealing of trade secrets. They're listing that as a reason to believe that the employees were breaching their duty of loyalty, so I don't think that's preemptive as such, but again, that's -- you know, what my rulings sound like. You know, insofar as you're trying to recover a second time for breach of -- or for misappropriation of trade secrets, your claim is -- is preempted by the state statute, it --

MR. NORRIE: The idea is that you cannot be unjustly enriched -- or sorry, the plaintiff could not seek a claim of unjust enrichment premised upon somebody having

what is a trade secret, what they call at page 45 of their brief the benefit --

THE COURT: But there's other ways they -- there could be unjust enrichment here. If, in fact, Bell Bank was running an agent inside of -- of Old National Bank, you know, it could be unjust enrichment because of the -- I don't -- unjust enrichment claims, they drive me crazy. They're pled in every claim -- every case, and, you know, in my 20-year career, I -- you know, there's maybe been recovery on two of them. They're always a toss-in, but they don't -- they don't change anything about the scope of discovery or the expense of the litigation.

MR. NORRIE: It's particularly problematic, Your Honor, from a doctrinal perspective when we look at it, because, right, what they're saying here is, for example, goodwill, customer relationships, and training. That it is unjust that Bell now has the training that these employees have --

THE COURT: Yeah, that's -- that's not the law. They can hire -- they can hire anybody over already they want. Right. That's obviously --

MR. NORRIE: But that's the essence of their claim as they have pleaded it.

THE COURT: Well, there's more to it. There's a lot of reasons they say the -- the -- you know, they

incorporate paragraphs 1 through 1,000,000 or whatever -- whatever they are, so.

Okay. Anything more you want to say at this point?

MR. NORRIE: No, Your Honor. Thank you.

THE COURT: Okay, thank you.

Let's see. Anything more, Mr. Griesmeyer?

MR. GRIESMEYER: No, Your Honor.

THE COURT: All right. Thank you for your help with the case. I will take the motion under advisement, get an order out as soon as we can.

And thank -- I know I changed the time of this and then we changed the location, and thanks for being patient with me. There's a lot of -- a lot of moving parts right now, so I appreciate it. Thank you.

*(Court adjourned at 2:54 p.m.)*

* * *

I, Janell M. Gruber, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

*s/ Janell M. Gruber* Janell M. Gruber Date: May 12, 2026
Janell M. Gruber, RMR, CRR, CRC